ROBERT J. SCHWARTZ (CSB #254778)
TRI-VALLEY CARES
2582 Old First Street
Livermore, California 94551
Telephone: (925) 443-7148
Facsimile: (925) 443-0177
Email: rob@trivalleycares.org

STEVEN SUGARMAN (*Pro Hac Vice*)
BELIN & SUGARMAN
618 Paseo de Peralta
Santa Fe, New Mexico 87501
Telephone: (505) 983-1700
Facsimile: (505) 983-0036
Email: sugarman@bs-law.com

Attorneys for Plaintiffs
TRI-VALLEY CARES, MARYLIA KELLEY,
JANIS KATE TURNER, and JEDIDJAH DE VRIES

E-filing

FILED
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
MAR 1 0 2008

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CV 08 1372

| | |
|---|---|
| TRI-VALLEY CARES, MARYLIA KELLEY, JANIS KATE TURNER, and JEDIDJAH DE VRIES, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| UNITED STATES DEPARTMENT OF ENERGY, NATIONAL NUCLEAR SECURITY ADMINISTRATION, and LAWRENCE LIVERMORE NATIONAL LABORATORY, | ) ) ) ) ) ) ) ) |
| Defendants | ) |

Case No.:

COMPLAINT FOR DECLARATORY, MANDAMUS, AND INJUNCTIVE RELIEF

# I. INTRODUCTION

1. This is a civil action brought under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.* Plaintiffs challenge Defendants' decision to begin operating a proposed Biosafety Level 3 ("BSL-3") facility at Lawrence Livermore National Laboratory ("LLNL" or "Livermore Lab") in Livermore, California. In violation of NEPA, this decision was formed on the basis of an inadequate Environmental Assessment ("EA"), which did not support the issuance of a Finding of No Significant Impact ("FONSI"). Because operation of the proposed facility may significantly affect the quality of the human environment, Defendants were required to prepare an Environmental Impact Statement ("EIS"). In addition, Defendants failed to prepare a supplement to the EA, as required under applicable regulations implementing NEPA, to account for significant new circumstances and information that came to light during the decisionmaking process for the proposed BSL-3 facility. Finally, the FONSI for the proposed facility was issued without public review and comment, in violation of the NEPA regulations promulgated by the Department of Energy ("DOE" or "Department").

2. Because Defendants are currently operating the proposed BSL-3 facility at Livermore Lab, Plaintiffs seek an injunction—including interim injunctive relief—to halt operation of the facility pending full compliance with NEPA.

3. Plaintiffs seek a declaratory judgment, mandamus, injunctive relief, and the award of costs, including attorney and expert witness fees and related expenses.

# II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1346 (United States as defendant), 1651 (writ of mandamus), 2201 (declaratory judgment), 2202 (injunctive relief), and 5 U.S.C. 701 *et seq.*

(review of final agency action) because (1) the action arises under NEPA and other laws of the United States, (2) the action seeks a declaratory judgment voiding Defendants' final agency approval of the proposed BSL-3 facility at LLNL, and (3) the action also seeks further equitable and mandamus relief until such time as Defendants comply with the law.

5. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(e) because one or more of the defendants reside in the judicial district, a substantial part of the events or omissions giving rise to the claims occurred in the district, and the real property that is the subject of the action is situated in the district.

## III. PARTIES

6. Plaintiff Tri-Valley CAREs (Communities Against a Radioactive Environment) ("TVC") is a non-profit public benefit corporation organized under the laws of the State of California. TVC's offices are located at 2582 Old First Street in Livermore, California, approximately three miles from the Livermore Lab Main Site where the proposed BSL-3 facility is to be located. Tri-Valley CAREs is a community-based environmental organization that was founded in 1983 by concerned neighbors living around Livermore Lab. TVC monitors nuclear weapons and environmental cleanup activities throughout the national nuclear weapons complex, with a special focus on LLNL and the surrounding communities. Tri-Valley CAREs' overarching mission is to promote peace, justice, and a healthy environment. TVC holds two technical assistance grants from the U.S. Environmental Protection Agency ("EPA") to monitor environmental cleanup at Livermore Lab's Main Site and its Site 300 Experimental Test Site, both of which are on the federal "Superfund" list of the most contaminated sites in the nation. TVC also organizes a support group for workers made ill through their employment at Livermore Lab and other sites in the nuclear weapons complex. Tri-Valley CAREs publishes and

distributes a free monthly newsletter, as well as fliers, fact sheets, and technical reports. In addition, TVC maintains a community "reading room" at its office in Livermore and a website at www.trivalleycares.org as part of its commitment to public outreach and education. A major, founding goal of TVC is to investigate and achieve remedies for the public health and environmental threats posed by LLNL. Tri-Valley CAREs currently has approximately 5,600 members, the majority of whom reside or work in the vicinity of Livermore Lab. TVC has won numerous local and national commendations and awards, including from EPA, the Alameda County Public Health Department, and Physicians for Social Responsibility. Tri-Valley CAREs prepared informative materials for the community and submitted extensive public comments on the EAs for the proposed Livermore Lab BSL-3 facility. The proposed facility challenged in this action would, if operated as proposed by Defendants, harm TVC by potentially exposing its members who work and reside in Livermore and the surrounding urban region to virulent and infectious biological agents and by endangering public health and safety, and environmental quality in Livermore, the San Francisco Bay Area, and Northern California.

7. Plaintiff Marylia Kelley was a co-founding member of Tri-Valley CARES in 1983 and currently serves as the organization's Executive Director. Ms. Kelley has lived in Livermore for 32 years. Since 1978, she has resided at 5720 East Avenue #116, which is located approximately one-quarter mile from the Livermore Lab Main Site. Soil analyses conducted by EPA and other agencies documented elevated levels of plutonium in a city park located one block from Ms. Kelley's home, and the LLNL Main Site is the responsible party. Rain samples taken by Livermore Lab in Ms. Kelley's neighborhood have been found to contain elevated levels of tritium (radioactive hydrogen), which wafted over from the Livermore Lab Main Site. Groundwater beneath her home is part of an off-site plume containing chemical contaminants

emanating from the LLNL Main Site. On a daily basis, Ms. Kelley lives, works, and recreates in close proximity to Livermore Lab. Her duties as TVC's Executive Director bring her to the Livermore Lab Main Site for meetings with personnel from the Department of Energy and LLNL on a regular basis. Since 1989, Ms. Kelley has been a member of the Livermore Lab Main Site's Community Work Group to advise DOE, LLNL, and state and federal regulators on the cleanup of contaminated soil and groundwater at Livermore Lab. Defendants' operation of the proposed BSL-3 facility at LLNL without the preparation of an EIS or a supplement to the EA, and without public review and comment on the proposed FONSI as required under applicable regulations, could endanger the health and safety of Ms. Kelley and further stress air, water, and soil resources already burdened by a history of toxic and radioactive releases from Livermore Lab.

8. Plaintiff Janis Kate Turner has lived in Livermore for 42 years and owns a home at 749 Hazel Street, which is located approximately one mile from the Livermore Lab Main Site. Ms. Turner has taught in area elementary and middle schools for more than three decades. She taught literature and science for twenty years at East Avenue Middle School, which is located approximately two miles from the Livermore Lab Main Site. Ms. Turner has retired from full-time teaching, but she occasionally substitute teaches at East Avenue Middle School. Between 1958 and 1974, the Livermore Lab Main Site accidentally released plutonium into the City of Livermore's sewage treatment system. During this time, plutonium-laden sludge was distributed to residents for use as a soil amendment. Ms. Turner obtained such sludge during that time period, and she has since volunteered to serve on a task force established by the Alameda County Public Health Department to determine appropriate monitoring and remediation. Ms. Turner's daughter-in-law, a Livermore resident, died at the age of 27 from malignant melanoma. A three-

decade study conducted by the California Department of Health Services found that Livermore-born children and youth had more than six times the expected rate of malignant melanoma. She believes that LLNL's operations may be implicated in her daughter-in-law's untimely passing. Ms. Turner lives, works, and recreates in close proximity to LLNL. She is concerned that operation of the proposed BSL-3 facility and the resultant importation of anthrax, plague, Q Fever, tularemia, and other potentially deadly biological agents may result in further negative health impacts on herself and her family, neighbors, and friends. Ms. Turner has been a member of Tri-Valley CAREs for more than fifteen years and currently serves on the group's Board of Directors.

9. Plaintiff Jedidjah de Vries, a recent graduate from the University of California at Santa Barbara, moved to Livermore in 2007. He currently resides at 3717 Carrigan Common, which is located approximately two and one-quarter miles from the Livermore Lab Main Site. Mr. de Vries is Tri-Valley CAREs' Outreach Director, a position which requires him to frequently interact with the public throughout Livermore and the surrounding communities. His duties are such that he often represents TVC at public meetings at the Livermore Lab Main Site. Mr. de Vries lives, works, and recreates in close proximity to Livermore Lab. He believes that Defendants' operation of the proposed BSL-3 facility without the preparation of an EIS or a supplement to the EA, and without the public participation required by law, could lead to the release of biological agents that would endanger his health and that of his community.

10. Plaintiffs are concerned not only for their own health and safety and that of their neighbors but also for the environment. These concerns are informed by Livermore Lab's long history of accidents, spills, and releases, and LLNL's lack of regard for informing the public of these mishaps. In addition, Plaintiffs are worried that the proposed BSL-3 facility is vulnerable

to attack by terrorists, an issue that was inadequately analyzed in the EA. Because the EA is inadequate and does not support the issuance of a FONSI, Defendants have failed to comply with NEPA. The Court should order Defendants to prepare an EIS for the proposed BSL-3 facility at LLNL or a supplement to the EA that adequately analyses the significant new circumstances and information that have recently arisen. At the very least, the Court should order Defendants to issue a proposed FONSI for public review and comment before making a final determination on the FONSI.

11. Defendant United States Department of Energy is a federal agency whose overarching mission is to advance the national, economic, and energy security of the nation; to promote scientific and technological innovation in support of that mission; and to ensure the environmental cleanup of the national nuclear weapons complex. The Department is responsible for administering and overseeing the contract between the United States and Lawrence Livermore National Security, LLC, whose primary objective is to deliver the National Nuclear Security Administration mission for LLNL. Through its National Nuclear Security Administration, DOE proposes to operate the BSL-3 facility at Livermore Lab that is the subject of this complaint. The Department has also provided funding for the design, construction, and operation of the proposed Livermore Lab BSL-3 facility.

12. Defendant National Nuclear Security Administration ("NNSA"), a quasi-autonomous agency within DOE, has responsibility for the U.S. nuclear weapons complex, including Livermore Lab, and national programs dealing with chemical and biological weapons ("bioweapons"). NNSA's biodefense work at LLNL involves work with infectious agents, including those historically used for bioweapons. NNSA will operate the proposed BSL-3

facility that is the subject of this complaint. NNSA also prepared the EA and FONSI for the proposed Livermore Lab BSL-3 facility.

13. Defendant Lawrence Livermore National Laboratory is an applied science laboratory located in Livermore, California. Between its inception in 1952 and September 30, 2007, LLNL was managed by the University of California for the U.S. government. Livermore Lab is now managed by Lawrence Livermore National Security, LLC, which is composed of Bechtel National, University of California, BWX Technologies, Washington Group International, and Battelle. LLNL has an annual budget of about $1.6 billion and a staff of over 8,000 employees. In its capacity as one of NNSA's national laboratories, Livermore Lab is charged with carrying out NNSA's mission. While the vast majority of the current work at LLNL focuses on nuclear weapons and related issues, Livermore Lab also conducts bioscience research in Biosafety Level 1 ("BSL-1") and Biosafety Level 2 ("BSL-2") facilities. The proposed BSL-3 facility that is the subject of this complaint is to be located at the Livermore Lab Main Site.

## IV. FACTS

*Overview*

14. NNSA proposes to operate a BSL-3 facility at the Livermore Lab Main Site, which is located approximately three miles to the east of the City of Livermore's central business district. The nearest member of the public is about one-half mile away, and there are more than 81,000 people residing in Livermore. In 2000, there were approximately 1.3 million people living in Alameda County, in which Livermore is located, and about 6.9 million people living within a 50-mile radius of LLNL.

15. The proposed BSL-3 facility would conduct research on infectious agents and biotoxins, particularly those associated with the bioweapons threat. The proposed facility is

designed to handle operations involving small-animal testing of biological agents ("bioagents") and biotoxins, in which up to 100 rodents would be exposed to aerosolized pathogenic material. Biological toxins are toxic chemicals of biological origin and are not self-replicating. In addition, the proposed facility at LLNL will have the ability to produce biological material (enzymes, DNA, ribonucleic acid, etc.) using infectious agents and genetically modified agents.

16. A number of incidents over the past several years have raised grave concerns about the safety and security of BSL-3 facilities. These incidents, which include an anthrax release caused by Livermore Lab in August-September 2005, consist of skin cuts, needle sticks, workers bitten or scratched by infected animals, broken vials, leaks of contaminated waste, missing infected animals, dropped containers, defective seals on airtight containers, missing or lost shipments, and other mishaps. The EA and FONSI issued by NNSA concerning the proposed facility fail to analyze the legitimate terrorism-related concerns raised by these incidents and other significant environmental impacts that may result from operation of the proposed BSL-3 facility.

17. A biosafety level or BSL is assigned to an agent based upon the activities typically associated with the growth and manipulation of the quantities and concentrations of infectious agents required to accomplish identification or typing as determined by the Centers for Disease Control and Prevention ("CDC") and National Institutes of Health ("NIH"). CDC and NIH published the 4th Edition of *Biosafety in Microbiological and Biomedical Laboratories* ("*BMBL*"), which describes the combination of standard and special microbiological practices, safety equipment, and facilities constituting Biosafety Levels 1-4. The recommendations contained in *BMBL* are merely advisory, and they are intended to provide a voluntary guide or code of practice, as well as goals for upgrading operations. The recommendations are also

offered as a guide and reference in the construction of new laboratory facilities and in the renovation of existing facilities. As specified in *BMBL*, the application of the recommendations to a particular laboratory operation should be based on a risk assessment of the special agents and activities relevant to that facility, rather than used as a universal and generic code applicable to all situations.

18. Microbiological and biomedical laboratories are classified from Biosafety Level 1 to Biosafety Level 4 ("BSL-4"), in accordance with the level of danger posed by the activities and agents permitted in the facility.

19. As specified in *BMBL*, BSL-1 is suitable for work involving well-characterized agents not known to consistently cause disease in healthy adult humans and of minimal potential hazard to personnel and the environment.

20. BSL-2 is similar to BSL-1 and is suitable for work involving agents of moderate potential hazard to personnel and the environment.

21. BSL-3 is suitable for work with indigenous or exotic agents that may cause serious or potentially lethal disease as a result of exposure by the inhalation route.

22. BSL-4 is suitable for work involving agents that pose a high individual risk of aerosol-transmitted laboratory infections and life-threatening disease.

23. The proposed BSL-3 facility at Livermore Lab would handle life-threatening bioagents, including, but not limited to, the select agents *Bacillus anthracis* (anthrax), *Yersinia pestis* (plague), *Clostridium botulinum* (botulism), *Coccidioides immitis* (Valley Fever), *Brucella spp.* (Brucellosis), *Francisella tularensis* (tularemia), and *Coxiella burnetii* (Q Fever). Select agents are those biological agents and toxins designated by the Secretary of the Department of

Health and Human Services as having "the potential to pose a severe threat to public health and safety." 42 C.F.R. § 73.3 (2005).

24. The proposed BSL-3 facility may also be used to handle biotoxins that are generally handled at the Biosafety Level for the microorganisms that produce them. In addition, the proposed facility will aerosolize pathogenic material for small-animal testing and may perform research with genetically modified organisms.

25. A number of the infectious agents that would be used in research at the proposed BSL-3 facility could have offensive uses as bioweapons.

26. Seed cultures or samples would be provided to the proposed BSL-3 facility by commercial suppliers, research collaborators, or other parties associated with LLNL projects. These may contain previously identified or unidentified organisms.

27. Biological materials or infectious agents would be shipped to Livermore Lab by commercial package delivery services, the U.S. Postal Service, other authorized entity, or delivered to the receiving area from an origination point within LLNL by a designated Livermore Lab employee acting as a courier.

28. The proposed BSL-3 facility at Livermore Lab may contain up to 50 liters of biological agents, and up to 3 liters of cultured microorganisms may be handled in the three discrete laboratories within the facility at any given time.

29. The proposed BSL-3 facility would be a prefabricated, one-story building with about 1,500 ft$^2$ (135 m$^2$) of floor space housing three BSL-3 laboratories (one with rodent handling and maintenance capability), showers, sinks, lavatories, and mechanical and electrical equipment areas. It is estimated that the operational design life of the proposed building would be at least 30 years.

30. A maximum of 100 rodents—mice, rats, and guinea pigs—would be used at any one time in the BSL-3 laboratory designated for rodent handling. Rodents would be exposed to infectious agents in a biological safety cabinet through inhalation via a device known as a collision nebulizer. This device creates aerosol particles of known size (depending upon the specific nozzle used) to which rodents would be exposed through a nose-piece.

31. The proposed BSL-3 facility at Livermore Lab has been constructed and all facility-related equipment installed. Accordingly, the impacts related to construction that are discussed in the EA have already occurred.

32. On January 25, 2008, the proposed BSL-3 facility at LLNL became operational.

*The NEPA Process*

33. Pursuant to NEPA, NNSA issued a draft EA for the proposed BSL-3 facility at Livermore Lab on July 24, 2002, which was followed by a public comment period that ended on September 7, 2002. Over 90 responses were received from residents of twelve different states and the District of Columbia.

34. With the exception of Jedidjah de Vries, comments were submitted by each of the plaintiffs in this action raising significant questions about the adequacy of the draft EA for the proposed facility.

35. On December 16, 2002, NNSA issued a final EA and FONSI to authorize construction and operation of the proposed BSL-3 facility at LLNL.

36. Since the EA for the proposed BSL-3 facility at LLNL was originally published, some of DOE's missions relating to biological security have been transferred to the Department of Homeland Security ("DHS"). However, DOE, NNSA, and LLNL continue to support these missions by performing work for DHS on a "work for others" basis. Any references to DOE or

NNSA in the EA should be understood as including work conducted on behalf of DHS in support of its mission objectives.

37. Despite the magnitude of DHS' involvement in the activities to be conducted in the proposed BSL-3 facility, DHS was not consulted in the preparation of the EA.

38. On September 16, 2003, Tri-Valley CAREs, et al. filed a lawsuit in federal district court in San Francisco challenging, inter alia, the adequacy of the EA for the proposed BSL-3 facility at Livermore Lab.

39. On September 10, 2004, the district court found the EA to be adequate.

40. On November 8, 2004, Tri-Valley CAREs, et al. filed a notice of appeal with the United States Court of Appeals for the Ninth Circuit.

41. In August-September 2005, while the lawsuit filed by Tri-Valley CAREs, et al. was pending in the Ninth Circuit, Livermore Lab was responsible for an anthrax release. Defendants failed to inform either the court or Plaintiffs of this incident, which was relevant to the issues under consideration in the litigation. The anthrax release was not revealed until over two years later—after the Ninth Circuit had already rendered its decision in the appeal referenced in the immediately preceding paragraph—when Livermore Lab issued a press release describing the incident on October 5, 2007.

42. Recent reports have also indicated that Livermore Lab failed to inform contractors who may have been exposed to Beryllium until seven months after initial tests revealed the presence of the toxic metal.

43. On October 16, 2006, the Court of Appeals for the Ninth Circuit issued a memorandum opinion in which the court held that DOE had inadequately assessed the threat of terrorist activity on the proposed BSL-3 facility at Livermore Lab in the EA. The court

remanded the matter for DOE to analyze the threat of terrorist attack on the proposed facility and to determine whether that threat necessitates the preparation of an EIS.

44. Following the Ninth Circuit's decision, the Department issued interim guidance on how to address intentional destructive acts in NEPA documents. In response to the Ninth Circuit's ruling and DOE's guidance, NNSA revised the EA for the proposed facility to consider the potential impacts of terrorist activity. NNSA then sought public comment on a draft EA during a 30-day comment period beginning April 11, 2007, and ending May 11, 2007. Over 80 comment responses were received from residents of eight different states and the District of Columbia.

45. Comments were submitted by each of the plaintiffs in this action, with the exception of Jedidjah de Vries, raising significant questions about the adequacy of the draft EA for the proposed BSL-3 facility, particularly with regard to the threat of terrorist attack.

46. On September 19, 2007, Tri-Valley CAREs sent a letter to Samuel Brinker, National Environmental Policy Act Document Manager in NNSA's Livermore Site Office, reiterating its position that NEPA requires NNSA to prepare an EIS for the proposed BSL-3 facility. This letter also noted that, should NNSA instead choose to issue a FONSI for the proposed facility, DOE regulations under NEPA require the Department to issue a proposed FONSI for public review and comment prior to making a final determination on the FONSI. Finally, TVC formally requested that a public hearing on the proposed BSL-3 facility be held so that the public's numerous concerns regarding the facility might be addressed. Tri-Valley CAREs received no response to this letter.

47. On January 25, 2008, Defendants issued a final EA and FONSI for the proposed BSL-3 facility at Livermore Lab. Without notification to the public or Plaintiffs, Defendants

began operating the proposed facility on that day. On January 28, 2008, NNSA's Livermore Site Office issued a press release stating that LLNL had been granted approval to begin operating the proposed BSL-3 facility. The announcement failed to disclose that the BSL-3 facility had become operational several days earlier.

### *The Terrorism Analysis Contained in the Final EA is Inadequate*

48. Defendants have failed to comply with NEPA because the analysis of the risk of terrorist attack on the proposed BSL-3 facility in the final EA is inadequate and does not support the issuance of a FONSI.

49. The terrorism analysis in the final EA is inadequate because it is based on an inapplicable and flawed accident scenario. As a result, the terrorism analysis fails to adequately analyze the consequences of a release of pathogenic material on Livermore Lab's employees and the approximately 6.9 million individuals living within a 50-mile radius of LLNL. This glaring oversight is the result of Defendants use of an unrealistic and inapplicable "bounding scenario," which unreasonably assumes that no bioagents or biotoxins will be released to the atmosphere as the result of terrorist activity because these would be subject to HEPA filtration or destroyed by environmental factors or exploding containers of disinfectant. This "bounding scenario" overlooks the critical fact that an accidental release of pathogenic material at the proposed facility is likely to be qualitatively and essentially different from a release precipitated by a terrorist attack.

50. The terrorism analysis in the final EA is also inadequate because it is unreasonable and unsupported. Defendants assume that diagnostic testing and medical treatment will be immediately available to those whose health is endangered by a release of deadly bioagents. Defendants fail to consider the strong likelihood that a breach of containment resulting from a

terrorist attack will release multiple types of pathogens—since many different ones may be stored or in use—in unknown concentrations. The analysis in the final EA also assumes that exposed individuals will be inoculated to prevent infection or treated to assist in recovery. Since, as Defendants later acknowledge, the bioagents to be handled in the proposed facility can be extremely difficult to detect and some may not cause illness immediately, this assumption is plainly unreasonable. Finally, Defendants also fail to account for the possibility that genetically engineered microorganisms handled in the proposed facility, against which available antibiotics and the environmental factors discussed above may be ineffective, will be released into the environment after a catastrophic breach of containment.

51. Furthermore, the terrorism analysis in the final EA is inadequate because Defendants unreasonably attempt to bolster their assertion that the probability of a successful terrorist attack on the proposed facility is very low and is not expected during the life of the facility by claiming that the bioagents to be contained in the facility are readily obtainable from the environment. According to the final EA, the proposed BSL-3 facility will have the ability to produce biological material (enzymes, DNA, ribonucleic acid, etc.) using infectious agents and genetically modified microorganisms, which could not be obtained from the environment. The proposed facility would also represent a collection of bioagents that could be used as bioweapons, so the comparison to gathering pathogenic material from distributed sources is inappropriate. In addition, the quantity of bioagents at the proposed BSL-3 facility, which could be as high as 50 liters, would exceed those quantities easily collected from animal or plant sources in the field.

*An EIS must be Prepared for the Proposed BSL-3 Facility at Livermore Lab*

52. The proposed BSL-3 facility at Livermore Lab is a "major Federal action[] significantly affecting the quality of the human environment," for which an EIS is required. 42

U.S.C. § 4332(C) (1975). In particular, the threat of terrorist attack on the proposed facility necessitates the preparation of an EIS because such an attack may have significant effects on the environment.

53. The Department has determined that preparation of an EIS is the appropriate level of NEPA analysis for the operation of a proposed BSL-3 facility at Los Alamos National Laboratory ("LANL" or "Los Alamos") in Los Alamos, New Mexico. The research to be conducted at the proposed BSL-3 facility at Los Alamos also seeks to reduce the threat from bioterrorism. The issues to be analyzed in the LANL EIS include additional seismic analysis; safety of laboratory operations; public health and safety; handling, collection, treatment, and disposal of research wastes; other risks; pollution prevention; and potential impacts on air quality, biological resources, cultural resources, water resources, land use, and socioeconomic resources.

54. Given the unique status of both LLNL and LANL as the nation's classified nuclear weapons design laboratories, there is no rational basis for preparing an EIS for the operation of the proposed BSL-3 facility at Los Alamos and only an EA for the virtually identical facility at Livermore Lab; the same issues which necessitated the preparation of an EIS for the proposed LANL BSL-3 facility are equally applicable to the proposed LLNL BSL-3 facility, if not more so. For instance, NNSA determined that it was necessary to conduct additional seismic analysis concerning the Los Alamos BSL-3 facility and not the Lawrence Livermore BSL-3 facility, despite the presence of known, active faults that run directly under nearby Berkeley/Alameda County, California. Moreover, the Livermore Lab Main Site is located in an urban region, in close proximity to residential housing and a busy interstate freeway, so the risks to the human environment are even greater.

*Significant New Circumstances and Information Require Supplementation of the Final EA*

55. Defendants have failed to comply with applicable regulations implementing NEPA by neglecting to gather and evaluate significant new circumstances and information relevant to environmental concerns and bearing on the proposed BSL-3 facility at Livermore Lab and its impacts. Defendants also neglected to provide the public and other government agencies with all information relevant to the determination as to whether the proposed BSL-3 facility should be authorized.

56. Federal agencies have a continuing duty to gather and evaluate new information relevant to the environmental impact of the agencies' actions. Pursuant to the Department's regulations implementing NEPA, "DOE shall prepare a supplemental EIS if there are . . . significant new circumstances or information relevant to environmental concerns," as discussed in the NEPA regulations promulgated by the Council on Environmental Quality ("CEQ"). 10 C.F.R. § 1021.314(a) (1992). Under CEQ's regulations, agencies shall prepare supplements to either draft or final EISs if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (1978). The standard for supplementing an EA is the same as for an EIS.

57. On September 24, 2007, the Regents of the University of California, as the manager of Livermore Lab, agreed to resolve its liability for the August-September 2005 anthrax release. Again, Defendants withheld this information until October 5, 2007, after the public comment period on the draft EA had ended.

58. The Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") alleged that Livermore Lab transferred vials of anthrax to two laboratories located in Florida and Virginia. During the transfers, anthrax was released from the approximately 4,000

shipped vials because the scientist who packaged the shipments left the twist caps off two

containers and a third vial had a loose cap. Five workers were exposed to anthrax while

unpacking the shipments and required treatment with the antibiotic Cipro. As a result of this

incident, CDC suspended all LLNL transfers of select agents, and Livermore Lab issued a full

stand-down of all select agent work. CDC sent LLNL a report listing twenty-nine (29) points

that needed to be addressed.

59. Specifically, the OIG alleged that LLNL failed to comply with security and access

requirements by allowing an individual not authorized to have access to select agents to package

the shipments of anthrax. The OIG also alleged that Livermore Lab violated the transfer

requirements of the select agent regulations by failing to comply with applicable shipping and

packaging laws when transferring a select agent. Finally, the OIG alleged that LLNL's

Responsible Official—the individual designated by Livermore Lab with the authority and control

to ensure compliance with the select agent regulations—failed to ensure such compliance. Under

the terms of the settlement, LLNL agreed to pay the OIG $450,000 to resolve these allegations.

60. On October 29, 2007, Tri-Valley CAREs sent another letter to Samuel Brinker in

response to revelations at the time regarding the August-September 2005 anthrax release. In this

letter, TVC urged DOE to further revise or supplement the draft EA for the proposed BSL-3

facility in a way that adequately analyzes the LLNL anthrax release and underlying security,

safety, and transportation violations. TVC maintained that the draft EA or a supplement thereto

should then be re-circulated for public comment because the inadequate and incomplete

description of the anthrax release contained in the draft EA effectively circumvented the public's

ability to comment. For instance, TVC noted in its letter that the description of the incident in

the draft EA failed to disclose that anthrax was involved, that the anthrax was packaged by an

1   unauthorized individual, or that LLNL's Responsible Official failed to ensure compliance with

2   the shipping and packaging requirements of the Select Agent Program. It appears that

3   Defendants withheld this information until such time as the public would not have an opportunity

4   to comment upon it.

5
    61. Pursuant to CEQ's NEPA regulations, "NEPA procedures must insure that
6
7   environmental information is available to public officials and citizens before decisions are made

8   and before actions are taken." 40 C.F.R. § 1500.1(b) (1978).

9   62. The August-September 2005 anthrax release raises significant questions regarding the

10  environmental impacts of the proposed facility and the terrorist threat analysis ordered by the

11
    Ninth Circuit. The fact that an unauthorized individual was allowed access to select agents is
12
13  directly relevant to the analysis of the threat of terrorist attack. This demonstrates both the

14  inadequacy of the security restrictions at Livermore Lab and the failure to ensure compliance

15  with the select agent regulations. It is widely believed that the individual responsible for the

16  2001 anthrax mailings is a current or former biodefense worker in a U.S. government laboratory.

17
    63. In the October 2007 letter, Tri-Valley CAREs also pointed out that recent reports
18
19  have shown that BSL-3 and BSL-4 laboratories in the United States have experienced more than

20  100 accidents and missing shipments since 2003, a number that is rising steadily as more of these

21  facilities are built.

22
    64. This significant new information is relevant to the analysis of abnormal events and
23
24  accident scenarios for the proposed BSL-3 facility at Livermore Lab. Although the final EA

25  contains a cursory discussion of some recent laboratory-acquired infections, that document was

26  not circulated for public comment.

27

28

65. Finally, in the same letter, Tri-Valley CAREs directed Defendants' attention to a report by the Government Accountability Office documenting a major proliferation of BSL-3 laboratories in recent years.

66. The GAO report calls into question the need for the proposed BSL-3 facility at LLNL. Again, while this report was briefly referenced in the final EA, that document was not circulated for public comment. Moreover, the final EA contains no discussion of how the recent proliferation of BSL-3 laboratories may affect the need for the proposed BSL-3 facility at Livermore Lab.

*Applicable Regulations Require Public Review and Comment on the Revised FONSI*

67. Applicable regulations implementing NEPA require Defendants to issue a proposed FONSI for public review and comment prior to making a final determination on the FONSI for the proposed BSL-3 facility at Livermore Lab.

68. Prior to commencing operation of the proposed facility, DOE had not previously operated any microbiological laboratory facilities above BSL-2.

69. Pursuant to the Department's Implementing Procedures under NEPA, "DOE shall issue a proposed FONSI for public review and comment before making a final determination on the FONSI if required [under the NEPA regulations promulgated by CEQ.]" 10 C.F.R. § 1021.322(d) (1996). Under CEQ's NEPA regulations, an agency shall make a FONSI available for public review for 30 days before the agency makes its final determination whether to prepare an EIS and before the action may begin where "[t]he nature of the proposed action is one without precedent." 40 C.F.R. § 1501.4(e)(2) (1978).

70. Since DOE did not previously operate any laboratories above BSL-2 before illegally commencing operation of the proposed BSL-3 facility at Livermore Lab, the proposed action is

clearly without precedent, both in terms of the Biosafety Level of the facility and the nature of the work to be conducted there. For instance, although LLNL has previously conducted biodefense research, the work to be performed in the proposed BSL-3 facility involves unique risks and techniques not applicable to BSL-1 or BSL-2 facilities. Similarly, even though there are other BSL-3 facilities in the U.S., the nature of the research to be conducted in the proposed BSL-3 facility—biodefense work involving genetic modification, small-animal aerosol challenges of infectious agents historically used as bioweapons, and an inventory of up to 50 liters of pathogenic material—is atypical.

71. The FONSI for the proposed BSL-3 facility at Livermore Lab was not issued for public review and comment.

## V. CAUSES OF ACTION

### COUNT 1: Failure to prepare an adequate EA and FONSI

72. Plaintiffs incorporate by reference all proceeding paragraphs.

73. The EA and FONSI for the proposed BSL-3 facility at Livermore Lab are inadequate in the following respects, among others:

        a. The terrorism analysis is grossly deficient; and

        b. The EA and FONSI fail to provide sufficient evidence and analysis for

        determining whether to prepare an EIS.

74. Defendants' failure to prepare a legally adequate EA and FONSI for the proposed BSL-3 facility is arbitrary and capricious, an abuse of discretion, or contrary to law and constitutes a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and NEPA.

### COUNT 2: Failure to Prepare an EIS

75. Plaintiffs incorporate by reference all proceeding paragraphs.

76. The proposed BSL-3 facility at Livermore Lab is a major federal action that may significantly affect the quality of the human environment in the following respects, among others:

> a. Operation of the proposed facility may affect public health and safety;
>
> b. The possible effects on the quality of the human environment from operation of the proposed facility are highly controversial;
>
> c. The possible effects on the human environment from operation of the proposed facility are highly uncertain and involve unique or unknown risks; and
>
> d. The proposed action, operation of a BSL-3 facility at Livermore Lab for biodefense purposes, threatens a violation of the Biological Weapons Convention, to which the United States is a State Party.

77. Defendants' approval of the EA and FONSI for the proposed BSL-3 facility at Livermore Lab is arbitrary and capricious, an abuse of discretion, or contrary to law and constitutes a violation of the APA and NEPA because Defendants were required to prepare an EIS for the proposed facility.

**COUNT 3: Failure to Supplement**

78. Plaintiffs incorporate by reference all proceeding paragraphs.

79. In violation of applicable federal regulations implementing NEPA, Defendants have failed to prepare a supplement to the EA in response to significant new circumstances and information relevant to the environmental impacts of the proposed BSL-3 facility.

80. Defendants' failure to prepare a supplement to the EA for the proposed BSL-3 facility is arbitrary and capricious, an abuse of discretion, or contrary to law and constitutes a violation of the APA and NEPA.

**COUNT 4: Failure to Comply with Applicable Regulations**

81. Plaintiffs incorporate by reference all proceeding paragraphs.

82. The FONSI for the proposed Livermore Lab BSL-3 facility was issued without public review and comment in violation of applicable federal regulations. Under DOE and CEQ's NEPA regulations, the Department shall issue a proposed FONSI for public review and comment before making a final determination on the FONSI where the nature of the proposed action is one without precedent. 10 C.F.R. § 1021.322(d) (1996); 40 C.F.R. § 1501.4(e)(2) (1978).

83. Defendants' failure to comply with applicable federal regulations is arbitrary and capricious, an abuse of discretion, or contrary to law and constitutes a violation of the APA and NEPA.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

84. Plaintiffs have exhausted all available administrative remedies by raising each of Defendants' violations of law alleged hereinabove in comments thereon. No administrative appeals are available to Plaintiffs.

85. Defendants' continued operation of the proposed BSL-3 facility at Livermore Lab could cause irreparable harm to the environment, to Plaintiffs, and to the public in the respects alleged hereinabove. Therefore, this Court should issue preliminary and permanent injunctive relief staying and setting aside Defendants' approvals of the proposed BSL-3 facility challenged herein.

**VI. PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant Plaintiffs the following relief:

a. A declaration that Defendants violated the APA and NEPA by issuing a FONSI for the proposed BSL-3 facility at Livermore Lab because the EA does not support the finding that the proposed action will not have a significant effect on the human environment.

b. A declaration that Defendants are in violation of the APA and NEPA because an EIS was not prepared for the proposed BSL-3 facility at LLNL.

c. A declaration that Defendants are in violation of the APA and NEPA because a supplement to the EA was not prepared to evaluate significant new circumstances and information relevant to the environmental impacts of the proposed facility.

d. A declaration that Defendants are in violation of the APA and NEPA because a proposed FONSI was not issued for public review and comment before a final determination was made on the FONSI for the proposed BSL-3 facility.

e. An order requiring Defendants to withdraw the FONSI for the proposed facility until such time as Defendants have complied with applicable laws and regulations under NEPA.

f. An injunction against further work at BSL-3 in the proposed facility until Defendants have complied with applicable laws and regulations under NEPA.

g. An award of reasonable attorney and expert witness fees and expenses incurred in the litigation of this action.

h. Any other relief that this Court deems just and proper.

Dated this 10th day of March, 2008

1

Robert J. Schwartz (CSB
#254778)
2          Tri-Valley CAREs
2582 Old First Street
3          Livermore, CA 94551
Telephone: (925) 443-7148
4          Facsimile: (925) 443-0177
Email:
5          rob@trivalleycares.org

6

7

Steven Sugarman (*Pro Hac
8          Vice*) (approved
telephonically)
9          Belin & Sugarman
618 Paseo de Peralta
10         Santa Fe, NM 87501
Telephone: (505) 983-1700
11         Facsimile: (505) 983-0036
Email: sugarman@bs-
12         law.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 26

1

## CERTIFICATE OF SERVICE

2

3        I am a citizen of the United States of America.  I am over the age of eighteen (18) years

4    and not a party to this action.  My business address is 2582 Old First Street, Livermore,

5    California 94551.

6        On March 10, 2008, I served a true copy of the foregoing document entitled

7

8        COMPLAINT FOR DECLARATORY, MANDAMUS, AND INJUNCTIVE RELIEF

9

10    in the above-captioned matter on each of the parties or persons listed below by placing a true

11    copy thereof in a sealed envelope with postage thereon fully prepaid in the United States mail at

12    Livermore, California addressed as follows:

13
    United States Department of Energy
14    1000 Independence Ave., SW
    Washington, DC 20585
15    Telephone: (202) 586-5000
    Facsimile: (202) 586-4003
16

17    National Nuclear Security Administration
    U.S. Department of Energy
18    1000 Independence Ave., SW
    Washington, DC 20585
19    Telephone: (202) 586-5000
20    Facsimile: (202) 586-3929

21    Lawrence Livermore National Laboratory
22    7000 East Avenue
    Livermore, CA 94551
23    Telephone: (925) 422-4599
    Facsimile: (925) 423-2943
24

25    Steven Sugarman
    Belin & Sugarman
26    618 Paseo de Peralta
    Santa Fe, NM 87501
27    Telephone: (505) 983-1700
28    Facsimile: (505) 983-0036

COMPLAINT - 27

1   Barclay T. Samford
2   United States Department of Justice
    Environment & Natural Resources Division
3   1961 Stout St. 8th Floor
    Denver, CO 80294
4   Telephone: (303) 844-1475
5   Facsimile: (303) 844-1350

6       I certify under penalty of perjury that the foregoing is true and correct.  Executed on

7   March 10, 2008, at Livermore, California.

8

9

10                                  Robert Schwartz

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 28