1   JOSEPH P. RUSSONIELLO
    United States Attorney
2   CHARLES O'CONNOR
    Assistant United States Attorney
3   450 Golden Gate Ave., Box 36055
    San Francisco, CA 94102
4   Telephone: (415) 536-6967
    Facsimile: (415) 436-6748
5
    RONALD J. TENPAS
6   Assistant Attorney General
    BARCLAY T. SAMFORD (NMBN 12323)
7   Trial Attorney
    U.S. Department of Justice
8   Environment & Natural Resources Div.
    1961 Stout St., 8th Floor
9   Denver, CO 80294
    Telephone: (303) 844-1475
10  Facsimile: (303) 844-1350

11

12  Attorneys for Defendants

13                  UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                      OAKLAND DIVISION

16  TRI-VALLEY CARES, MARYLIA KELLEY,      )
    JANIS KATE TURNER, and                 )
17  JEDIDJAH DE VRIES,                     )    Case No. 08-cv-1372-SBA
                                           )
18          Plaintiffs,                    )
                                           )
19  v.                                     )
                                           )
20  UNITED STATES DEPARTMENT OF ENERGY, )      DEFENDANTS' OPPOSITION TO
21  NATIONAL NUCLEAR SECURITY              )    PLAINTIFFS' MOTION FOR
    ADMINISTRATION, LAWRENCE LIVERMORE )        PRELIMINARY INJUNCTION
22  NATIONAL LABORATORY,                   )
                                           )
23          Defendants.                    )
    _____)

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.      Prior Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        B.      The LLNL BSL-3 lab . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

V       ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Plaintiffs Have not Demonstrated a Likelihood of Success
                on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                1.      DOE Properly Addressed Terrorism Risks on Remand . . . . . . . . . . . . . . 7

                        a.      Breach of Containment from Terrorist Attack . . . . . . . . . . . . . . 8

                        b.      Theft and Release of a Pathogen by a
                                Terrorist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                        c.      Covert Theft and Release of a Pathogen by
                                An Insider . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                2.      Plaintiffs Fail to Demonstrate DOE's Evaluation of
                        Terrorist Attacks is Arbitrary and Capricious . . . . . . . . . . . . . . . . . . . . 11

        B.      Plaintiffs Have Not Demonstrated Any Likelihood of Success
                on their Claim that the Agency Should have Prepared an EIS . . . . . . . . . . . . . 15

                1.      The "context" surrounding the BSL-3 Lab does not
                        require an EIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                2.      An EIS is not needed to address impacts on public
                        health and safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                3.      Plaintiffs have not demonstrated the existence of
                        "controversy" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                4.      The effects of the facility are not highly uncertain or
                        unknown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                5.      An EIS is not required to consider the BWC . . . . . . . . . . . . . . . . . . . . . 18

C.  Plaintiffs Have Not Demonstrated a Likelihood of
Success on their Claim that the Agency Failed to
Supplement the EA ............................................. 18

　　1.  2005 Shipping Incident ...................................... 19

　　2.  Information regarding safety and security of
BSL-3 facilities ............................................ 20

　　3.  GAO Report on the Increase in BSL-3 Facilities ................... 21

　　4.  Congressional Hearing ...................................... 22

　　5.  Leitenberg Report ......................................... 22

D.  DOE Was Not Required to Make the LLNL BSL-3 FONSI
Available for Public Review Before Implementing the Project ............. 23

VI.  THE BALANCE OF EQUITIES STRONGLY MILITATES AGAINST
ISSUANCE OF A PRELIMINARY INJUNCTION ........................... 24

A.  Plaintiffs Have Not Demonstrated They Will Suffer Irreparable
Injury ..................................................... 24

B.  An Injunction Will Harm the Public Interest ......................... 25

C.  An Injunction Will Harm LLNL's Biological Security Program ............ 25

VII.  CONCLUSION .................................................... 25

# TABLE OF AUTHORITIES

## CASES

Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army,
288 F. Supp.2d 64 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army,
398 F.3d 105 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 6

Associated Gen. Contractors of Cal. v. Coalition for Econ. Equity,
950 F.2d 1401 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Bering Strait Citizens for Responsible Development v. U.S. Army Corps of Eng.,
511 F.3d 1011 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Biodiversity Conservation Alliance v. U.S. BLM, 404 F.Supp.2d.
212 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Burbank Anti-Noise Group v. Goldschmidt, 623 F.2d 115
(9th Cir.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Caribbean Marine Services Co. v. Baldrige, 844 F.2d 668
(9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 24

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . 7

Dep't of Transp. v. Public Citizen, 541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Florida Power & Light Co. v. Lorion, 470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fund for Animals, Inc. v. Lujan, 962 F.2d 1391 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . 6

Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . 5

Idaho Sporting Congress v. Thomas, 137 F.3d 1146 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . 18

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . 7, 19, 20

Metropolitan Edison Co v. People Against Nuclear Energy, 460 U.S. 766
(1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835 (9th Cir. 2003) . . . . . . . . . . . . . . . 13, 15

Nat'l Comm. For the New River v. F.E.R.C., 373 F.3d 1323
(D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Northern Cheyenne Tribe v. Norton, 503 F.3d 836 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 6

Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153 (9th Cir. 1998) . . . . . . . . . . . . . . . . . 14

Sammartano v. First Judicial Circuit, 303 F.3d 959 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 6

San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,
 449 F.3d 1016 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Sierra Club v. Froehlke, 816 F. 2d 205 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115
(9th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Universal Health Serv. Inc., v. Thompson, 363 F.3d 1013
(9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Western Radio Serv. v. Espy, 79 F.3d 896 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Western Radio Serv. v. Glickman, 123 F.3d 1189 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 16

Wisconsin v. Weinberger, 745 F.2d 412 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21, 22

## STATUTES

5 U.S.C. §§ 701-706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 U.S.C. §§ 4321-4370d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

50 U.S.C. § 2301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## REGULATIONS

10 C.F.R. § 1021.301(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

10 C.F.R. § 1021.321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

40 C.F.R. § 1501.4(e)(2)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

40 C.F.R. § 1502.9 (C) (1) (ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

40 C.F.R. § 1508.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1

40 C.F.R. § 1508.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

40 C.F.R. § 1508.27(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.    INTRODUCTION**

2        Before the Court is Plaintiffs' request for a preliminary injunction halting the ongoing

3    operation of a Biosafety Level 3 (BSL-3) lab at the Lawrence Livermore National Laboratory

4    (LLNL). Plaintiffs' motion should be denied.

5        On the merits, this is Plaintiffs' second challenge to the Environmental Assessment (EA)

6    prepared by the Department of Energy (DOE) to evaluate the environmental impacts of the facility

7    pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370d. In Plaintiffs'

8    first challenge, both this Court and Court of Appeals upheld the vast majority of the DOE's analysis,

9    remanding the matter to the DOE only for consideration of the narrow question of whether the threat

10   of terrorist activity required preparation of an Environmental Impact Statement. On remand, the

11   DOE carefully considered the threat of terrorist activity and issued a Revised EA. Plaintiffs now

12   challenge not only that analysis, but a host of issues previously rejected by this Court and the Court

13   of Appeals. As set forth below, these claims fail.

14       In addition to failing to demonstrate a likelihood of success on the merits, Plaintiffs' motion

15   must be rejected because the balance of harms favors allowing operations of the BSL-3 facility to

16   continue. While Plaintiffs rely on an attenuated and speculative claim to harm, an injunction will

17   cause concrete harm to the LLNL's biological security program and to the national interest.

18   **II.    FACTUAL BACKGROUND**

19       **A.    Prior Litigation**

20       On December 16, 2002, pursuant to its statutory mission to reduce the global danger from

21   weapons of mass destruction, including biological weapons, the National Nuclear Security

22   Administration (NNSA), an agency within the DOE, authorized the construction of a BSL-3

23   laboratory at LLNL. Exh. 1 at 4. Pursuant to NEPA, the DOE described the need for the BSL-3 lab

24   and its conclusion that the lab will not have a significant impact on the environment in an EA and

25   finding of no significant impact (FONSI).

26       On August 26, 2003, Plaintiffs brought suit challenging the EA in numerous regards. Dkt

27   No. 1, Case No.03-cv-03926-SBA. On September 10, 2004, this Court issued an order granting

28   DOE's motion for summary judgment and denying Plaintiffs' motion for summary judgment. See

1  Exh. 2. Plaintiffs appealed, and on October 16, 2006, the Ninth Circuit affirmed in part, and

2  reversed in part. See Exh. 3. The Court of Appeals found that with the exception of the lack of

3  analysis of the possibility of a terrorist attack, the DOE took "a 'hard look' at the identified

4  environmental concerns and that the DOE's decision was fully informed and well-considered." Id.

5  at 4. With regard to the possibility of terrorist attack, the Court of Appeals reversed on the basis of

6  a new appellate court decision, San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,

7  449 F.3d 1016 (9th Cir. 2006). This Court therefore remanded the case to the DOE to "consider

8  whether the threat of terrorist activity necessitates the preparation of an Environmental Impact

9  Statement." Dkt No. 150, Case No.03-cv-3926-SBA.

10  On May 11, 2007, the DOE released for public comment a draft Revised EA which

11  addressed the impacts potentially associated with terrorist attacks. On January 25, 2008, after

12  evaluating public comment, the DOE released a Final Revised EA and a FONSI. See Exhs. 1 and

13  4. BSL- 3 operations at the facility began on January 25, 2008. See Exh. 5 at ¶ 3.

14  **B.      The LLNL BSL-3 lab**

15  DOE originally proposed the BSL-3 lab as part of the Chemical and Biological National

16  Security Program, an initiative developed in response to the 1997 Defense Against Weapons of Mass

17  Destruction Act, 50 U.S.C. § 2301, and designed to engage NNSA's laboratories in improving

18  preparedness for chemical and biological attacks. Exh. 1 at 4. Congress subsequently transferred

19  some of the NNSA's biological security mission to the Department of Homeland Security (DHS).

20  Id. DHS is authorized to access DOE laboratory resources in furtherance of its biological security

21  mission, and LLNL contemplates that the majority of research conducted at the BSL-3 facility be

22  performed for the DHS. Id.

23  Current bioscience work at LLNL targets both the reduction of the national threat from

24  terrorism using biological weapons and enhancement of public health capabilities. Exh. 1 at 6. For

25  example, LLNL "has developed the Biological Aerosol Sentry and Information System ("BASIS")

26  to aid in early detection and rapid response to biological attack." Id.

27  Prior to the opening of the BSL-3 lab, LLNL only maintained microbiology laboratories

28  equipped to operate at Biosafety Levels ("BSL") 1 and 2. Exh. 1 at 7. Therefore, when research at

1    LLNL required use of a BSL-3 laboratory, off-site private sector and University facilities had to be

2    used. Id. The use of off-site facilities is problematic because chances of cross-contamination and

3    degradation of samples is increased by excessive handling and transportation, because security at

4    off-site facilities cannot be guaranteed, and because, off-site BSL-3 laboratories are in high demand,

5    and frequently committed to projects for other entities. Id. DOE therefore determined that future

6    bioscience work at LLNL required the construction of an on-site BSL-3 facility. Id. at 8.

7          The designation "BSL-3" refers to the "Biosafety in Microbiological and Biomedical

8    Laboratories" (BMBL) guidelines promulgated by the Centers for Disease Control and Prevention

9    (CDC) and National Institutes for Health (NIH). Designed to standardize procedures, safety

10   equipment and facility design to protect laboratory workers and the public, the CDC guidelines

11   divide laboratory operations into four levels, BSL-1 to BSL-4. BSL-3 laboratories work with agents

12   which may cause diseases with serious or lethal consequences *if untreated* and which have the

13   potential of aerosol (airborne) transmission. There are over 1,350 BSL-3 laboratories in the United

14   States. Id. Common examples include hospital surgical suites, laboratories associated with medical

15   schools and university research laboratories. Exh. 1 at 6.

16         After identifying the need for an on-site BSL-3 lab, the EA considered a range of

17   alternatives, see id. at 26-27, and determined that the best alternative was to use a prefabricated

18   building installed adjacent to the existing BSL-2 facilities. Id. at 9. The 1,500 square foot lab

19   contains three BSL-3 lab rooms, and will normally be occupied by no more than six workers. Id.

20         As constructed, the lab exceeds CDC/NIH guidelines. Among the safety features of the

21   building is a High Efficiency Particulate Air-Purifying (HEPA) air filtration system, in which all

22   laboratory room air passes through two state-of-the-art HEPA filters in series before being vented

23   outside. Exh. 1 at 13. Each HEPA filter is a minimum of 99.97 percent efficient at removing

24   bioagents. Exh. 1 at 43, 55. One room within the BLS-3 lab is equipped with pressurized HEPA

25   filtered cages to handle up to 100 rodents. Exh. 1 at 15-16.

26         Operations at the BSL-3 lab are governed by a stringent set of guidelines and regulations.

27   First, as noted above, the CDC and NIH have established comprehensive standards for the operation

28   of BSL-3 labs to which the LLNL lab must adhere. Exh. 1 at 17-19. Among other things, the CDC

Opposition to Plfs' Mtn. for Prelim. Inj., 08-cv-1372-SBA - page 3

1  standards require that before infectious microorganisms may be handled, a risk analysis must be

2  prepared, and the local medical community be informed of the agent being handled and the methods

3  of identifying and treating the diseases associated with that agent. Exh. 1 at 18. Prior to using a

4  CDC designated select agent, the facility must register with the CDC and demonstrate that it "meets

5  biosafety level requirements for working with the particular biological agent." Id. at 17. The CDC

6  periodically inspects facilities. Id. at 21.

7       Second, pursuant to NIH regulations, operations at the BSL-3 lab are subject to the LLNL

8  Institutional Biosafety Committee (IBC), which includes staff members, health care providers, a

9  DOE federal official and at least two members of the public. Exh. 1 at 5-6. All experiments with

10  pathogens must first be reviewed and approved by the IBC. Exh. 6 at C-8. This ensures that "the

11  public will be involved in approval of BSL-3 research and review of safety and compliance

12  protocol[s]." Id. at C-11.

13       Pursuant to NEPA, the EA disclosed the environmental impacts of the proposed BSL-3 lab

14  on a wide range of issues, including: human health (Exh.1 at 40); ecological resources (id. at 39);

15  transportation (id. at 56); waste management (id. at 48); geology, soils and seismology (id. at 49);

16  noise (id. at 47); and air quality (id. at 46).

17       In evaluating the health impacts of lab operations on laboratory personnel and the public,

18  DOE drew from three relevant comparisons: the experience of the hundreds of CDC-registered BSL-

19  3 laboratories, the experience of the U.S. Army's Biological Defense Research Program (BDRP)

20  laboratories, and DOE's own experience with microbiology labs. Exh. 1 at 40-42. DOE found that

21  since the CDC's guidelines were issued in 1974, there has been an extremely low incidence of

22  laboratory-acquired infections in laboratories following CDC guidelines. Id. at 41. The U.S.

23  Army's BDRP labs have a similarly impressive safety record; the Army estimates that the rate of

24  public infection from Army microbiology between 1970 and 1989 is less than 0.001 per 1,000,000

25  person-years and the risk of death to a laboratory worker as 0.005 per 1,000,000 person years. Id.

26  at 42. Finally, DOE found its own biological laboratory experience at LLNL confirms the

27  insignificant risk of public or worker infection in CDC-registered and Army labs. In the past 20

28  years there have been no infections of lab personnel or the public from the operations of LLNL's

1  biological research facilities.  Id.  Nor have there been any unintentional releases of bioagents

2  associated with LLNL biological research labs.  Id.  Thus, DOE concluded that there would be "no

3  discernible public human health effect from routine BSL-3 laboratory operations at the proposed

4  facility."  Id. at 41.

5      In addition to evaluating normal operations, DOE carefully considered the potential impacts

6  of abnormal events and accident scenarios through a  "catastrophic release scenario" which shows

7  the outside bounds of the impact of the accidental release of a pathogen.  Id. at 51.  As explained

8  more fully below, this scenario revealed that even in the extremely unlikely event of a bioagent

9  release, there would be no significant impact on public health and safety.  Id. at 55.

10     Based on its consideration of all reasonably foreseeable environmental impacts, and given

11 the proven safety record of CDC-monitored and Army BSL-3 laboratories, the safety record of

12 existing biological operations at LLNL, and the negligible impact of even a highly unlikely

13 "catastrophic release scenario," the DOE concluded that the BSL-3 lab would not significantly

14 impact the human environment, and on December 16, 2002, issued a FONSI approving the lab.

15     On remand, the DOE carefully addressed impacts of a potential terrorist attack.  The agency

16 addressed three potential scenarios: a destructive direct attack on the facility – such as an airplane

17 crash or explosive device– that would breach facility containment; theft of and later release of a

18 pathogen by a terrorist; and theft of and later release by an insider with access to the facility.  Exh.

19 1 at 57-64.  With regard to a destructive direct attack, the DOE found that the impacts of such an

20 attack were bounded by the accidental catastrophic release scenario, and would not have a

21 significant impact on the environment.  With regard to theft and later release of the a pathogen

22 whether by terrorist or insider, the DOE found that, in light of the 1,350 other BSL-3 facilities where

23 comparable pathogens are available, the risk of a terrorist acquiring pathogenic material is not

24 significantly increased by the presence of such material at LLNL, one of the most secure facilities

25 in the nation.  Id. at 64.  DOE issued a new FONSI on January 25, 2008.

26 **III.  STANDARD OF REVIEW**

27     A preliminary injunction is an extraordinary remedy, the entitlement to which the plaintiff

28 bears the burden of proving by clear and convincing evidence.  See Granny Goose Foods, Inc. v.

1    <u>Teamsters</u>, 415 U.S. 423, 442 (1974).  A plaintiff must show either a likelihood of success on the

2    merits and the possibility of irreparable injury, or that serious questions going to the merits were

3    raised and the balance of hardships tips sharply in its favor.  <u>Sun Microsystems, Inc. v. Microsoft</u>

4    <u>Corp.</u>, 188 F.3d 1115, 1119 (9th Cir.1999).  These two alternatives represent extremes of a single

5    continuum rather than two separate tests.  <u>Id</u>.  Thus, the greater the relative hardship to the moving

6    party, the less probability of success must be shown.  <u>Id</u>.  However, "[u]nder either formulation of

7    the test, the party seeking the injunction must demonstrate that it will be exposed to some significant

8    risk of irreparable injury."  <u>Associated Gen. Contractors of Cal. v. Coal. for Econ. Equity</u>, 950 F.2d

9    1401, 1410 (9th Cir. 1991).

10        In addition to the balancing of the relative hardships to the parties, the Ninth Circuit directs

11    that courts must also consider the impacts of an injunction on the public interest.  <u>Sammartano v.</u>

12    <u>First Judicial Dist. Court</u>, 303 F.3d 959, 974 (9th Cir. 2002) ("While we have at times subsumed this

13    inquiry into the balancing of the hardships, <u>see</u>, <u>e.g.</u>, <u>Caribbean Marine Services Co. v. Baldrige</u>, 844

14    F.2d 668, 674 (9th Cir. 1988), it is better seen as an element that deserves separate attention in cases

15    where the public interest may be affected.").

16        The traditional equitable rules for injunctive relief are not altered by the invocation of an

17    environmental statute such as NEPA.  Both the Supreme Court and the Ninth Circuit have rejected

18    the notion that an injunction presumptively follows the violation of environmental statutes.  <u>Amoco</u>

19    <u>Prod. Co. v. Village of Gambell</u>, 480 U.S. 531, 545 (1987) (finding the environment can be "fully

20    protected" without the presumption that irreparable damage occurs when an agency fails to evaluate

21    thoroughly the environmental impact of a proposed action); <u>Northern Cheyenne Tribe v. Norton</u>, 503

22    F.3d 836, 844 n.30 (9th Cir. 2007) ("The dissent argues a NEPA violation requires an injunction

23    prohibiting all action pending NEPA compliance.  On the contrary, there is no such absolute rule.").

24    Similarly, there is no presumption that environmental harm should outweigh other harms to the

25    public interest.  <u>Fund for Animals, Inc. v. Lujan</u>, 962 F.2d 1391, 1400 (9th Cir. 1992).

26    **IV.    LEGAL BACKGROUND**

27        NEPA is a procedural statute which obligates federal agencies to disclose the environmental

28    consequences of a proposed action before a decision is made.  NEPA does not require an agency to

1    choose a particular course of action, but only to take a hard look at its action and disclose the

2    impacts to the public.  Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989).

3        For "major Federal actions significantly affecting the quality of the human environment,"

4    NEPA requires federal agencies to prepare a detailed Environmental Impact Statement (EIS).  42

5    U.S.C. § 4332(2)(C).  NEPA also permits an agency to prepare a concise Environmental Assessment

6    (EA) to determine whether an action is one requiring an EIS. 40 C.F.R. § 1508.9; 10 C.F.R. §

7    1021.321.  If the EA reveals the proposed action will not have a significant impact on the

8    environment, the Agency may complete its NEPA obligations by issuing a "finding of no significant

9    impact" (FONSI), and need not prepare a full EIS.  Here, the DOE prepared an EA which took a

10   hard look at all reasonably foreseeable impacts of the proposed BSL-3 lab, and properly concluded

11   the lab will not have significant environmental impacts.

12       Plaintiffs' NEPA challenge is reviewed under the narrow and highly deferential standard of

13   review set forth in the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.  Under the APA

14   the Court's review is limited to a determination of whether the agency acted in a manner that was

15   "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C.

16   §706(2)(A).  The agency action under review is provided a presumption of administrative regularity,

17   thus a presumption that the agency has acted in accordance with the law.  Citizens to Preserve

18   Overton Park v. Volpe, 401 U.S. 402, 415 (1971).[1]/

19   **V.    ARGUMENT**

20        **A.    Plaintiffs Have not Demonstrated a Likelihood of Success on the Merits.**

21             **1.    DOE Properly Addressed Terrorism Risks on Remand.**

22       Plaintiffs first assert that the DOE failed to adequately address the question of whether the

23   threat of terrorist activities requires preparation of an EIS. Pl. Br. at 13. Plaintiffs have no likelihood

24   of success on this claim.  As set forth below, the DOE carefully evaluated of the threat of terrorist

25

26   [1]/    Ultimately judicial review will be based on (and limited to) the administrative record before
     the agency.  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985).  Because that record

27   has not yet been compiled and filed with the Court, to facilitate the Court's review of Plaintiffs'
     motion for preliminary injunction, Defendants have attached as exhibits several documents which

28   will ultimately be included in the record.

1    activities and reached the determination that preparation of an EIS was not necessary.

2                    **a.      Breach of Containment from Terrorist Attack**

3            DOE first considered the impact of a breach of all facility containment systems caused by

4    an event such as a suicide airplane crash or an explosive device delivered by a vehicle or individual

5    on foot. Exh. 1 at 59. As the EA explains, several factors severely limit the consequences of such

6    an event. First, during routine lab operations, very limited quantities of biological agents would be

7    in use – usually only enough to begin cultures in a petri dish – and such agents would typically be

8    handled in a liquid or solid medium, so that if spilled, very few organisms would be released to the

9    air. Id. When not in use, organisms are stored in 2 mL sealed plastic vials and locked in -80°C

10   freezers. Exh. 6 at C-22. So for any quantity of a pathogen to be released, the lab itself, the freezers

11   and the individual containment vials would all have to be breached, and frozen material converted

12   to a dispersible form. See id. at C-24. Even if the structure were breached and materials in a

13   dispersible form released, the negative air pressure in the building means that air would be drawn

14   *into* the building and through the HEPA filtration system instead of inside air escaping unfiltered.

15   Exh. 7 at ¶ 6. Second, the EA explains that the fire resulting from an airplane crash or explosive

16   device of the magnitude necessary to breach containment would itself kill BLS-3 organisms quickly.

17   Exh. 1 at 59.[2]/ Finally, in the highly unlikely event that a bioagent is released, microorganisms are

18   generally rendered innocuous by exposure to outside conditions, in particular exposure to sunlight

19   and dehydration. Id.

20           The EA explains that these factors would substantially reduce the number of microbes

21   released as a result of a direct attack within minutes, and that the impacts of a facility breach caused

22   by a direct terrorist act, such as a plane crash, would be no greater than the impacts addressed in the

23   accident based "catastrophic release scenario" included in the EA. Exh. 1 at 59.

24           The "catastrophic release scenario" in the EA was designed to evaluate the outside bounds

25   of the impact of an accident-based release of a dangerous bioagent. In formulating the scenario,

26   triggering events such as earthquakes, explosion, fire or airplane crash were all considered. Exh.

27
28   [2]/     For example, *Bacillus anthracis* spores are sterilized in 30 seconds at 200°C. Exh. 6 at C-22.
     In comparison, the flame temperature for gasoline in a "open pool" fire is 1,026°C. Id.

1 at 51. However, because microorganisms are generally rendered innocuous by high temperatures, fire, and sunlight, DOE determined such events would reduce, rather than enhance, the consequences of a release. <u>Id</u>. Thus, after consideration of numerous scenarios, DOE determined the most appropriate release scenario was one that has been used by the U.S. Army in conducting NEPA analyses of its own biological research labs. <u>Id</u>. at 52.

The U.S. Army's "maximum credible event" modeled a scenario in which a portion of a liter of *C. burnetii,* which causes Q-fever, is accidentally aerosolized and released within the lab, resulting in the production of almost 10 billion airborne human infective doses (HIDs). <u>Id</u>. at 54. *C. burnetii* was chosen as a representative of all types of BSL-3 microorganisms because it poses a high human health risk, is "highly durable, infectious, and transmissible, and has excellent environmental sustainability." <u>Id</u>. at 53. The Army then modeled the plume of HIDs as it moved through the lab and outside via the ventilation system. <u>Id</u>. at 54. For conservative results, the Army assumed the lab had only one HEPA filter operating at only 95 percent effectiveness. <u>Id</u>. The Army concluded the chance of public exposure to even a fraction of one HID was extremely remote; at a distance of only 2 meters from the building vent, one liter of air would contain less than 1 HID, and 128 feet from the vent, one liter of air would contain less than 1/100th of an HID. <u>Id</u>. at 54.

DOE found that the chances of exposure at LLNL were even more remote than those modeled by the Army. <u>Id</u>. at 54-55. The Army scenario assumes one HEPA filter that is only 95 percent effective. The LLNL BSL-3 lab, however, filters all room air through two HEPA filter banks, each of which is at least 99.97% effective. <u>Id</u>. at 55. The Army scenario also assumes a lab in close proximity to the public, but the LLNL BSL-3 is one-half mile from the nearest public area. <u>Id</u>. at 52-53. Finally, the Army scenario assumes lower wind speeds than are prevalent at LLNL, and higher wind would decrease airborne concentrations more quickly. <u>Id</u>. Based on this analysis, the DOE concluded that even under a highly unlikely catastrophic release, there would be no significant impact on public health or safety.

The lack of any significant impact on public health is underscored by the fact that all of the bioagents to be used in the BSL-3 facility cause diseases for which treatment or inoculation is available. <u>Id</u>. at 60. LLNL has briefed local health care providers, so that the consequences of any

1  release would be mitigated by inoculation and treatment of exposed individuals.  Id.

2       Finally, the EA notes that the probability of such a successful terrorist attack on the facility

3  is mitigated by the extensive security measures in place at LLNL and the BSL-3 facility itself.  Id.

4  at 60-61.  Unlike the majority of the 1,350 BSL-3 labs nation-wide, which are mostly academic or

5  clinical facilities, the LLNL site is protected by extensive physical security.  LLNL is surrounded

6  by a patrolled security fence with badge-identification required for entry.  Id. at 61.  LLNL is

7  protected by its own security force; which includes an armed emergency response force.  Id.  In

8  addition to LLNL security, access to the BSL-3 facility itself is limited to employees registered with

9  the CDC and screened by LLNL.  Id.  Further, access to individual lab rooms within the building

10 is limited to staff members approved to work during specific shifts, and all lab room are equipped

11 with motion sensors.  Id.  Finally, within the lab, select agents are kept in locked freezers when not

12 in use.  Id.

13      In addition to the physical security described above, DOE has prepared a Biological Risk and

14 Threat Assessment (BRTA) for the LLNL BSL-3 facility, which examined the potential

15 vulnerability of the facility to terrorist attacks and security countermeasures to such threats.  Exh.

16 1 at 61.  Based on the BRTA, the DOE also prepared the LLNL Select Agents and Toxins Security

17 Plan which sets out a protection program for LLNL's select agent use and storage areas.  Id.

18      Thus, DOE concluded that the chance of a terrorist attack resulting in a breach of facility

19 containment and the release of a pathogen was exceedingly remote.  However, if such a breach were

20 to occur, the resulting release would fall within the bounds of the existing catastrophic release

21 scenario, and would not have a significant impact on human health or the environment.

22                **b.    Theft and Release of a Pathogen by a Terrorist**

23      The DOE next considered the theft and subsequent release of a pathogen by a terrorist.

24 Exh.1 at 60.  The EA explains that the types of pathogenic organisms which would be sought by

25 terrorists are widely available from sources other than the LLNL BSL-3 lab.  Not only do hundreds

26 of BSL-3 facilities in the United States regularly handle and store these substances, but many are

27

28

1   widely available from environmental sources. Id. at 62.[3]/ Thus, a terrorist seeking such organisms

2   would be able to find them in any of hundreds of BSL-3 labs nationwide which are less secure than

3   the LLNL facility, or from numerous unguarded natural sources.  Based on the wide availability of

4   such materials, DOE concluded that the proposed facility at LLNL would not have a significant

5   impact on the "avenues already available to a terrorist for obtaining pathogenic materials or

6   measurably increase the likelihood of this type of malicious act." Id. at 63.

7       DOE's conclusion regarding potential impacts of the theft and release of a pathogen from

8   the LLNL facility is reasonable.  Given the wide availability of potentially dangerous bioagents, the

9   operations of a single facility within the highly secure LLNL complex will have no significant

10  impact over the status quo.  Where the proposed action does not significantly alter the status quo,

11  it does not have a significant impact under NEPA.  Burbank Anti-Noise Group v. Goldschmidt, 623

12  F.2d 115, 116 (9th Cir.1980)(holding that an EIS is not required when "the proposed federal action

13  will effect no change in the status quo.").

14                    **c.      Covert Theft and Release of a Pathogen by an Insider.**

15      Finally, DOE considered the possibility of the covert theft and subsequent release of a

16  pathogen by an employee with access to the facility.  Exh. 1 at 63-64.  DOE first notes that

17  numerous safeguards and screening protocols are in place to insure that employees will not remove

18  pathogens from the facility.  Id.[4]/ DOE then acknowledges that in the unlikely event that a pathogen

19  is removed and released, the impacts could be dramatic, as evidenced by the 2001 anthrax release.

20  Id.  However, as with the theft by a terrorist scenario, from a NEPA perspective, the incremental

21  increase in risk from this single facility in light of the 1,350 facilities nation-wide, does not a

22  represent a significant change from the environmental status quo.

23                **2.      Plaintiffs Fail to Demonstrate DOE's Evaluation of Terrorist Attacks is
                           Arbitrary and Capricious.**

24

25  [3]/     See Exh. 1 at 62 (describing the environmental sources of the organisms that cause Anthrax,
         Valley Fever, Hantavirus, Plague and Rabbit Fever).

26  [4]/     For example, personnel with access to select agents must pass LLNL's Select Agent Human
27       Reliability Program (SAHRP), which includes screening for physical, mental and personality
         disorders, alcohol and drug abuse, and any other conditions that may be a security risk.  Exh. 1 at
28       65.

1    Plaintiffs bring a hodgepodge of complaints about the DOE's evaluation of the potential

2    impacts of terrorist attacks. None of Plaintiffs' assertions, whether considered individually or

3    together, demonstrate DOE's evaluation is arbitrary or capricious.

4    Plaintiffs first question DOE's methodology in examining the impacts of a direct terrorist

5    attack resulting in a breach of containment, asserting, on the basis of selective quotations from DOE

6    NEPA guidance, that an accident scenario should not be used to address intentional destructive acts.

7    Pl. Br. at 13. Contrary to Plaintiffs' characterization, the cited DOE guidance actually explains that

8    an accident based scenario "may be appropriate for many, if not most situations where the potential

9    sabotage or terrorist scenarios and the accident scenarios involve similar physical initiating events

10   or forces (e.g. fires, explosions, drops, punctures, aircraft crashes)," and encourages decision makers

11   to "explicitly consider whether the accident scenarios are truly bounding of intentional destructive

12   acts." <u>See</u> Pl. Exh. 13 at 2.[5]/ Here, the DOE made precisely such a determination and found that

13   its catastrophic release accident scenario–which bounds breach events such as a plane crash– was

14   appropriate to bound a breach event caused by a direct terrorist attack by airplane crash or

15   explosives. Exh. 1 at 59-60. Because the accident scenario and the direct terrorist attack scenarios

16   cover "similar physical initiating events," this analysis is imminently reasonable.

17   Plaintiffs also erroneously claim that DOE's use of a bounding analysis was contrary to DOE

18   NEPA guidance. Pl. Br. at 13. To the contrary, the cited guidance merely compares the merits of

19   bounding analyses with other scenarios. Of note, it suggests that a bounding analysis may be

20   appropriate in circumstances –such as the instant case– where there is "analytical uncertainty." Pl.

21   Exh. 16 at 3. In fact, a portion of the guidance omitted by Plaintiffs *recommends* use of a

22   transportation accident scenario to bound the impacts of a terrorist attack on the transportation of

23   nuclear waste. <u>See</u> Exh. 8 at 22.[6]/

24   [5]/    Moreover, a portion of the guidance Plaintiffs omit explicitly indicates that "the

25   consequences of an act of sabotage or terrorism could be discussed by a comparison to the
     consequences of a severe accident because the force that could result in a release of radioactive or

26   hazardous material would be similar to those considered in accident analyses." Exh. 8 at 20.

27   [6]/    While DOE clearly complied with the cited guidance, internal agency guidance documents
     not issued pursuant to notice and comment rulemaking –like those cited– are not legally

28   enforceable. <u>Western Radio Serv. v. Espy</u>, 79 F.3d 896, 901 (9th Cir. 1996).

In addition to criticizing DOE's choice to use a bounding analysis, Plaintiffs also proffer a series of complaints about the maximum credible event scenario itself, none of which demonstrate that its use was arbitrary or capricious. Pl. Br. at 14. First, Plaintiffs criticize the scenario's assumption that air passes through the facility's HEPA filters before being released outside, because they believe (without citation to authority) that a breach in the facility would result in air passing directly outside. Pl. Br. at 14. To the contrary, in the event of a breach, the facility's negative air pressure system would draw air *into* the lab rather than allowing air inside to escape unfiltered. Exh. 7 at ¶ 6; Exh. 1 at 17; Exh. 6 at C-5. Plaintiffs also criticize the assumption that released bioagents will be neutralized by heat and outside conditions, based on the fact that "weaponized" bioagents may be spread by explosive munitions. Pl. Br. at 14.[7] The LLNL BSL-3, however, will not contain "weaponized" or "milled" biological agents that can be spread in this manner. Exh. 6 at C-23.

Plaintiffs speculate (again without citation) that DOE's breach scenario is "improbable" because a terrorist would "attempt to lightly damage the facility so as to result in a loss of containment and release of pathogenic material" without an explosion and fire which would innoculate the agents. Pl. Br. at 15. The question of the most likely attack scenario is a matter of expertise in which the Agency's experts are due deference. National Ass'n of Home Builders v. Norton, 340 F.3d 835, 843 (9th Cir. 2003) (noting that courts defer to agency's reliance of the reasonable opinions of its own qualified experts). However, if the Court chooses to engage in Plaintiffs' speculation over what a terrorist is likely to do, the flaw in Plaintiffs' "light damage without a fire" scenario is that it fails to proffer an event of sufficient magnitude to breach the building as well as the locked freezers and individual plastic vials. The DOE's assumption that any direct attack severe enough to compromise these multiple layers of containment would also involve explosion and fire is a reasonable one.

Plaintiffs criticize the DOE's statement that medical treatment will be available to the local community in the event of a pathogenic release. Pl. Br. at 15. This critique misunderstands the role of medical treatment in the NEPA analysis. DOE's finding of no significant impact does not depend

---

[7]     Plaintiffs' basis for this assertion includes inadmissible hearsay statements from plaintiff Marylia Kelley. Pl. Exh. 2 at ¶ 39.

on medical treatment being immediately available.  As noted above, the DOE found that in the unlikely event of a release, infectious doses drop to less than .01 doses per liter of air within 128 feet of the facility, so members of the public would have "a very low likelihood of being exposed to even a small fraction of one [infectious dose]."  Exh. 1 at 55.  Thus, the fact that the agents used in the facility are all amenable to medical treatment, and local medical providers have been briefed on their treatment provides added assurance that a release will not have significant impacts, but it is not the basis for that finding.  Exh. 1 at 60.  Plaintiffs' unsupported allegation that the BSL-3 lab might release agents that have been genetically altered to make antibiotics ineffective is also off base.  Such work is closely regulated, and any experiment proposing to transfer a drug resistant trait to a microorganism requires specific approval by the NIH.  Exh. 9 at Section III-A-1 & III-A-1-a.

Finally, Plaintiffs assert –relying on the non-expert declaration of a named plaintiff – that a release would cause cessation of operations at LLNL, evacuation of local residents, closure of I-580, and "unprecedented economic disruption throughout the San Francisco Bay Area" and that such impacts should have been addressed in the EA.  Pl. Br. at 16.  This allegation is baseless.  As noted above, the DOE reasonably concluded that in the event of a bioagent release, the concentration of infectious doses would be negligible within 128 feet of the release.  Thus, there would be no need to evacuate the community or close highways, and no reason to speculate about the environmental impacts of such actions.  Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153, 1163 (9th Cir. 1998) (agencies "need not consider potential effects that are highly speculative or indefinite") (citations omitted).

Finally, Plaintiffs do not seriously contest DOE's evaluation of the impacts of the theft and release of a bioagent by a terrorist or  insider.  In particular, Plaintiffs do not challenge DOE's conclusion that given the number of BSL-3 facilities, the incremental change in the risk of a theft and release incident does not constitute a significant environmental impact.  Plaintiffs' sole criticism of the theft event analysis is to assert that the availability of pathogenic materials from natural sources does not reduce the likelihood of an attempt to steal such materials from the LLNL BSL-3 because the facility may hold genetically modified agents or agents with "demonstrated human virulence" unavailable in the environment and a quantity of agents not easily collected in nature. Pl.

1  Br. at 16.  A dispute over whether a terrorist would prefer to attempt to steal from a heavily guarded

2  federal facility or to collect samples from unguarded domestic livestock operations, is a question of

3  expertise as to which DOE is entitled to rely on its expertise in biosecurity issues.  <u>National Ass'n</u>

4  <u>of Home Builders</u>, 340 F.3d at 843 (judicial deference to agency expertise is appropriate); <u>Marsh</u>,

5  490 U.S. at 373 (an  agency is entitled to rely on the reasonable opinions of its own experts even if,

6  "as an original matter, a court might find contrary views more persuasive").  More to the point,

7  however,  Plaintiffs' narrow critique ignores the fact that DOE's determination that the increased

8  risk of a theft and release incident posed by this facility is not significant is based not only on the

9  availability of pathogenic agents from natural sources, but on the fact that these substances are also

10 available from hundreds of relatively unguarded BSL-3 facilities nationwide.[8]/

11         In sum, DOE took a hard look at impacts of multiple terrorist attack scenarios, and reached

12 the reasonable conclusion that those risks do not require preparation of an EIS.  Plaintiffs fail to

13 show this conclusion is arbitrary and capricious.

14     **B.     Plaintiffs Have Not Demonstrated Any Likelihood of Success on their Claim
               that the Agency Should have Prepared an EIS.**

15         Plaintiffs' second claim is that under CEQ's "significance" factors, 40 C.F.R. § 1508.27, the

16 DOE was required to prepare an EIS.  Pl. Br. at 17.  These claims– which are largely attempts to

17 revisit claims rejected in Plaintiffs' prior challenge– all fail.  The DOE reasonably concluded the

18 LLNL BSL-3 would not have significant environmental impacts, and thus preparation of an EIS was

19 not necessary.

20         **1.     The "context" surrounding the BSL-3 Lab does not require an EIS**

21         Among the factors to be considered in the determination of whether a proposal's impacts are

22 significant is their "context."  40 C.F.R. § 1508.27 (a).  With regard to context, Plaintiffs assert that

23 the impacts of the proposed facility are rendered significant by the fact that LLNL is close to

24 Highway 580 and the San Francisco Bay Area.  Pl. Br. at 17.  This claim fails.

25         First, with regard to any pathogen release except one caused by terrorist act, this Court

26

27  _____

28  [8]/     There is no difference in kind or concentration between the agents that may be used at the
         LLNL BSL-3 and those used at other BSL-3 facilities.  Exh. 7 at ¶ 9.

1    previously reviewed and upheld DOE's conclusion that a release would not have significant impacts

2    on the human environment. Exh. 2 at 13. This Court explicitly considered and rejected the claim

3    that the proximity of the LLNL to Highway 580 and the population of the Bay Area rendered the

4    impacts of the facility significant. Id. at 11-12. This analysis was upheld by the Court of Appeals,

5    and is no basis for relitigating it here.[9]/ Exh. 3. However, should the Court wish to consider the

6    question again, the DOE's accidental release scenario makes clear that human infectious doses

7    would be reduced to negligible levels within hundreds of feet of the facility; and would certainly not

8    cross the ½ mile distance between the lab and the nearest public building. Exh. 1 at 54. Plaintiffs

9    fail to demonstrate that conclusion is arbitrary or capricious.[10]/

10    Plaintiffs' second "context" argument asserts DOE should prepare an EIS for the LLNL

11    BSL-3 facility because the DOE has determined to prepare an EIS for a BSL-3 facility at the Los

12    Alamos Nuclear Laboratory in New Mexico. Pl. Br. at 18. This claim fails, however, because the

13    circumstances compelling completion of an EIS for the Los Alamos facility are unrelated to the

14    LLNL facility. As DOE explained in response to public comments, an EA was initially prepared

15    for the Los Alamos facility and a FONSI issued. Exh. 6 at C-4. However, after construction of the

16    facility was complete, DOE determined that the location of the building on fill material on the

17    sloping side of a canyon mandated additional seismic analysis. Id. This issue is unrelated to the

18    impacts of the LLNL BSL-3 facility and does not suggest the DOE was arbitrary or capricious in

19    determining not to prepare an EIS for the LLNL facility.[11]/

20    _____

21    [9]/    This claim, and Plaintiffs' multiple other attempts to relitigate issues and claims resolved in
22    their prior challenge, is barred by the doctrine of res judicata. Res judicata bars relitigation of claims
    where there is (1) identity of claims; (2) final judgement on the merits; and (3) identity of privity of
23    the parties. Western Radio Serv. v. Glickman, 123 F.3d 1189,1192 (9th Cir.1997) (holding NEPA
    claim barred by res judicata). All three criteria are met here.

24    [10]/    To the extent Plaintiffs make their "context" argument in relation the adequacy of the DOE's
25    terrorist release analysis, the DOE took a hard look at the issue, and reasonably concluded that the
    risk of terrorist attack does not require preparation of an EIS. See supra at 7-14.

26    [11]/    Plaintiffs' attempt to parlay the need for additional seismic analysis at Los Alamos into a
27    need for additional seismic analysis at LLNL is unavailing. Both this Court and the Court of
    Appeals have previously upheld DOE's evaluation of seismic issues at LLNL. Exh. 2 at 13; Exh.
28    3 at 3. There is no basis for relitigation of that claim.

1

### 2.    An EIS is not needed to address impacts on public health and safety

2      Plaintiffs assert, based on the alleged risk posed by the potential of a release of a bioagent

3   because of "terrorist attack, accidents, earthquake and fire" that the facility poses significant impacts

4   to public health and safety necessitating an EIS.  This claim fails.  With regard to a release caused

5   by means other than terrorism – such as accidents or earthquakes – this Court and the Court of

6   Appeals have already found DOE's conclusion that such events will not have a significant impact.

7   Exh. 2 at 12-14 and Exh. 3 at 3-4.  There is no basis for relitigation of that claim.  With regard to

8   the risk of a release as a result of a terrorist act, the EA conducted a careful evaluation, and reached

9   the reasonable conclusion that an EIS was not needed.  See supra at 7-14.

10

### 3.    Plaintiffs have not demonstrated the existence of "controversy"

11      Plaintiffs assert that DOE should have prepared an EIS because the possible effects of the

12   LLNL BSL-3 facility on the human environment are highly controversial.  Pl. Br. at 20.  This claim

13   was considered and rejected in Plaintiffs' prior challenge to the EA.  See Exh. 2 at 19-20, Exh. 3 at

14   3-4.  There is no basis for relitigation of this claim here.

15

### 4.    The effects of the facility are not highly uncertain or unknown

16      Plaintiffs assert that an EIS was required because the effects "from the operation of the

17   proposed facility are highly uncertain because there is no precedent for the release of pathogenic

18   material from such a facility in the United States."  Pl. Br. at 21.  In other words, Plaintiffs suggest

19   that because of the *lack* of pathogenic releases from U.S. facilities, the DOE should have prepared

20   an EIS.  To the contrary, the long and safe history of BSL-3 operations in the United States is

21   irrefutable proof that the DOE was reasonable in concluding that the operation of the LLNL BSL-3

22   will not have significant environmental impacts.  As the EA explains, the safety records of the

23   hundreds of CDC-registered BSL-3 labs, the experience of the U.S. Army's BDRP labs, and DOE's

24   own experience with microbiology labs all indicate that the operation of the LLNL BSL-3 will not

25   have significant environmental impacts.  Exh. 1 at 41-42.[12]/

26

27   [12]/    To the extent Plaintiffs are asserting that DOE erred in relying on the safe history of BSL-3
operations nation-wide, that claim has been reviewed and rejected by this Court and the Court of
28   Appeals and there is no basis for relitigating it here.  Exh. 2 at 10-13; Exh. 3 at 3-4.

Opposition to Plfs' Mtn. for Prelim. Inj., 08-cv-1372-SBA - page 17

1

**5.    An EIS is not required to consider the BWC**

2        Plaintiffs assert that DOE should have prepared an EIS because the LLNL BSL-3 facility

3    "threatens a violation of the Biological Weapon Convention" (BWC).  Pl. Br. at 21.  DOE has

4    explained that the LLNL BSL-3 does not violate the BWC.  Exh. 6 at C-10.    Plaintiffs'

5    disagreement is a policy dispute that falls outside the bounds of NEPA.  Metro. Edison Co. v. People

6    Against Nuclear Energy, 460 U.S. 766, 777 (1983) ("Neither the language nor the history of NEPA

7    suggest that it was intended to give citizens a general opportunity to air their policy objections to

8    proposed federal actions.  The political process, and not NEPA, provides the appropriate forum in

9    which to air policy disagreements.").

10        Indeed, Plaintiffs tried and failed to bring this precise claim in their prior case, and this

11    Court, in a decision affirmed by the Court of Appeals, struck all testimony proffered by Plaintiffs

12    on the issues of compliance with the BWC.[13]/  See Dkt 121 at 7.  Plaintiffs are unlikely to succeed

13    on their claim that DOE should have prepared an EIS to address potential violations of the BWC.

14    **C.    Plaintiffs Have Not Demonstrated a Likelihood of Success on their Claim that
            the Agency Failed to Supplement the EA.**

15        Plaintiffs' next claim on the merits is that the DOE violated NEPA by failing to supplement

16    the Revised EA to address a laundry-list of allegedly significant new circumstances or information

17    that became available only after the document was issued.  Pl. Br. at 22.  This claim fails.

18        NEPA imposes a continuing duty to supplement NEPA analyses in response to "significant

19    new circumstances or information relevant to environmental concerns and bearing on the proposed

20    action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).[14]/  To warrant supplementation, the new

21    information or changed circumstances must present a "seriously different picture of the likely

22    environmental harms stemming from the proposed project."  Wisconsin v. Weinberger, 745 F.2d

23    ─────────────────────────

24    [13]/    Plaintiffs go so far as to resubmit to this Court the previously stricken testimony. *Compare*
          current Wheelis Decl. (Pl. Exh. 3) at ¶¶ 18-24 *with* Wheelis Decl.  (03-cv-3926 Dkt No. 61-5) at ¶¶
25        7, 10, 11, 13, 16, 17, 18.  This testimony is no more admissible now than it was in the last case.
          Plaintiffs also attempt to bolster this claim with an inadmissible hearsay statement from plaintiff
26        Marylia Kelley about the concerns of unidentified diplomats.  Pl. Exh. 2 at ¶ 38.

27    [14]/    While 40 C.F.R. § 1502.9(c)(1)(ii) only addresses the duty to supplement an EIS, it has been
          applied to EAs by the Ninth Circuit.  Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1152 (9th
28        Cir. 1998).

1    412, 420 (7th Cir. 1984).[15]/  Thus, a supplemental EIS is not required "every time new information

2    comes to light after the EIS is finalized.  To require otherwise would render agency decisionmaking

3    intractable, always awaiting updated information."  Marsh, 490 U.S. at 373-74.

4        Each of the alleged new circumstances identified by Plaintiffs is addressed below:

5                **1.    2005 Shipping Incident**

6        The first allegedly significant new information cited by Plaintiffs is a 2005 incident in which

7    two vials containing *Bacillus anthracis* (anthrax) were improperly closed prior to shipment out of

8    LLNL so that they leaked from their primary containers into the inner packaging of the secondary

9    container, but did not escape tertiary containment.  Nobody was injured as a result of the incident,

10   and CDC and DOT inspected LLNL's select agent program and approved of improvements made

11   to address the causes of the incident.  Exh. 1 at 56-57.

12       This is not a case of new information which became available only after the Revised EA was

13   issued.  As Plaintiffs concede, the incident was addressed in the draft Revised EA which was issued

14   for public comment on May 11, 2007.  After the close of the comment period, Plaintiffs wrote DOE

15   to complain about the lack of detail with which the incident was discussed.  See Pl. Exh. 2 at ¶ 28.

16   In response to Plaintiffs' comment, the DOE presented a more detailed discussion of the 2005

17   shipping incident in the final Revised EA.  Exh. 6 at C-26; Exh. 1 at 56-57.

18       Plaintiffs' claim therefore, is not that DOE failed to address the 2005 shipping incident in

19   the final Revised EA, but that the DOE was required to recirculate the final Revised EA for

20   additional public comment on the more detailed discussion of the incident.  This claim fails.  First,

21   NEPA does not require that EAs be circulated for public comment in the first instance.  Bering Strait

22   Citizens v. U.S. Army Corps of Eng'rs, 511 F.3d 1011, 1025 (9th Cir. 2008).[16]/  Just as DOE was

23   not obligated to circulate the draft EA for public comment, it was also not required to recirculate the

24   _____

25   [15]/    See also Sierra Club v. Froehlke, 816 F.2d 205, 210 (5th Cir. 1987) ("[N]ot every new
     circumstance, however small, requires filing a SEIS; the new circumstance must present a *seriously*
26   *different* picture of the environmental impact of the proposed project from what was previously
     envisioned") (emphasis in original).
27
     [16]/    Nor do DOE regulations require that EAs be circulated for public comment.  See 10 C.F.R.
28   § 1021.301(d) (obligating DOE to circulate draft EAs only to host tribes and host states).

1  final EA.  Unsurprisingly, Plaintiffs cite no caselaw for the proposition that the addition of detail to

2  the Final EA of an issue described in the draft –in response to public comments on the draft EA –

3  requires that the final EA be circulated for public comment.  Indeed, the only caselaw of which

4  Defendants are aware holds precisely the opposite.  See Biodiversity Conservation Alliance v. U.S.

5  BLM, 404 F.Supp.2d. 212, 220 (D.D.C. 2005) (noting that "Plaintiffs have not cited any binding

6  authority to support their argument that the regulations require an agency to solicit supplemental

7  public comments when there are changes to the proposed action before the EA has been issued," and

8  holding that an increase in project area did not require agency to solicit supplemental public

9  comments on final EA).

10      Finally, even taking the 2005 incident as new information, nothing in the more detailed

11  description of the 2005 shipping incident "affect[s] the environment in a significant manner or to

12  a significant extent not already considered," Marsh, 490 U.S. at 374, or "provides a *seriously*

13  *different picture of the environmental landscape.*" Nat'l Comm. for the New River v. F.E.R.C., 373

14  F.3d 1323, 1330 (D.C. Cir. 2004) (emphasis in original).  The transportation analysis in the EA is

15  reasonably based on the safe history of the transportation of *thousands* of shipments annually of

16  hundreds of *tons* of infectious materials.  A single transportation incident, in which nobody was

17  injured and there was no public release, does not provide a seriously different picture of impacts of

18  the proposed facility.[17]/  Indeed, the fact that the incident was reported to CDC, and that CDC and

19  DOT inspected LLNL's shipping protocols and approved of the improvements made by the lab,

20  illustrates that shipping of BSL-3 agents is subject to robust oversight and effective controls.

21          **2.      Information regarding safety and security of BSL-3 facilities**

22      Plaintiffs next assert that DOE was required to supplement the EA to address a newspaper

23  article from October 2, 2007, which reports on incidents at BSL-3 and BSL-4 facilities around the

24  country.  Pl. Br. at 26.  Plaintiffs contend that article "undercuts" DOE's conclusion that laboratory

25  staff are unlikely to acquire infection during the operation of the facility, and that transportation

26

27  [17]/      Plaintiffs previously challenged DOE's evaluation of the risks of transporting BSL-3 agents.
   Both this Court and the Ninth Circuit upheld that analysis.  Exh. 2 at 8-10; Exh. 3 at 3-4.  They may
28  not relitigate that issue here.

1   related incidents are unlikely to increase. Id.[18]/

2       As noted above, see supra at 4-5, the DOE carefully analyzed the safety of lab operations,

3   and based its conclusion that the risk of laboratory infection in the facility was no different than at

4   other BSL-3 facilities and was not significant based on the nearly 30-year history of safe operations

5   of BSL-3 labs in the country.  Nothing in the October 2007 article makes the DOE's conclusion

6   –which is based on *decades* of experience– arbitrary or capricious.  Nor does the article demonstrate

7   a "seriously different picture of the likely environmental harms stemming from the proposed action."

8   Wisconsin v. Weinberger, 745 F.2d at 420.

9                     **3.     GAO Report on the Increase in BSL-3 Facilities**

10      Plaintiffs next point to a Governmental Accountability Office (GAO) Report which found

11  a "major proliferation" of BSL-3 and BSL-4 facilities in the United States.  Pl. Br. at 27.  The GAO

12  report does not constitute new information.  As Plaintiffs themselves concede, the DOE considered

13  the GAO report in preparing the Revised EA.  Id.  Thus Plaintiffs' complaint cannot be that the

14  GAO report constitutes new information requiring supplementation of the Revised EA, but rather

15  a disagreement over the weight given the Report in the Revised EA.  In this regard, Plaintiffs allege

16  that the expansion in the number of BSL-3 facilities "may obviate the need" for a BSL-3 facility at

17  LLNL.  Pl. Br. at 27.  This assertion fails because it rests on the erroneous assumption that the only

18  reason for an on-site BSL-3 facility is the lack of availability of off-site facilities.  To the contrary,

19  as explained in the EA, using off-site facilities does not serve the Agency's purpose and need for

20  a multitude of reasons: the chances of cross-contamination and degradation of samples is increased

21  by the excessive handling and transportation required by using off-site labs; third party facilities

22  cannot uniformly meet the information and physical security requirements needed by the DOE and

23  DHS; off-site facilities may not be able to provide the "chain of custody" requirements for federal

24  projects; and it is not cost effective to use off-site facilities when the human expertise is available

25

26  _____
    [18]/     Plaintiffs also cite a list of incidents proffered in the declaration of Edward Hammond.  The
27  majority of the incidents, however, occurred before May 2007 when the revised EA was circulated
    for public comment.  Information available to Dr. Hammond during the public comment period
28  should have been submitted to the Agency during that time, and cannot now form the basis for a
    "new" information claim.  Dep't of Transp. v. Public Citizen, 541 U.S. 752, 765 (2004).

1    on-site. <u>See</u> Exh. 1 at 7; Exh. 6 at C-28, C-29; Exh. 5 at ¶ 6. Thus, while the lack of availability of

2    other facilities is one factor contributing to the need for a BSL-3 facility on-site, there are numerous

3    other factors which are not impacted by the increase in off-site facilities, and the increase in the

4    number of BSL-3 facilities nation-wide does not suggest that the DOE was arbitrary and capricious

5    in its determination that it needs a BSL-3 facility on-site at LLNL.

6               **4.      Congressional Hearing**

7         Plaintiffs also list as a separate "new circumstance" an October 2007 Congressional hearing

8    at which the GAO report addressed above was presented. As noted above, nothing in the GAO

9    report demonstrates that the conclusions reached by DOE in the EA were arbitrary and capricious.

10    Plaintiffs point to nothing in the Congressional hearing reiterating that report which demonstrates

11    a "seriously different picture of the likely environmental harms stemming from the proposed action."

12    <u>Wisconsin v. Weinberger</u>, 745 F.2d at 420.

13               **5.      Leitenberg Report**

14         Finally, Plaintiffs assert that a December 2005 research paper by Milton Leitenberg which

15    argues "the U.S. biodefense research program appears to be drifting into violation" of the Biological

16    Weapons Convention (BWC) constitutes significant new information requiring supplementation of

17    the EA. Pl. Br. at 28. This claim fails. First, and most simply, the December 2005 report does not

18    constitute new information. The draft Revised EA was circulated for public comment in May 2007

19    –almost two years after the cited report. The Revised EA explains that the BSL-3 facility will

20    comply with the BWC (Exh. 1 at 18) and the DOE addressed concerns about compliance with the

21    BWC that were submitted during the comment period. Exh. 6 at C-10 to C-11. To the extent that

22    Plaintiffs believe that this specific report adds significantly to that discussion, they had the ability

23    and the obligation to present the report to DOE during the public comment period. By failing to do

24    so, Plaintiffs have waived their right to pursue the issue in this Court. <u>Dep't of Transp. v. Public</u>

25    <u>Citizen</u>, 541 U.S. 752, 765 (2004) (holding that respondent forfeited particular challenges to an

26    agency action when it failed to raise those challenges in the public comment period); <u>Universal</u>

27    <u>Health Serv. Inc., v. Thompson</u>, 363 F.3d 1013, 1019 (9th Cir. 2004) (holding "a party's failure to

28    make an argument before the administrative agency in comments on a proposed rule barred it from

1    raising that argument on judicial review").

2         Second, even if the Leitenberg Report constitutes new information, it does not compel

3    supplementation of the EA.  As noted above, see supra at 17-18, the assertion that operation of the

4    LLNL BSL-3 facility will violate the BWC is a political policy dispute beyond the ambit of the

5    environmental impacts to be addressed under NEPA.  Metropolitan Edison, 460 U.S. at 777.

6         **D.    DOE Was Not Required to Make the LLNL BSL-3 FONSI Available for Public
              Review Before Implementing the Project.**

7         Plaintiffs assert that the DOE was obligated by CEQ regulations to make the FONSI

8    available for public review for 30 days before implementing the project, because "[t]he nature of the

9    proposed action is one without precedent."  Pl. Br. at 29 (citing 40 C.F.R. § 1501.4(e)(2)(ii)).

10   Notwithstanding the 1,350 existing BSL-3 facilities, Plaintiffs attempt to portray the LLNL BSL-3

11   facility as "without precedent" by emphasizing that it is the first such facility to be proposed by the

12   DOE.  Pl. Br. at 30.  This argument misstates the law.

13        The question of whether a proposed action is "without precedent"under 40 C.F.R. §

14   1501.4(e)(2)(ii), turns on the nature of the *environmental* impact of the action rather than the agency

15   with jurisdiction over the project.  For example, in Alliance to Protect Nantucket Sound, Inc. v. U.S.

16   Dep't of Army, 288 F. Supp. 2d 64, 78-79 (D. Mass. 2003), plaintiffs alleged the Corps' approval

17   of a privately owned data tower in waters under federal jurisdiction was without precedent because

18   the only other data towers in the area were in State waters and publicly owned.  The district court

19   rejected this contention: "From an environmental perspective, however, these differences are

20   irrelevant. Neither the location nor the nature of ownership of Cape Wind's data tower render its

21   environmental impacts different from those of the Martha's Vineyard tower."  Id. at 79 n.107.  The

22   First Circuit affirmed, emphasizing that "[t]he CEQ regulations, however, are designed to address

23   environmental impact. . . . [and] we can see nothing unprecedented about the way this data tower

24   will impact the environment.  398 F.3d 105, 115 (1st Cir. 2005).

25        Here there is no difference between the environmental impacts of the LLNL BSL-3 facility

26   and the 1,350 other facilities nation-wide, and consequently DOE was not required to make the

27   FONSI available for public review before implementing the project.

28

Opposition to Plfs' Mtn. for Prelim. Inj., 08-cv-1372-SBA - page 23

1

2

## VI. THE BALANCE OF EQUITIES STRONGLY MILITATES AGAINST ISSUANCE OF A PRELIMINARY INJUNCTION

3

### A. Plaintiffs Have Not Demonstrated They Will Suffer Irreparable Injury.

4

5

6

Plaintiffs assert irreparable injury in the form of the risk to the public health posed by the release of a pathogen from the LLNL BSL-3 facility.  Pl. Br. at 31.  Plaintiffs do not explain why the risks of such a release at this facility are of greater concern than the risk from any of the BSL-3 labs around the country in operation every day.

7

8

9

10

As set forth above, the DOE has taken a hard look at the environmental impacts of the proposed facility and reached the reasonable conclusion that – particularly when considered in the context of the hundreds of other facilities in operation, and in light of the physical security available at LLNL – this single facility will not have a significant impact on the environment.

11

12

13

14

15

16

17

18

19

The possibility of an event resulting in the accidental release that Plaintiffs fear rests on a chain of speculation too attenuated to justify preliminary injunctive relief.  For example: a terrorist attack or earthquake would have to occur; AND the incident would have to breach multiple layers of containment; AND the breach would have to occur in a manner that did not generate sufficient heat to innoculate the bioagents or release solvents which would kill bioagents; AND the incident would have to damage the negative air pressure system which otherwise would draw air into the structure instead of allowing it to escape unfiltered; AND upon release, biological agents would have to survive external environmental conditions which would quickly innoculate and dilute the agents to the point that they would not pose a public health hazard.

20

21

22

23

24

25

Thus, the risk that Plaintiffs claim as an irreparable harm is based on a chain of events, each of which is exceedingly unlikely to occur. Such a speculative possibility cannot constitute an irreparable harm that would justify injunctive relief.  Caribbean Marine Serv., 844 F.2d at 675 (finding that plaintiffs' injuries "too remote and speculative to constitute irreparable injury" where "[m]ultiple contingencies must occur before their injuries would ripen into concrete harms.").[19]/

26

27

28

---

[19]/    Moreover, to justify a preliminary injunction, Plaintiffs must demonstrate that they face a risk of this speculative chain of events occurring *during the adjudication of this case* on the merits. 11A Wright & Miller § 2948.1 ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer

### B.    An Injunction Will Harm the Public Interest

In exercising its discretion to determine whether an preliminary injunction is appropriate, the Court "should pay particular regard" to the public interest. Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). In this case, the public interest strongly disfavors an injunction. As explained in the attached declarations of Jeffrey Stiefel and Susan Elizabeth George, the LLNL BSL-3 facility will perform critical work to improve the Nation's ability to detect and respond to the threat of terrorism using biological agents, and accordingly, halting operations at the facility would directly and adversely impact national security. Exhs. 10 and 11.

### C.    An Injunction Will Harm LLNL's Biological Security Program

In contrast to Plaintiffs' entirely speculative harm, an injunction poses a concrete harm to LLNL. LLNL is in the midst of the annual funding proposal cycle and is applying for funding to perform BSL-3 work for the next year. See Exh. 5 at ¶ 4. Even a short-term injunction would result in the withdrawal of current proposals, forcing LLNL to wait another year to request funding. A loss of funding for this year would translate into the loss of jobs for up to eight people. Id. at ¶ 6. This delay could have a long term impact on LLNL's ability to retain and recruit staff, because without an operational BSL-3 facility, LLNL lacks a basic tool needed to conduct research in this field, and qualified researchers may other facilities to pursue their research careers. Id. at ¶ 5.

## VII.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction halting ongoing operations at the LLNL BSL-3 facility should be denied.

Dated this 26th day of March, 2008.

                                         Respectfully submitted,
                                         RONALD J. TENPAS
                                         Assistant Attorney General

                                          /s/ Barclay T. Samford
                                         BARCLAY T. SAMFORD
                                         Trial Attorney
                                         U.S. Department of Justice
                                         Environment & Natural Resources Division
                                         1961 Stout Street, 8th Floor
                                         Denver, CO 80294

---

irreparable harm before a decision on the merits can be rendered").