JOSEPH P. RUSSONIELLO
United States Attorney
CHARLES O'CONNOR
Assistant United States Attorney
450 Golden Gate Ave., Box 36055
San Francisco, CA 94102
Telephone: (415) 536-6967
Facsimile: (415) 436-6748

RONALD J. TENPAS
Assistant Attorney General
BARCLAY T. SAMFORD (NMBN 12323)
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
1961 Stout St., 8th Floor
Denver, CO 80294
Telephone: (303) 844-1475
Facsimile: (303) 844-1350

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| TRI-VALLEY CARES, MARYLIA KELLEY, JANIS KATE TURNER, and JEDIDJAH DE VRIES, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF ENERGY, NATIONAL NUCLEAR SECURITY ADMINISTRATION, LAWRENCE LIVERMORE NATIONAL LABORATORY, <br><br> Defendants. | Case No. 08-cv-1372-SBA <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF** |

1  **I.    INTRODUCTION**

2      Before the Court is Plaintiffs' second motion to file a supplemental brief in support of

3  their motion for a preliminary injunction against operation of the Biosafety Level-3 ("BSL")

4  facility at Lawrence Livermore National Laboratory ("LLNL") at Livermore, California.  Dkt.

5  No. 47.  In their motion, Plaintiffs seek the admission – as extra-record evidence "necessary to

6  determine whether the agency has considered all relevant factors and has explained its decision,"

7  – of a draft Environmental Impact Statement ("EIS") issued in June 2008 by the Department of

8  Homeland Security ("DHS") for a proposed National Bio and Agro-Defense Facility ("NBAF").

9  As set forth below, Plaintiffs' motion must be denied.  First, Plaintiffs' motion fails because the

10 proffered draft EIS was not available to the DOE at the time the BSL-3 decision was made, and

11 post-decision materials are not admissible extra-record evidence of factors an agency allegedly

12 failed to consider.  Second, assuming arguendo, that post-decision materials are admissible, the

13 draft EIS for the NBAF does not demonstrate that the DOE failed to consider any relevant

14 factors or was otherwise arbitrary or capricious in issuing the EA for the LLNL BSL-3 facility.

15 **II.    LEGAL STANDARDS**

16      Judicial review of the adequacy of the BSL-3 EA prepared by the DOE is governed by

17 the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Under the APA, a court is to review

18 an agency's decision on the basis of the administrative record that existed before the agency at

19 the time the decision was made.  Both the Supreme Court and the Ninth Circuit have emphasized

20 that "the focal point for judicial review should be the administrative record already in existence,

21 not some new record made initially in the reviewing court."  Camp v. Pitts, 411 U.S. 138, 142

22 (1973).  See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985);  Southwest Ctr. for

23 Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996).  As the Ninth

24 Circuit has held, "[t]he task of the reviewing court is to apply the appropriate APA standard of

25 review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the

26 reviewing court."  Friends of the Earth v. Hintz, 800 F.2d 822, 829 (9th Cir. 1986) (quoting

27 Florida Power & Light Co., 470 U.S. at 743-44); see Southwest Ctr. for Biological Diversity,

28 100 F.3d at 1450-51.

1    If the record is not sufficient to judge the agency's decision, the decision should be

2    remanded. Courts are not to consider information "that was not available at the time the

3    [Agency] made its decision." Airport Cmty. Coalition v. Graves, 280 F. Supp. 2d 1207, 1213

4    (W.D. Wash. 2003) (noting that consideration of "new information represents 'Monday morning

5    quarterbacking.'").

6    The Ninth Circuit allows a reviewing court to consider extra-record materials in APA

7    cases only under four narrow exceptions: "(1) if necessary to determine 'whether the agency has

8    considered all relevant factors and explained its decision,' (2) 'when the agency has relied on

9    documents not in the record,' (3) 'when supplementing the record is necessary to explain

10   technical terms or complex subject matter,'" or (4) "'when plaintiffs make a showing of agency

11   bad faith.'" Inland Empire Public Lands Council v. Glickman, 88 F.3d 697, 703-04 (9th Cir.

12   1996) (quoting Friends of the Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 997

13   (9th Cir. 1993) (per curiam) and National Audubon Soc'y v. U.S. Forest Serv., 46 F.3d 1437,

14   1447 n.9 (9th Cir. 1993)).

15   Mere allegations that the court should look beyond the administrative record to consider

16   material falling into one of the four exceptions are not sufficient; a plaintiff must first make a

17   showing that the record is inadequate. Animal Defense Council v. Hodel, 840 F.2d 1432, 1437

18   (9th Cir. 1988) ("The [plaintiff] makes no showing that the district court *needed* to go outside the

19   administrative record to determine whether the [agency] ignored information") (emphasis

20   added).

21

22   **III.  ARGUMENT**

23   **A.  The Draft EIS for the NBAF Does Not Fall Within Any Exception to Record Review.**

24   As noted above, the Ninth Circuit recognizes four limited exceptions to the rule that the

25   review of an agency action is limited to the administrative record. Plaintiffs assert that the

26   NBAF draft EIS is admissible under the exception for materials necessary to determine "whether

27   the agency has considered all relevant factors and explained its decision." Pls.' 2nd Mot. for

28   Leave at 3. This claim fails at the threshold because the exception allowing admission of extra-

record material to determine whether the agency has considered all relevant factors and explained its decision, "only applies to information available at the time, not post-decisional information." <u>Rock Creek Alliance v. U.S. Fish and Wildlife Serv.</u>, 390 F. Supp. 2d 993, 1002 (D. Mont. 2005) (denying motion to submit extra-record material unavailable when the decision was made).

As the court in <u>Airport Communities Coalition</u>, 280 F. Supp. 2d at 1213, explained in striking extra-record material unavailable to the agency when the decision was made:

> Here the extra-record information represents new information that was not available at the time the [agency] made its decision. If the information had been available within that time frame, the court could then use that information to determine whether the [agency] acted arbitrarily and capriciously in not considering that information as a relevant factor . . . . If the court were to consider this new information in an arbitrary and capricious analysis the court would effectively transform that analysis into a *de novo* review, a level of review for which this court is not authorized.

Here, the final revised EA for the LLNL BSL-3 facility was issued on January 25, 2008. Defs' Exh. 5 [Dkt. No. 12] at ¶ 3. The draft EIS for NBAF was issued six months later, in June 2008. The draft EIS for the NBAF was therefore not available for consideration by the DOE during the decisionmaking process for the LLNL EA, and consequently does not fall within any exception to record review. For this reason alone, Plaintiffs' motion to file a supplemental brief should be denied.

**B.    Even if Post-Decision Documents are Admissible, the Draft EIS for NBAF Does Not Show DOE Failed to Consider Relevant Factors or Explain its Decision.**

Even if the Court determines that documents unavailable to the agency at the time the challenged decision was made may fall within an exception to record review, the NBAF draft EIS does not bear on whether the DOE considered all relevant factors and explained its decision.

**1.    The Proposed NBAF and the LLNL BSL-3 are Not Comparable Facilities.**

Plaintiffs first assert that because of the "structural and operational similarities" and "like potential for significant impacts," of the two facilities, the fact that an EIS was prepared for the

1   proposed NBAF suggests an EIS should also have been prepared for the LLNL BSL-3.[1]  This

2   claim fails.

3          There is little structural commonality between the two facilities.   The proposed NBAF

4   facility is a complex composed of six buildings encompassing 500,000 to 520,000 square feet

5   and requiring 30-acres of open land.  DEIS at ES-3 and 1-2.[2]  In contrast, the LLNL BSL-3 is

6   single 1,500 square foot building constructed on 1/4 quarter acre of land.  FREA at 9.  The

7   proposed NBAF includes a staff of 250-350 people, while the LLNL BSL-3 lab has a staff of six.

8   Compare DEIS at 1-2 with FREA at 9.  NBAF could house 200 to 300 large animals at any

9   given time, including cattle, swine and sheep, while the BSL-3 has the capacity of contain a

10  maximum of 100 small rodents.  Compare DEIS at 2-1 with FREA at 16.

11         Obviously, two such vastly different facilities will have substantially different impacts.

12  For example, the draft EIS for NBAF anticipates that the facility will generate 25 to 30 million

13  gallons of wastewater annually, while the LLNL BSL-3 is anticipated to generate 10,000 gallons.

14  Compare DEIS at ES-7 with FREA at 24.  Moreover the NBAF, which would be similar in size

15  to a 400 bed hospital or 1,600 student high school, would have unavoidable adverse visual

16  impacts.  DEIS at ES-7.  In contrast, the LLNL BSL-3 occupies a former parking lot and has "no

17  visual issues."  FREA at 31.  These differences easily justify the preparation of an EIS in one

18  case and an EA in the other.

19         The operational differences between the two facilities also belie Plaintiffs' suggestion

20  that the NABF draft EIS demonstrates an EIS should have been prepared for the LLNL BSL-3.

21

22  [1]      Plaintiffs attempt in passing to resurrect their argument that DOE should prepare an EIS
    for the LLNL BSL-3 facility because the DOE has determined to prepare an EIS for a BSL-3
23  facility at the Los Alamos Nuclear Laboratory in New Mexico.  Pls.' 2d Supp. Br. at 7, n. 4.  As
    explained in Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction, this
24  claim fails because the circumstances surrounding the preparation  of an EIS for the Los Alamos
    facility are unrelated to the LLNL facility.  Defs' Opp. to Plfs.' Mot. for Prelim. Inj. [Dkt. No.
25  11] at 16.
26  [2]      Defendants will cite to the Draft EIS for the NBAF, which is Exhibit 30 to Docket
    Numbers 47-49, as "DEIS" followed by the appropriate page.  Defendants will cite the Final
27  Revised EA for the  LLNL BSL-3, which is Exhibit 1 to Dkt. No. 12, as "FREA" followed by
    the appropriate page.
28

1    Most critically, the NBAF will include between 55,000 and 57,000 square feet designed for

2    BSL-4 research.  DEIS at 1-2 ("Approximately 11% of the 500,000 to 520,000-square-foot

3    NBAF would be designed for BSL-4 research...").  Unlike a BSL-3 facility, which utilizes

4    pathogens for which medical treatment is available, BSL-4 facilities are equipped to handle

5    "exotic pathogens that pose a high risk of life threatening disease in animals or humans through

6    the aerosol route and for which ***there is no known vaccine or therapy***."  DEIS at 1-2 (emphasis

7    added).  The presence of a BSL-4 capability alone is a critical difference between the two

8    facilities from a NEPA perspective.  As explained in the NBAF draft EIS, while there are 1,356

9    BSL-3 facilities in 46 states, there are only 15 planned, under construction or operational BSL-4

10   labs nation-wide.  DEIS at 1-3.  Further, once constructed, the NBAF will be the ***only*** large

11   animal or livestock BSL-4 facility in the United States.  DEIS at 1-3.

12           Plaintiffs' suggestion that the two facilities will work with similar types and volumes of

13   pathogens is also baseless.  Pls.' 2nd Supp. Br. at 6.  The NBAF is proposed to "enable basic and

14   advanced research, diagnostic testing and validation, countermeasure development (i.e. vaccines

15   and antiviral therapies), and diagnostic training for high-consequence livestock diseases with

16   potentially devastating impacts to U.S. agriculture and public health."  DEIS at ES-1.  In pursuit

17   of that mission, NBAF will focus on zoonotic (capable of animal to human transmission) and

18   foreign animal diseases, including African swine fever, classical swine fever, foot and mouth

19   disease ("FMD"), Japanese encephalitis, Rift Valley fever and the Hendra and Nipah viruses,

20   DEIS at 1-2, none of which are expected to be cultured at the LLNL BSL-3.  One of the principal

21   missions of the NBAF is development of a vaccine for FMD, which "is one of the most

22   devastating viral animal diseases affecting cloven hoofed animals."  DEIS at 1-4. The mission of

23   the LLNL BSL-3, in contrast, targets the reduction of the national threat from terrorism using

24   biological weapons and enhancement of public health capabilities.  FREA at 6.

25           Plaintiffs also assert that the LLNL BSL-3 facility holds the same volume of pathogenic

26   material, "concentrated in a smaller area," as NBAF.  Pls.' 2d Supp. Br. at 6, n. 3.  This assertion

27   is incorrect.  While the NBAF draft EIS does not explicitly set forth the maximum volume of

28   pathogenic material contained facility-wide, the quantity of material at risk used in the NBAF

accident analysis suggests a total facility volume of approximately **10,000 liters** –
approximately 200 times the capacity of the LLNL BSL-3 facility.[3]/  See Second Declaration of
Eric Gard (attached as Exhibit 1) at ¶ 4.

In sum, the NBAF facility is vastly larger than the LLNL BSL-3, works with a vastly
larger volume of different and higher risk pathogens than the LLNL BSL-3 facility, and serves a
different purpose than the BSL-3 facility.  Moreover, rather than one of over a thousand similar
facilities nation-wide like the LLNL BSL-3, the NBAF is the first of its kind in the United
States.  Under these circumstances, the decision to prepare an EIS for the NBAF does not
suggest that DOE was arbitrary and capricious in its decision not to prepare an EIS for the LLNL
BSL-3.

### 2.    The NBAF EIS Does Not Suggest the DOE Failed to Consider Relevant Factors in Evaluating the Threat of Terrorist Activity.

Plaintiffs assert that the draft EIS for the NBAF demonstrates that the DOE failed to take
a "hard look" at the potential environmental consequences of a terrorist attack at the proposed
BSL-3 facility.  Pls.' 2nd Mot. for Leave at 2.  This claim fails.

First, as noted above, the NBAF and the LLNL BSL-3 are not comparable facilities, and
for that reason, the methodology utilized in one analysis does not suggest that the methodology
for the other analysis was inappropriate.  For example, the LLNL BSL-3 adds one facility to a
baseline of hundreds of facilities nation-wide, and thus makes a negligible incremental change in
the risk of a terrorist attack.  See FREA at 63.   In contrast, the NBAF is the only facility of its
kind, and thus the difference between action and no-action is more likely meaningful.

However, to the extent that any comparison is appropriate, the terrorist analysis
conducted by the DHS for the NBAF is similar to that prepared for the LLNL BSL-3.  For
example, the DHS developed a Threat and Risk Assessment ("TRA") to "identify potential
vulnerabilities and weaknesses . . . and . . . recommend the most prudent measures to establish a
reasonable level of risk for the security of operations fo the NBAF."  DEIS at 3-430.  Similarly,

---

[3]/      Of course, it seems common sense that a facility with 300 times more square feet than
the LLNL BSL-3 would also contain a far higher volume of pathogens.

1    for the LLNL lab, the DOE developed a Biological Risk and Treat Assessment ("BRTA") to

2    "examine the potential vulnerabilities of the facility and its operations, and to mitigate risks."

3    FREA at 61.  Both the TRA for NBAF and the LLNL EA consider threats of external acts and

4    internal sabotage.  Compare DEIS at 3-341 with FREA at 58.  The NBAF TRA addressed

5    mitigating threats through measures such as personnel security programs, contractor screening

6    and monitoring, perimeter security procedures, behavior observation programs, inventory

7    control,  and coordination with local emergency response agencies.  DEIS at 3-433.  The EA for

8    LLNL discussed analogous mechanisms for mitigating threats to the BSL-3 lab.  See FREA at 63

9    (discussing"personnel security and screening programs"); id. at 61 (discussing perimeter

10   security), id. at 65 (discussing personnel and inventory monitoring); id. at 60 (discussing

11   coordination with local medical providers).  In sum, the analytical approaches taken for the two

12   documents are quite similar.[4]/

13        Finally, with regard to the Ninth Circuit's direction on remand, that the DOE "consider

14   whether the threat of terrorist activity necessitates the preparation of an Environmental Impact

15   Statement," the draft EIS for NBAF supports the DOE's conclusion that the threat of terrorist

16   activities does not have significant impacts requiring an EIS.  Tri-Valley CARES v. Dep't of

17   Energy, No. 04-17252, 2006 WL 2971651, at *2 (9th Cir. Oct. 16, 2006).  While the DHS has

18   prepared an EIS, that analysis was not compelled by the impacts of potential terrorist activities.

19   To the contrary, the draft EIS concludes that "[t]he evaluation demonstrated that the risks from

20   intentional acts could be reduced to very low levels with the identified security features."  DEIS

21   at 3-434.[5]/

22        In sum, nothing in the evaluation of the threat of terrorist activity conducted for the

23

24   [4]/    Plaintiffs mistakenly assert that the analysis in the NBAF draft EIS demonstrates the

25   analysis in the LLNL EA is inadequate because the NBAF analysis "assumed that a release of
     pathogenic matter would occur."  Pls.' 2nd Supp. Br. at 7.  To the contrary, the EA of the BSL-3

26   also evaluates impacts based on the assumption that a terrorist attack would result in a breach of
     containment and a release of a pathogen.  FREA at 59.

27   [5]/    The most prominent impacts identified in the draft EIS of NBAF appear to be visual

28   impacts and infrastructure impacts.  DEIS at ES-11.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NBAF draft EIS suggests the DOE failed to consider relevant factors in the LLNL BSL-3 EA.

**3.      The Evaluation of Operational Accidents and External Acts in the NBAF Draft EIS Does Not Demonstrate DOE Failed to Consider Relevant Factors.**

Plaintiffs emphasize that the NBAF draft EIS separately evaluates the consequences of operational accidents and external acts and claim that the EA for the LLNL BSL-3 is flawed for failing to make the same distinction. Pls.' 2nd Supp. Br. at 8. Contrary to Plaintiffs' characterization, the EA for the LLNL BSL-3 also separately evaluates operational accidents and external acts. See FREA at 40-46 (discussing human health impacts of lab operations); FREA 50-55 (discussing abnormal events and accidents); FREA at 57-66. Plaintiffs' real dispute is with the DOE's conclusion that the reasonably foreseeable impacts of such events are bounded by the same Maximum Credible Event release scenario. See FREA at 51-55 (discussing Maximum Credible Event); id. at 59-60 (discussing applicability of Maximum Credible Event to release caused by terrorist attack). As set forth in briefing already before the Court, the DOE's determination that the Maximum Credible Event scenario appropriately bounded the impacts of both and external event and an operational accident is well-supported by the record before the Court. Opp. to Plfs' Mtn. for Prelim. Inj. [Dkt. No. 11] at 8-10.

The fact that DHS found it appropriate to conduct separate bounding analyses for operational accidents and external acts for the NBAF is unremarkable, and certainly does not demonstrate that the DOE's use of a single bounding analysis for both categories of events was arbitrary and capricious. As noted above, the NBAF and the LLNL BSL-3 are vastly different facilities. The fact that DHS would adopt one methodology to address a 500,000 square foot, first of its kind lab with BSL-4 capabilities, does not suggest that DOE erred in choosing to use a slightly different methodology to evaluate a 1,500 square foot BSL-3 lab which is operationally indistinguishable from hundreds of similar facilities nation-wide.

The choice of analytical methodology is one left to agency discretion. As the Ninth Circuit recently emphasized in a unanimous *en banc* decision, "NEPA does not require [the reviewing court] to 'decide whether [a NEPA document] is based on the best scientific

1  methodology available.'" Lands Council v. McNair, __ F.3d __, 2008 WL 2640001, at *19 (9th

2  Cir. 2008)*19, quoting Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 986 (9th

3  Cir. 1985) (citations omitted).  The Ninth Circuit emphasized that courts should "conduct a

4  'particularly deferential review' of an 'agency's predictive judgments about areas that are within

5  the agency's field of discretion and expertise . . . as long as they are reasonable.'" Id. at *9,

6  quoting Earthlink, Inc. v. FCC, 462 F.3d 1, 12 (D.C. Cir. 2006) (citations and internal quotations

7  omitted).

8      Here, the DOE has explained, based on the administrative record, why its bounding

9  analysis is reasonable.  The different bounding analysis used by the DHS in the draft EIS for the

10  NBAF does not suggest the DOE failed to consider any relevant factors in the LLNL BSL-3 EA.

11
12      **4.    The Inclusion of Mitigated and Unmitigated Scenarios in the NBAF
           Draft EIS Does Not Demonstrate DOE Failed to Consider Relevant
           Factors.**

13      Plaintiffs also claim that the NBAF draft EIS demonstrates that the LLNL BSL-3 EA is

14  inadequate because it did not consider both "mitigated and unmitigated scenarios" for a release

15  occurring as the result of an accident or terrorist attack.  Pls.' 2nd Supp. Br. at 9.  This claim

16  fails.

17      In the NBAF draft EIS, the DHS developed both unmitigated scenarios, which are

18  accidents "evaluated without primary or secondary biocontainment barriers or procedural

19  controls in place," DEIS at 3-374, and mitigated scenarios, which assume a "facility that has

20  been appropriately designed, constructed, and operated to handle the high-containment

21  pathogens proposed for study in the NBAF."  DEIS at E-11.  The EA for the LLNL BSL-3

22  developed accident scenarios based on a reasonably foreseeable impacts analysis that included

23  the mitigating effects of the facility's operational controls.  FREA at 54-55 (accident analysis

24  assumes HEPA filters work, but for conservative results, that they work below normal

25  efficiency).[6]

26

27  _____

28  [6]    Although Plaintiffs have never previously alleged that the DOE erred in considering
       mitigated impacts in the LLNL BSL-3 EA, it is well established that an agency may use

1    While Plaintiffs might prefer an analysis that includes only unmitigated scenarios, such

2   an approach is simply not required by NEPA.  NEPA requires an agency to disclose the

3   "reasonably foreseeable" impacts of a proposed action, not to speculate over unmitigated worse

4   case scenarios.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 356 (1989)

5   (upholding CEQ's decision to remove a "worst case analysis" requirement from the NEPA

6   regulations, and noting that by "requiring that an EIS focus on reasonably foreseeable impacts,

7   the new regulation 'will generate information and discussion on those consequences of greatest

8   concern to the public and of greatest relevance to the agency's decision,' rather than distorting

9   the decisionmaking process by overemphasizing highly speculative harms.") (citations omitted).

10   The DOE disclosed the reasonably foreseeable impacts of the LLNL BSL-3 facility, and

11   in so doing fully complied with NEPA.  In fact, while the draft EIS for NBAF contains both

12   unmitigated and mitigated scenarios, the DHS also ultimately concludes that unmitigated impact

13   scenarios are not reasonably foreseeable and final estimates of the "behavior of the facility under

14   accident conditions were based on the mitigated accidents, wherein full or partial functionality of

15   safety control or barrier is assumed."  DEIS at E-6.[7]/

16       **5.    The Draft EIS for the NBAF Does Not Demonstrate the DOE Failed
               to Follow Applicable Standards.**

17
        Finally, Plaintiffs assert that the LLNL BSL-3 EA is deficient for failing to utilized two

18   DOE Standards that were used in the NBAF draft EIS.  Pls.' 2nd Supp. Br. at 10.  This claim is

19

20   _____

21   mitigated impacts to determine a project has no significant impacts.  See, e.g., Churchill County
     v. Norton, 276 F.3d 1060, 1080-81 (9th Cir. 2001) (Army Corps could justifiably determine that

22   mitigation measures render adverse impacts so minor as to not warrant an EIS); Wetlands Action
     Network v. U.S. Army Corps of Engineers, 222 F.3d 1105, 1121 (9th Cir. 2000) (decision to

23   forego issuing an EIS may be justified by presence of mitigating measures even if those
     measures do not completely compensate for adverse environmental impacts).

24   [7]/      DHS appears to have developed the comparison between mitigated and unmitigated

25   scenarios in part because the NBAF is only "at the conceptual design stage, [so] there is less
     detailed information available for developing detailed system interaction models than would

26   commonly be available with a final design."  DEIS at E-6.  In contrast, operational details of the
     EA LLNL were BSL-3 were less speculative at the time the EA was prepared both because the

27   facility plan was relatively clear (see FREA at 12-17) and because hundreds of similar facilities

28   were already in existence.

1    baseless.

2        The first cited standard is DOE Standard 3009-94, *Preparation Guide for U.S.*

3    *Department of Energy Nonreactor Nuclear Facility Documented Safety Analyses* ("DOE-STD-

4    3009-94").  As its name suggests, DOE-STD-3009-94, pertains to the preparation of

5    Documented Safety Analyses ("DSAs") for **nuclear** facilities.  Under federal regulations, a DSA

6    must be prepared for certain categories of DOE nuclear facilities.  See 10 C.F.R. § 830.204.

7    DOE-STD-3009-94 is designed to guide contractors and others in preparing DSAs that comply

8    with the applicable regulations.  See DOE-STD-3009-94 at vi.[8]/  DOE-STD-3009-94 does not set

9    forth any requirements for the content of the NEPA analysis of non-nuclear facilities such as the

10   LLNL BSL-3, and the DOE was not arbitrary and capricious is not utilizing the standard in

11   preparing the LLNL BSL-3 EA.

12       The second DOE standard identified in the draft EIS for the NBAF is DOE-STD-3014,

13   which sets forth a quantitative approach to assessing the risk of an airplane crash into a

14   hazardous facility.[9]/  In developing the EA for the LLNL BSL-3 facility, rather than conducting

15   the quantitative analysis outlined in DOE-STD-3014, the DOE conducted a qualitative

16   assessment based on the reasoned option of agency experts.  See FREA at C-21 to C-23.

17   Contrary to Plaintiffs' suggestion, nothing in DOE's decision to use a methodology different

18   from that out-lined in DOE-STD-3014 is arbitrary and capricious.  As noted above, agencies

19   have considerable discretion to adopt the methodology they deem reasonable under the

20   circumstances, and DOE-STD-3014 itself indicates its use is not required.  See DOE-STD-3014

21   at 1.

22       Given the vast differences between the facilities in the amount of material potentially

23   placed at risk by an airplane crash it is unsurprising that the agencies would opt to use different

24

25   _____

26   [8]/    DOE-STD-3009-94 is available at:
     http://www.hss.energy.gov/NuclearSafety/techstds/standard/std3009/doe-std-3009-94_cn3_3-30-
27   06.pdf

28   [9]/    DOE-STD-3014-2006 is available at:
     http://www.hss.energy.gov/NuclearSafety/techstds/standard/std3014/std3014.pdf

analytical methodologies.  Both EA and the draft EIS explain that in the event of an airplane crash the material potentially at risk is that which is outside of secure storage at the time of a crash.[10]/  For the NBAF, 30 liters of material is routinely at risk, while for the LLNL BSL-3, less that one liter of material would routinely be at risk.[11]/

Finally, Plaintiffs' assertion that the DOE was arbitrary in not using the methodology of DOE-STD-3014 in the LLNL BSL-3 EA is belied by the fact that despite the differing methodologies, both agencies came to the same conclusion: both the NBAF DEIS and the BSL-3 EA concluded that the impacts of airplane crash –assuming some functionality of safety features – would have no significant impacts on public health.  See FREA at 51; FREA at C-21 to C-23; DEIS at 3-429 (concluding mitigated aircraft accident scenario would be expected to have "negligible" off-site consequences.")  See also DEIS at E-158 (mitigated airplane accident falls in severity category E/D); DEIS at E-46 (defining severity categories).[12]/

**IV.    CONCLUSION**

For the reasons set forth above, Plaintiffs' second motion for leave to file a supplemental brief must be denied.

Dated this 15th day of August, 2008.

Respectfully submitted,
RONALD J. TENPAS
Assistant Attorney General

 /s/ Barclay T. Samford
BARCLAY T. SAMFORD

---

[10]/    See DEIS at E-143 ("Any material outside of secure storage (e.g. freezer, transport packaging) is considered susceptible to the impact and available for release."); FREA at C-22 ("virtually the entire inventory of pathogens in the BSL-3 facility would be contained in 2-mL double containment plastic vials maintained in padlocked freezer/refrigerators").

[11]/    DEIS at E-151 (single maximum volume considered is 30-L cGMP); FREA at 59 (routine operations would use on very limited quantities of biological agents and only a few possible operation could hypothetically place up to 1 liter quantities of material at risk at any point in time).

[12]/    Moreover, the frequency of such an incident is projected to be less than 1 time in 1 million operating years.  DEIS at 3-429 (Accident Frequency $\leq 1 \times 10^{-6}$); E-158 (Frequency Category V); 3-374 (defining frequency categories).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
1961 Stout Street, 8th Floor
Denver, CO 80294

JOSEPH P. RUSSONIELLO
United States Attorney
CHARLES O=CONNOR
Assistant United States Attorney
450 Golden Gate Ave., Box 36055
San Francisco, CA 94102
Telephone: (415) 536-6967
Facsimile: (415) 436-6748

RONALD J. TENPAS
Assistant Attorney General
BARCLAY T. SAMFORD (NMBN 12323)
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Div.
1961 Stout St., 8th Floor
Denver, CO 80294
Telephone: (303) 844-1475
Facsimile: (303) 844-1350


Attorneys for Defendants

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| TRI-VALLEY CARES, MARYLIA KELLEY, JANIS KATE TURNER, and JEDIDJAH DE VRIES )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF ENERGY, ) NATIONAL NUCLEAR SECURITY ADMINISTRATION, LAWRENCE LIVERMORE ) NATIONAL LABORATORY, )<br><br>Defendants. ) | Case No. 08-cv-1372-SBA<br><br><br><br>SECOND DECLARATION OF ERIC GARD |

I, Eric Gard, hereby declare and state as follows:

1.      I am the Associate Program Leader for Select Agent Science at Lawrence Livermore

National Laboratory (LLNL). I have the responsibility for overseeing research,

development, testing and evaluations for biological detection projects here at LLNL. I have

a Ph.D. in Chemistry and 15 years of experience as a researcher and program manager

working at the interface of biology and chemistry. In the past 10 years I have been working

heavily in the area of biological threat detection and have experience working with and

managing select agent activities. I have published numerous peer reviewed articles on

biological detection.

2.      I am familiar with the National Bio and Agro-Defense Facility (NBAF) draft

Environmental Impact Statement (EIS) and with plaintiffs' supplemental brief arguing that

because the NBAF and the LLNL BSL-3 facility are comparable both should go through the

EIS process.

3.      The purpose of this declaration is to dispute and correct a point made on page 6 of

plaintiffs' supplemental brief which states "both facilities will house similar quantities of

pathogenic material and therefore represent similar threats to the environment".

4.      Plaintiffs correctly note that the EA for the LLNL BSL-3 facility specifies a

maximum inventory of 50 liters of pathogenic material, although I have previously

explained that it will be years, if ever, before the LLNL BSL-3 will contain that volume.

The plaintiffs assertion that "tens of liters of pathogen-rich solution" represents the overall

inventory of the NBAF facility is based on a misunderstanding of a statement in the NBAF

draft EIS (incorrectly sited as pg E-134 but actually on pg E-135) which provides the

following: "The source of pathogen would include the cGMP facility considered for

operation in the NBAF that is capable of processing tens of liters of pathogen-rich solution.

In addition, the NBAF also houses the inventory of infected animals as discussed in

previous accident scenarios." The cGMP facility referenced above is short for "current

good manufacturing practice" facility where virus will be growth in ~ 30 L batches for

vaccine development. The "tens of liters" mentioned above refers to the "single maximum

volume considered" which is estimated to be 30 L (page E-132), and represents just a small

portion of the cumulative facility inventory as is evident from the statement drawn from the

draft EIS.

4.    The NBAF draft EIS does not contain an explicit statement regarding the expected

inventory capacity of the facility. However, a credible estimate of the expected inventory

capacity can be derived from the quantitative information provided in several of the

accident scenarios located in Table 3.13.3-1 on page 3-405 of the NBAF EIS.

- Accident scenario #1 (Spill or uncontrolled release of aerosol pathogen) states that $10^{10}$ viable virions are derived from 100 ml which converts to $10^{11}$ viable virions per liter. This can be used as the nominal concentration of pathogen per liter of pathogen-rich solution. This is further supported by the following statement from the NBAF EIS on page E-96: "While there are differences between pathogens in relation to the number of particles in a solution or gel media, it is reasonable to assume that approximately $1 \times 10^8$ viable virions could be present in a single milliliter of culture media." This coverts to $10^{11}$ viable virions per liter.

- To determine the entire facility capacity, we can use accident scenario #7 (Large multi-room spill as a result of a seismic event) which state that $10^{15}$ viable virions would be the amount of Material At Risk (MAR).

- To determine the total inventory, divide $10^{15}$ viable virions by the standard stock concentration of $10^{11}$ viable virions per liter.

- This results in an inventory capacity of $10^4$ liters of material or 10,000 liters which is 200 times larger than the maximum capacity of the LLNL BSL-3 facility.

- Based on this information it is clear that the inventory capacity of NBAF is substantially larger than that for the LLNL BSL-3 facility.

5.     The calculation above represents the lower bound of the NBAF maximum inventory based one accident scenario. The NBAF draft EIS (page E-135) contains another accident scenario where the Material at Risk "is assumed to be a significant number of viable pathogens on the order of $1 \times 10^{20}$(or greater) that could be available for release in either of the proposed natural phenomena events." Using this as a starting point for the inventory capacity calculation leads to an estimate of the NBAF maximum inventory capacity which is orders of magnitude larger.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Eric Gard*     7/25/08

Dr. Eric E. Gard

1

2      **UNITED STATES DISTRICT COURT**
       **NORTHERN DISTRICT OF CALIFORNIA**
3      **OAKLAND DIVISION**

4   TRI-VALLEY CARES, MARYLIA KELLEY,     )
    JANIS KATE TURNER, and                )
5   JEDIDJAH DE VRIES,                    )        Case No. 08-cv-1372-SBA
                                          )
6                                         )
           Plaintiffs,                    )
7                                         )        [proposed] **ORDER DENYING**
    v.                                    )        **PLAINTIFFS' SECOND**
8                                         )        **MOTION FOR LEAVE TO**
    UNITED STATES DEPARTMENT OF ENERGY,   )        **FILE A SUPPLEMENTAL**
9   NATIONAL NUCLEAR SECURITY             )        **BRIEF**
    ADMINISTRATION, LAWRENCE LIVERMORE    )        [Docket No. 47]
10  NATIONAL LABORATORY,                  )
                                          )
11         Defendants.                    )
    _____)

12

13  **I.    REQUEST BEFORE THE COURT**

14          Before the Court is Plaintiffs' second motion to file a supplemental brief in support of

15  their motion for a preliminary injunction against operation of the Biosafety Level-3 ("BSL")

16  facility at Lawrence Livermore National Laboratory ("LLNL") at Livermore, California.  Dkt.

17  No. 47.  In their motion, Plaintiffs seek the admission – as extra-record evidence "necessary to

18  determine whether the agency has considered all relevant factors and has explained its decision,"

19  – of a draft Environmental Impact Statement ("EIS") issued in June 2008 by the Department of

20  Homeland Security ("DHS") for a proposed National Bio and Agro-Defense Facility ("NBAF").

21  As discussed below, the Court DENIES the motion on two independent grounds.  First,

22  Plaintiffs' motion fails because the proffered draft EIS was not available to the DOE at the time

23  the BSL-3 decision was made, and post-decision materials are not admissible extra-record

24  evidence of factors an agency allegedly failed to consider.  Second, assuming arguendo, that

25  post-decision materials are admissible, the draft EIS for the NBAF does not demonstrate that the

26  DOE failed to consider any relevant factors or was otherwise arbitrary or capricious in issuing

27  the EA for the LLNL BSL-3 facility.

28

1    **II.    LEGAL STANDARDS**

2            Judicial review of the adequacy of the BSL-3 EA prepared by the DOE is governed by

3    the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Under the APA, a court is to review

4    an agency's decision on the basis of the administrative record that existed before the agency at

5    the time the decision was made.  Both the Supreme Court and the Ninth Circuit have emphasized

6    that "the focal point for judicial review should be the administrative record already in existence,

7    not some new record made initially in the reviewing court."  Camp v. Pitts, 411 U.S. 138, 142

8    (1973).  See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985);  Southwest Ctr. for

9    Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996).  As the Ninth

10   Circuit has held, "[t]he task of the reviewing court is to apply the appropriate APA standard of

11   review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the

12   reviewing court."  Friends of the Earth v. Hintz, 800 F.2d 822, 829 (9th Cir. 1986) (quoting

13   Florida Power & Light Co., 470 U.S. at 743-44); see Southwest Ctr. for Biological Diversity,

14   100 F.3d at 1450-51.

15           If the record is not sufficient to judge the agency's decision, the decision should be

16   remanded.  Courts are not to consider information "that was not available at the time the

17   [Agency] made its decision."  Airport Cmty. Coalition v. Graves, 280 F. Supp.2d 1207, 1213

18   (W.D. Wash. 2003) (noting that consideration of "new information represents 'Monday morning

19   quarterbacking.'").

20           The Ninth Circuit allows a reviewing court to consider extra-record materials in APA

21   cases only under four narrow exceptions: "(1) if necessary to determine 'whether the agency has

22   considered all relevant factors and explained its decision,' (2) 'when the agency has relied on

23   documents not in the record,' (3) 'when supplementing the record is necessary to explain

24   technical terms or complex subject matter,'" or (4) "'when plaintiffs make a showing of agency

25   bad faith.'"  Inland Empire Public Lands Council v. Glickman, 88 F.3d 697, 703-04 (9th Cir.

26   1996) (quoting Friends of the Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 997

27   (9th Cir. 1993) (per curiam) and National Audubon Soc'y v. U.S. Forest Serv., 46 F.3d 1437,

28   1447 n.9 (9th Cir. 1993)).

1   Mere allegations that the court should look beyond the administrative record to consider

2   material falling into one of the four exceptions are not sufficient; a plaintiff must first make a

3   showing that the record is inadequate.  Animal Defense Council v. Hodel,840 F.2d 1432, 1437

4   (9th Cir. 1988) ("The [plaintiff] makes no showing that the district court *needed* to go outside the

5   administrative record to determine whether the [agency] ignored information") (emphasis

6   added).

7   **III.   ANALYSIS**

8   For the following two separate and independent reasons, the Court DENIES Plaintiffs'

9   motion.

10          **A.    The Draft EIS for the NBAF Does Not Fall Within Any Exception to Record**

11          **Review.**

12  The Ninth Circuit recognizes four limited exceptions to the rule that the review of an

13  agency action is limited to the administrative record.  Plaintiffs assert that the NBAF draft EIS is

14  admissible under the exception for materials necessary to determine "whether the agency has

15  considered all relevant factors and explained its decision."  Pls.' 2nd Mot. for Leave at 3.  This

16  claim fails at the threshold because the exception allowing admission of extra-record material to

17  determine whether the agency has considered all relevant factors and explained its decision,

18  "only applies to information available at the time, not post-decisional information."  Rock Creek

19  Alliance v. U.S. Fish and Wildlife Serv., 390 F. Supp. 2d 993, 1002 (D. Mont. 2005) (denying

20  motion to submit extra-record material unavailable when the decision was made).

21  As the court in Airport Communities Coalition, 280 F. Supp. 2d at 1213, explained in

22  striking extra-record material unavailable to the agency when the decision was made:

 Here the extra-record information represents new information that was not
 available at the time the [agency] made its decision.  If the information had been
 available within that time frame, the court could then use that information to
 determine whether the [agency] acted arbitrarily and capriciously in not
 considering that information as a relevant factor . . . . If the court were to consider
 this new information in an arbitrary and capricious analysis the court would
 effectively transform that analysis into a *de novo* review, a level of review for
 which this court is not authorized.

 Here, the final revised EA for the LLNL BSL-3 facility was issued on January 25, 2008.

1   Defs' Exh. 5 [Dkt. No. 12] at ¶ 3.  The draft EIS for NBAF was issued six months later, in June

2   2008.  The draft EIS for the NBAF was therefore not available for consideration by the DOE

3   during the decisionmaking process for the LLNL EA, and consequently does not fall within any

4   exception to record review.  For this reason alone, Plaintiffs' motion to file a supplemental brief

5   is denied.

**B.      Even if Post-Decision Documents are Admissible, the Draft EIS for NBAF Does Not Show DOE Failed to Consider Relevant Factors or Explain its Decision.**

8        Even assuming documents unavailable to the agency at the time the challenged decision

9   was made may fall within an exception to record review, for the reasons set forth below, the

10  Court finds that the NBAF draft EIS does not show DOE failed to consider relevant factors or

11  explain its decision.

**1.      The Proposed NBAF and the LLNL BSL-3 are Not Comparable Facilities.**

13       Plaintiffs first assert that because of the "structural and operational similarities" and "like

14  potential for significant impacts," of the two facilities, the fact that an EIS was prepared for the

15  proposed NBAF suggests an EIS should also have been prepared for the LLNL BSL-3.

16       Defendants have demonstrated that there is little structural commonality between the two

17  facilities.  The proposed NBAF facility is a complex composed of six buildings encompassing

18  500,000 to 520,000 square feet and requiring 30-acres of open land.  DEIS at ES-3 and 1-2.[1/]  In

19  contrast, the LLNL BSL-3 is single 1,500 square foot building constructed on 1/4 quarter acre of

20  land.  FREA at 9.  The proposed NBAF includes a staff of 250-350 people, while the LLNL

21  BSL-3 lab has a staff of six.  Compare DEIS at 1-2 with FREA at 9.  NBAF could house 200 to

22  300 large animals at any given time, including cattle, swine and sheep, while the BSL-3 has the

23  capacity of contain a maximum of 100 small rodents.  Compare DEIS at 2-1 with FREA at 16.

24       Obviously, two such vastly different facilities will have substantially different impacts.

25

26  [1/]     The Court will cite to the Draft EIS for the NBAF, which is Exhibit 30 to Docket
27  Numbers 47-49, as "DEIS" followed by the appropriate page.  The Court will cite the Final
    Revised EA for the  LLNL BSL-3, which is Exhibit 1 to Dkt. No. 12, as "FREA" followed by
28  the appropriate page.

[proposed] Order Denying Plfs' Mot. for Leave to File Supp. Br. - 08-cv-1372-SBA          - 4 -

1   For example, the draft EIS for NBAF anticipates that the facility will generate 25 to 30 million

2   gallons of wastewater annually, while the LLNL BSL-3 is anticipated to generate 10,000 gallons.

3   Compare DEIS at ES-7 with FREA at 24.  Moreover the NBAF, which would be similar in size

4   to a 400 bed hospital or 1,600 student high school, would have unavoidable adverse visual

5   impacts.  DEIS at ES-7.  In contrast, the LLNL BSL-3 occupies a former parking lot and has "no

6   visual issues."  FREA at 31.  These differences easily justify the preparation of an EIS in one

7   case and an EA in the other.

8       The Court finds there is little "operational similarity" between the two facilities.  Most

9   critically, the NBAF will include between 55,000 and 57,000 square feet designed for BSL-4

10  research.  DEIS at 1-2 ("Approximately 11% of the 500,000 to 520,000-square-foot NBAF

11  would be designed for BSL-4 research...").  Unlike a BSL-3 facility, which utilizes pathogens for

12  which medical treatment is available, BSL-4 facilities are equipped to handle "exotic pathogens

13  that pose a high risk of life threatening disease in animals or humans through the aerosol route

14  and for which *there is no known vaccine or therapy*."  DEIS at 1-2 (emphasis added).  The

15  presence of a BSL-4 capability alone is a critical difference between the two facilities from a

16  NEPA perspective.  As explained in the NBAF draft EIS, while there are 1,356 BSL-3 facilities

17  in 46 states, there are only 15 planned, under construction or operational BSL-4 labs nation-

18  wide.  DEIS at 1-3.  Further, once constructed, the NBAF will be the *only* large animal or

19  livestock BSL-4 facility in the United States.  DEIS at 1-3.

20      Plaintiffs' suggestion that the two facilities will work with similar types and volumes of

21  pathogens is also baseless.  Pls.' 2nd Supp. Br. at 6.  The NBAF is proposed to "enable basic and

22  advanced research, diagnostic testing and validation, countermeasure development (i.e. vaccines

23  and antiviral therapies), and diagnostic training for high-consequence livestock diseases with

24  potentially devastating impacts to U.S. agriculture and public health."  DEIS at ES-1.  In pursuit

25  of that mission, NBAF will focus on zoonotic (capable of animal to human transmission) and

26  foreign animal diseases, including African swine fever, classical swine fever, foot and mouth

27  disease ("FMD"), Japanese encephalitis, Rift Valley fever and the Hendra and Nipah viruses,

28  DEIS at 1-2, none of which are expected to be cultured at the LLNL BSL-3.  One of the principal

1  missions of the NBAF is development of a vaccine for FMD, which "is one of the most

2  devastating viral animal diseases affecting cloven hoofed animals."  DEIS at 1-4. The mission of

3  the LLNL BSL-3, in contrast, targets the reduction of the national threat from terrorism using

4  biological weapons and enhancement of public health capabilities.  FREA at 6.

5        Plaintiffs also erroneously assert that the LLNL BSL-3 facility holds the same volume of

6  pathogenic material, "concentrated in a smaller area," as NBAF.  Pls.' 2d Supp. Br. at 6, n. 3.

7  While the NBAF draft EIS does not explicitly set forth the maximum volume of pathogenic

8  material contained facility-wide, the quantity of material at risk used in the NBAF accident

9  analysis suggests a total facility volume of approximately **10,000 liters** –  approximately 200

10  times the capacity of the LLNL BSL-3 facility.

11        In sum, the NBAF facility is vastly larger than the LLNL BSL-3, works with a vastly

12  larger volume of different and higher risk pathogens than the LLNL BSL-3 facility, and serves a

13  different purpose than the BSL-3 facility.  Moreover, rather than one of over a thousand similar

14  facilities nation-wide like the LLNL BSL-3, the NBAF is the first of its kind in the United

15  States.  Under these circumstances, the decision to prepare an EIS for the NBAF does not

16  suggest that DOE was arbitrary and capricious in its decision not to prepare an EIS for the LLNL

17  BSL-3.

18              **2.     The NBAF EIS Does Not Suggest the DOE Failed to Consider
                          Relevant Factors in Evaluating the Threat of Terrorist Activity**.

19        The Court also finds Plaintiffs' claim that the draft EIS for the NBAF demonstrates that

20  the DOE failed to take a "hard look" at the potential environmental consequences of a terrorist

21  attack at the proposed BSL-3 facility to be unpersuasive.

22        First, as noted above, the NBAF and the LLNL BSL-3 are not comparable facilities, and

23  for that reason, the methodology utilized in one analysis does not suggest that the methodology

24  for the other analysis was inappropriate.  For example, the LLNL BSL-3 adds one facility to a

25  baseline of hundreds of facilities nation-wide, and thus makes a negligible incremental change in

26  the risk of a terrorist attack.  See FREA at 63.   In contrast, the NBAF is the only facility of its

27  kind, and thus the difference between action and no-action is more likely meaningful.

28

1        However, to the extent that any comparison is appropriate, the terrorist analysis

2  conducted by the DHS for the NBAF is similar to that prepared for the LLNL BSL-3.  For

3  example, the DHS developed a Threat and Risk Assessment ("TRA") to "identify potential

4  vulnerabilities and weaknesses . . . and . . . recommend the most prudent measures to establish a

5  reasonable level of risk for the security of operations fo the NBAF."  DEIS at 3-430.  Similarly,

6  for the LLNL lab, the DOE developed a Biological Risk and Treat Assessment ("BRTA") to

7  "examine the potential vulnerabilities of the facility and its operations, and to mitigate risks."

8  FREA at 61.  Both the TRA for NBAF and the LLNL EA consider threats of external acts and

9  internal sabotage.  <u>Compare</u> DEIS at 3-341 <u>with</u> FREA at 58.  The NBAF TRA addressed

10  mitigating threats through measures such as personnel security programs, contractor screening

11  and monitoring, perimeter security procedures, behavior observation programs, inventory

12  control,  and coordination with local emergency response agencies.  DEIS at 3-433.  The EA for

13  LLNL discussed analogous mechanisms for mitigating threats to the BSL-3 lab.  <u>See</u> FREA at 63

14  (discussing"personnel security and screening programs"); <u>id.</u> at 61 (discussing perimeter

15  security), <u>id.</u> at 65 (discussing personnel and inventory monitoring); <u>id.</u> at 60 (discussing

16  coordination with local medical providers).  In sum, the analytical approaches taken for the two

17  documents are quite similar.[2]/

18        Finally, with regard to the Ninth Circuit's direction on remand, that the DOE "consider

19  whether the threat of terrorist activity necessitates the preparation of an Environmental Impact

20  Statement," the draft EIS for NBAF supports the DOE's conclusion that the threat of terrorist

21  activities does not have significant impacts requiring an EIS.  <u>Tri-Valley CARES v. Dep't of</u>

22  <u>Energy</u>, No. 04-17252, 2006 WL 2971651, at *2 (9th Cir. Oct. 16, 2006).  While the DHS has

23  prepared an EIS, that analysis was not compelled by the impacts of potential terrorist activities.

24

25

26  [2]/    Plaintiffs mistakenly assert that the analysis in the NBAF draft EIS demonstrates the
analysis in the LLNL EA is inadequate because the NBAF analysis "assumed that a release of

27  pathogenic matter would occur."  Pls.' 2nd Supp. Br. at 7.  To the contrary, the EA of the BSL-3
also evaluates impacts based on the assumption that a terrorist attack would result in a breach of

28  containment and a release of a pathogen.  FREA at 59.

1   To the contrary, the draft EIS concludes that "[t]he evaluation demonstrated that the risks from

2   intentional acts could be reduced to very low levels with the identified security features." DEIS

3   at 3-434.[3]/

4           In sum, the Court concludes that nothing in the evaluation of the threat of terrorist

5   activity conducted for the NBAF draft EIS suggests the DOE failed to consider relevant factors

6   in the LLNL BSL-3 EA.

7

8           **3.     The Evaluation of Operational Accidents and External Acts in the
                     NBAF Draft EIS Does Not Demonstrate DOE Failed to Consider
                     Relevant Factors.**

9

10          Plaintiffs emphasize that the NBAF draft EIS separately evaluates the consequences of

11  operational accidents and external acts and claim that the EA for the LLNL BSL-3 is flawed for

12  failing to make the same distinction. Pls.' 2nd Supp. Br. at 8. Contrary to Plaintiffs'

13  characterization, the EA for the LLNL BSL-3 also separately evaluates operational accidents and

14  external acts. See FREA at 40-46 (discussing human health impacts of lab operations); FREA

15  50-55 (discussing abnormal events and accidents); FREA at 57-66. Plaintiffs' real dispute is

16  with the DOE's conclusion that the reasonably foreseeable impacts of such events are bounded

17  by the same Maximum Credible Event release scenario. See FREA at 51-55 (discussing

18  Maximum Credible Event); id. at 59-60 (discussing applicability of Maximum Credible Event to

19  release caused by terrorist attack). Briefing already before the Court, see Opp. to Plfs' Mtn. for

20  Prelim. Inj. [Dkt. No. 11] at 8-10, explains DOE's determination that the Maximum Credible

21  Event scenario appropriately bounded the impacts of both and external event and an operational

22  accident and the NBAF draft EIS is unnecessary to review of that determination.

23          The fact that DHS found it appropriate to conduct separate bounding analyses for

24  operational accidents and external acts for the NBAF is unremarkable, and certainly does not

25  demonstrate that the DOE's use of a single bounding analysis for both categories of events was

26  arbitrary and capricious. As noted above, the NBAF and the LLNL BSL-3 are vastly different

27

28  [3]/     The most prominent impacts identified in the draft EIS of NBAF appear to be visual
        impacts and infrastructure impacts. DEIS at ES-11.

1  facilities.  The fact that DHS would adopt one methodology to address a 500,000 square foot,

2  first of its kind lab with BSL-4 capabilities, does not suggest that DOE erred in choosing to use a

3  slightly different methodology to evaluate a 1,500 square foot BSL-3 lab which is operationally

4  indistinguishable from hundreds of similar facilities nation-wide.

5         The choice of analytical methodology is one left to agency discretion.  As the Ninth

6  Circuit recently emphasized in a unanimous *en banc* decision, "NEPA does not require [the

7  reviewing court] to 'decide whether [a NEPA document] is based on the best scientific

8  methodology available.'"  <u>Lands Council v. McNair</u>, __ F.3d __, 2008 WL 2640001, at *19 (9th

9  Cir. 2008)*19, quoting <u>Friends of Endangered Species, Inc. v. Jantzen</u>, 760 F.2d 976, 986 (9th

10  Cir. 1985) (citations omitted).  The Ninth Circuit emphasized that courts should "conduct a

11  'particularly deferential review' of an 'agency's predictive judgments about areas that are within

12  the agency's field of discretion and expertise . . . as long as they are reasonable.'"  <u>Id.</u> at *9,

13  quoting <u>Earthlink, Inc. v. FCC</u>, 462 F.3d 1, 12 (D.C. Cir. 2006) (citations and internal quotations

14  omitted).

15         Here, the DOE has explained, based on the administrative record, why its bounding

16  analysis is reasonable.  The different bounding analysis used by the DHS in the draft EIS for the

17  NBAF does not suggest the DOE failed to consider any relevant factors in the LLNL BSL-3 EA.

18
19         **4.    The Inclusion of Mitigated and Unmitigated Scenarios in the NBAF
               Draft EIS Does Not Demonstrate DOE Failed to Consider Relevant
20             Factors.**

21         The Court has considered and rejects Plaintiffs' claim that the NBAF draft EIS

22  demonstrates that the LLNL BSL-3 EA is inadequate because it did not consider both "mitigated

23  and unmitigated scenarios" for a release occurring as the result of an accident or terrorist attack.

24  Pls.' 2nd Supp. Br. at 9.

25         In the NBAF draft EIS, the DHS developed both unmitigated scenarios, which are

26  accidents "evaluated without primary or secondary biocontainment barriers or procedural

27  controls in place," DEIS at 3-374, and mitigated scenarios, which assume a "facility that has

28  been appropriately designed, constructed, and operated to handle the high-containment

1  pathogens proposed for study in the NBAF." DEIS at E-11. The EA for the LLNL BSL-3

2  developed accident scenarios based on a reasonably foreseeable impacts analysis that included

3  the mitigating effects of the facility's operational controls. FREA at 54-55 (accident analysis

4  assumes HEPA filters work, but for conservative results, that they work below normal

5  efficiency).[4]/

6         While Plaintiffs might prefer an analysis that includes only unmitigated scenarios, such

7  an approach is simply not required by NEPA. NEPA requires an agency to disclose the

8  "reasonably foreseeable" impacts of a proposed action, not to speculate over unmitigated worse

9  case scenarios. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 356 (1989)

10 (upholding CEQ's decision to remove a "worst case analysis" requirement from the NEPA

11 regulations, and noting that by "requiring that an EIS focus on reasonably foreseeable impacts,

12 the new regulation 'will generate information and discussion on those consequences of greatest

13 concern to the public and of greatest relevance to the agency's decision,' rather than distorting

14 the decisionmaking process by overemphasizing highly speculative harms.") (citations omitted).

15        The DOE disclosed the reasonably foreseeable impacts of the LLNL BSL-3 facility, and

16 in so doing fully complied with NEPA. In fact, while the draft EIS for NBAF contains both

17 unmitigated and mitigated scenarios, the DHS also ultimately concludes that unmitigated impact

18 scenarios are not reasonably foreseeable and final estimates of the "behavior of the facility under

19 accident conditions were based on the mitigated accidents, wherein full or partial functionality of

20 safety control or barrier is assumed." DEIS at E-6.

21                    **5.       The Draft EIS for the NBAF Does Not Demonstrate the DOE Failed
                              to Follow Applicable Standards.**

22

23 ───────────────────

24 [4]/     Although Plaintiffs have never previously alleged that the DOE erred in considering
   mitigated impacts in the LLNL BSL-3 EA, it is well established that an agency may use

25 mitigated impacts to determine a project has no significant impacts. See, e.g., Churchill County
   v. Norton, 276 F.3d 1060, 1080-81 (9th Cir. 2001) (Army Corps could justifiably determine that

26 mitigation measures render adverse impacts so minor as to not warrant an EIS); Wetlands Action
   Network v. U.S. Army Corps of Engineers, 222 F.3d 1105, 1121 (9th Cir. 2000) (decision to

27 forego issuing an EIS may be justified by presence of mitigating measures even if those
   measures do not completely compensate for adverse environmental impacts).

28

1    Finally, the Court finds unpersuasive Plaintiffs assert that the LLNL BSL-3 EA is

2    deficient for failing to utilized two DOE Standards that were used in the NBAF draft EIS. Pls.'

3    2nd Supp. Br. at 10.

4    The first cited standard is DOE Standard 3009-94, *Preparation Guide for U.S.*

5    *Department of Energy Nonreactor Nuclear Facility Documented Safety Analyses* ("DOE-STD-

6    3009-94"). As its name suggests, DOE-STD-3009-94, pertains to the preparation of

7    Documented Safety Analyses ("DSAs") for **nuclear** facilities. Under federal regulations, a DSA

8    must be prepared for certain categories of DOE nuclear facilities. See 10 C.F.R. § 830.204.

9    DOE-STD-3009-94 is designed to guide contractors and others in preparing DSAs that comply

10   with the applicable regulations. See DOE-STD-3009-94 at vi.[5]/ DOE-STD-3009-94 does not set

11   forth any requirements for the content of the NEPA analysis of non-nuclear facilities such as the

12   LLNL BSL-3, and the DOE was not arbitrary and capricious is not utilizing the standard in

13   preparing the LLNL BSL-3 EA.

14   The second DOE standard identified in the draft EIS for the NBAF is DOE-STD-3014,

15   which sets forth a quantitative approach to assessing the risk of an airplane crash into a

16   hazardous facility.[6]/ In developing the EA for the LLNL BSL-3 facility, rather than conducting

17   the quantitative analysis outlined in DOE-STD-3014, the DOE conducted a qualitative

18   assessment based on the reasoned option of agency experts. See FREA at C-21 to C-23.

19   Nothing in DOE's decision to use a methodology different from that out-lined in DOE-STD-

20   3014 is arbitrary and capricious. As noted above, agencies have considerable discretion to adopt

21   the methodology they deem reasonable under the circumstances, and DOE-STD-3014 itself

22   indicates its use is not required. See DOE-STD-3014 at 1.

23   Given the vast differences between the facilities in the amount of material potentially

24

25   [5]/    DOE-STD-3009-94 is available at:
26   http://www.hss.energy.gov/NuclearSafety/techstds/standard/std3009/doe-std-3009-94_cn3_3-30-
     06.pdf

27   [6]/    DOE-STD-3014-2006 is available at:
28   http://www.hss.energy.gov/NuclearSafety/techstds/standard/std3014/std3014.pdf

[proposed] Order Denying Plfs' Mot. for Leave to File Supp. Br. - 08-cv-1372-SBA          - 11 -

1   placed at risk by an airplane crash it is unsurprising that the agencies would opt to use different

2   analytical methodologies.  Both EA and the draft EIS explain that in the event of an airplane

3   crash the material potentially at risk is that which is outside of secure storage at the time of a

4   crash.[7]/  For the NBAF, 30 liters of material is routinely at risk, while for the LLNL BSL-3, less

5   that one liter of material would routinely be at risk.[8]/

6        Finally, Plaintiffs' assertion that the DOE was arbitrary in not using the methodology of

7   DOE-STD-3014 in the LLNL BSL-3 EA is belied by the fact that despite the differing

8   methodologies, both agencies came to the same conclusion: both the NBAF DEIS and the BSL-3

9   EA concluded that the impacts of airplane crash –assuming some functionality of safety features

10  – would have no significant impacts on public health.  See FREA at 51; FREA at C-21 to C-23;

11  DEIS at 3-429 (concluding mitigated aircraft accident scenario would be expected to have

12  "negligible" off-site consequences.")  See also DEIS at E-158 (mitigated airplane accident falls

13  in severity category E/D); DEIS at E-46 (defining severity categories).[9]/

14

15  **IV.    CONCLUSION**

16        Accordingly, the Court DENIES Plaintiffs' Second Motion for Leave to File a

17  Supplemental Brief [Dkt. No. 47].

18        IT IS SO ORDERED.

19

20

21  [7]/     See DEIS at E-143 ("Any material outside of secure storage (e.g. freezer, transport
22  packaging) is considered susceptible to the impact and available for release."); FREA at C-22
    ("virtually the entire inventory of pathogens in the BSL-3 facility would be contained in 2-mL
23  double containment plastic vials maintained in padlocked freezer/refrigerators").

24  [8]/      DEIS at E-151 (single maximum volume considered is 30-L cGMP); FREA at 59
25  (routine operations would use on very limited quantities of biological agents and only a few
    possible operation could hypothetically place up to 1 liter quantities of material at risk at any
26  point in time).

27  [9]/      Moreover, the frequency of such an incident is projected to be less than 1 time in 1
    million operating years.  DEIS at 3-429 (Accident Frequency $\leq 1 \times 10^{-6}$); E-158 (Frequency
28  Category V); 3-374 (defining frequency categories).

[proposed] Order Denying Plfs' Mot. for Leave to File Supp. Br. - 08-cv-1372-SBA          - 12 -

1

September ___, 2008          _____
                             Saundra Brown Armstrong
2                            United States District Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28