1
2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

3

4    TRI-VALLEY CARES, *et al.*,                          No.  C 08-01372 SBA

5                    Plaintiffs,                          **ORDER**

6        v.                                               [Docket No. 47]

7    UNITED STATES DEPARTMENT OF
     ENERGY, *et al.*,

8                    Defendants.

9    _____

10                            **REQUEST BEFORE THE COURT**

11            Before the Court is Plaintiffs' Motion for Leave to File Supplemental Brief (the "Motion")

12   [Docket No. 47] and defendants' Memorandum in Opposition (the "Opposition") [Docket No. 54].

13   Plaintiffs seek leave of Court to file a supplemental brief in support of their Amended Motion for a

14   Preliminary Injunction (the "Amended Motion") [Docket No. 13].  Specifically, plaintiffs seek to

15   supplement with documents related to a draft environmental impact statement ("EIS") for a

16   proposed United States Department of Homeland Security ("DHS") National Bio and Agro-Defense

17   Facility (the "NBAF").  Mot. at 2.  Plaintiffs claim these documents show defendants failed to

18   consider all relevant factors or explain their decision, in issuing a Final Revised Environmental

19   Assessment (the "FREA") for a proposed a biosafety level-3 facility, at the Lawrence Livermore

20   National Laboratory ("LLNL").  *Id.*  Defendants issued the FREA in response to a Ninth Circuit

21   order to consider whether the threat of a terrorist act necessitated the preparation of an EIS for this

22   facility, which defendants found it did not.  *See id.*

23            Plaintiffs having filed an administrative motion, the Court disposes of the Motion without a

24   hearing, under Civil Local Rule 7-11(c).  As discussed below, the Court DENIES the Motion for two

25   reasons.  First, any differences between the EIS and the FREA are due to differences between the

26   NBAF and LLNL's facility, do not raise any concerns not already considered by the Ninth Circuit

27   and this Court, or are irrelevant.  And second, because plaintiffs failed to make a reasonable effort to

28   meet and confer prior to filing the Motion.

1

**BACKGROUND**

2    The facts of this matter are detailed, complex, and lengthy, but well-known to the parties, so

3  the Court will not repeat them here.  The Court will instead state the facts directly relevant to

4  plaintiff's Motion.  This is plaintiffs' second suit, under the National Environmental Policy Act of

5  1969 (the "NEPA"), 42 U.S.C. § 4321 *et seq.*, to prevent defendants from operating a biosafety

6  level-3[1] ("BSL-3") laboratory at LLNL.  In December 2002, the United States Department of Energy

7  (the "DOE") issued an initial Environmental Assessment (the "EA") for the BSL-3 facility,

8  concluding it would have no significant impact on the environment, and thus also issued a Finding

9  of No Significant Impact ("FONSI").  *See* Docket No. 12, Ex. "1" at ii ("FREA").

10    On August 26, 2003, plaintiffs[2] sued defendants in this Court, under the NEPA, challenging

11  the EA on numerous grounds, in *Tri-Valley Cares v. U.S. Department of Energy*, No. C

12  03-3926-SBA, 2004 WL 2043034, 2004 U.S. Dist. LEXIS 18777 (N.D. Cal. Sep 10, 2004).  *See*

13  Docket No. 1 in case 03-03926 SBA.  On September 10, 2004, this Court granted summary

14  judgment for the DOE and denied summary judgment for plaintiffs.  *Tri-Valley Cares*, 2004 WL

15  2043034 at *1, 2004 U.S. Dist. LEXIS 18777 at *3-*4.  On appeal, the Ninth Circuit noted the EA

16  failed to consider the environmental impact of a terrorist attack.  *Tri-Valley Cares v. Dep't of*

17  *Energy*, 203 Fed.Appx. 105, 107 (9th Cir. 2006).  It thus affirmed in part and reversed in part,

18  remanding for the DOE to consider whether the threat of a terrorist act required the preparation of an

19  Environmental Impact Statement ("EIS").  *Id.* at 106-07.

20    On remand, from April 11 through May 11, 2007, the DOE circulated a draft Revised

21  Environmental Assessment (the "REA") for public comment which considered the impacts

22

23  [1]    Guidelines issued by the Centers for Disease Control and Prevention (the "CDC") and the

24  National Institutes for Health (the "NIH") divide lab operations into four levels, BSL-1 to BSL-4.
BSL-3 laboratories work with agents which may cause diseases with serious or lethal consequences

25  if untreated and which have the potential of aerosol (airborne) transmission. There are over 1,350
BSL-3 laboratories in the United States.  FREA at 8.  Common examples are hospital surgical suites,

26  laboratories associated with medical schools, or university research laboratories.  *Id.* at 6.

27  [2]    Not all the plaintiffs in the first suit are plaintiffs in the current suit, as those who were

28  involved in a separate action related to the Los Alamos National Laboratory which has been
resolved, have not joined the current suit.  *See* Docket No. 177 in case 03-3926 at 2:18-3:5.  Also,
there is a new plaintiff in the current suit, Jedidjah De Vries.  *Id.*

2

potentially associated with terrorist attacks.  Docket No. 13, Ex. "4" at cover; FREA at ii, 8.  On January 25, 2008, after evaluating public comment, the DOE found no significant environmental impact would result from a terrorist attack on the BSL-3 laboratory, and issued the FREA and a Finding of No Significant Impact (the "FONSI").  Docket No. 11 at 5:25; *see* FREA and Docket No. 12, Ex. "4."  The BSL-3 began operations this same day.[3]  Docket No. 12, Ex. "5" ¶ 3.

On March 10, 2008, plaintiffs filed a Complaint alleging defendants had failed to prepare an adequate EA and FONSI, failed to prepare an EIS, failed to supplement their REA, and failed to publicly circulate the FONSI.  *See* Docket No. 1.  On March 26, 2008, they filed a motion for a preliminary injunction.  See Docket No. 13.  This motion is currently under submission.  On June 5, 2008, plaintiffs filed a Request for Judicial Notice [Docket No. 40], regarding a one-page May 9, 2008 press release issued by defendant National Nuclear Security Administration.  *See* Docket No. 40.  On June 9, 2008, the Court denied this request as the release was irrelevant to this matter.  *See* Docket No. 41.  In denying this request, the Court noted it had taken the motion for the preliminary injunction under submission and did "not require any supplemental pleadings."  *See id.*

Nonetheless, nine days later, plaintiffs filed a motion for leave to file supplemental brief.  *See* Docket No. 42.  Plaintiffs sought to supplement their request for a preliminary injunction on their third claim that defendants failed to supplement and circulate the FREA with information regarding March and April 2008 developments.  *Id.* at 2:10-27.  On July 28, 2008, the Court denied this motion on the grounds plaintiffs' third clam was that defendants failed to supplement and circulate the March 2007 REA, and thus, they could not argue defendants failed to supplement the REA with information regarding developments occurring after the January 2008 FREA was issued.  *See* Docket No. 53 at 1.

///

---

[3]     By stipulation, the parties agreed to a voluntary limitation on operations at the BSL-3 facility for 60 days, pending this Court's ruling on the preliminary injunction.  Docket No. 13 at 10 n.1. This limitation requires:  (a) no aerosol testing; (b) no rodent infection experiments; (c) no production, generation, or knowing receipt of genetically modified biological material that would require management of the facility at the BSL-3 level; and (d) the total amount of agents in the facility for which BSL-3 containment is recommended in fourth edition of *Biosafety in Microbiological and Biomedical Laboratories*, published by the CDC and NIH, shall not exceed 100 ml.  *Id.*

The Court also denied this motion on the independent ground that plaintiffs had failed to make a reasonable effort to meet and confer as required by the Court's Standing Order for Civil Trials. *See* id. at 10. Specifically, the evidence showed on June 16, 2008, plaintiffs' counsel sent an e-mail to defendants' counsel, asking if they would oppose this motion, who then received an automated response that defendants' counsel would be out of his office from June 16 through 20, 2008. *Id.* On June 18, 2008, plaintiffs filed their motion, without meeting and conferring. *Id.*

Prior to the July 28, 2008 Order, plaintiffs filed on July 11, 2008 the Motion for Leave to File Supplemental Brief (the "Motion") [Docket No. 47] which is currently before the Court. In the Motion, plaintiffs seek to supplement their motion for a preliminary injunction with documents related to a draft EIS prepared for the proposed NBAF. Mot. at 2. Plaintiffs claim these documents show defendants failed in the FREA to consider all relevant factors regarding the environmental risk posed by a potential terrorist attack on LLNL's BSL-3. *Id.* Defendants argue the Court may not consider these documents because they were unavailable to defendants when they prepared the FREA. Opp'n at 1:9-12. Alternatively, defendants argue any differences in the NBAF EIS are due to differences between the NBAF and LLNL's facility, do not raise any concerns not already considered by the Ninth Circuit and this Court, or are irrelevant. Opp'n.

**LEGAL STANDARD**

**I.     The Four Exceptions for Reviewing Extra-Record Evidence**

It is an established rule that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Under limited circumstances, however, extra-record evidence can be admitted and considered.

At the district court level, extra-record evidence is admissible if it fits into one of four "narrow" exceptions: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when

4

1      plaintiffs make a showing of agency bad faith.  *Southwest Ctr. for Biological*

2      *Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (internal

3      punctuation omitted).

4  *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S.D.A.*, 499 F.3d 1108,

5  1117 (9th Cir. 2007).

6  **II.      The Court's Meet-and-Confer Requirement**

7      Paragraph 5 of the Court's Standing Order for Civil Trials mandates all parties meet and

8  confer before filing any motions.

9                                        **ANALYSIS**

10      For the following reasons, the Court DENIES plaintiffs' Motion.

11  **I.      The Court may consider plaintiffs' post-decision evidence.**

12      Plaintiffs seek to supplement the administrative record with post-decision extra-record

13  evidence.  As a threshold matter, before the Court may determine whether this evidence falls within

14  one of the four *extra-record* admissibility exceptions, it must first determine whether it is admissible

15  as *post-decision* extra record evidence.  "[P]ost-decision information . . . may not be advanced as a

16  new rationalization either for sustaining or attacking an agency's decision."  *Southwest Ctr. for*

17  *Biological Diversity*, 100 F.3d at 1450.  Post-decision information may be considered by a district

18  court, however, where it is "helpful in understanding the problem faced by the Agency and the

19  methodology it used to resolve it."  *Ass'n of Pac. Fisheries v. E.P.A.*, 615 F.2d 794, 811 (9th Cir.

20  1980).

21      Here, the FREA was issued in January 2008, while the draft EIS for the NBAF was issued in

22  June 2008.  Opp'n at 3:12-14.  Thus, plaintiffs may not attack defendants' conclusions in the FREA

23  on the grounds they failed to consider facts within the NBAF.  Plaintiffs, however, merely seek to

24  use the methodology employed by the DHS, in analyzing terrorist threats in the draft EIS, to show

25  defendants failed to use a reasonable methodology to analyze terrorist threats in the FREA.  Mot.,

26  Ex. "29" at 2-3.  Further, they seek to show defendants failed to use their own 2006 safety analysis

27  publications, in preparing the 2008 FREA, even though the DHS used them for the NBAF EIS.  *Id.*

28  at 10.  Thus, both as an aid for analyzing defendants' methodology in the FREA, and because certain

facts in the NBAF documents preceded the FREA's release, plaintiffs extra-record evidence is not inadmissible despite its post-decision nature. Nonetheless, the Court must still determine whether it is admissible under any of the four extra-record admissibility exceptions.

**II.     Plaintiffs' extra-record evidence is inadmissible as it is not necessary to determine whether defendants considered all relevant factors or explained its terrorism analysis in the FREA.**

Plaintiffs seek to admit documents related to the EIS for the NBAF only under the first extra-record admissibility exception. Mot. at 2-3. In support, plaintiffs present three reasons why these documents show defendants failed in the FREA to consider all relevant factors when preparing their analysis of the environmental impact of a possible terrorist attack on LLNL's BSL-3 facility. *See id.* For the following reasons, however, these reasons do not support plaintiffs' conclusion.

**A.     The NBAF and LLNL's facility are extremely different in size, scope, operation, and environmental impact.**

Plaintiffs assert both the NBAF and LLNL's facility will perform work for the DHS, have BSL-3 laboratories with similar containment measures and security, work with similar quantities of similar biological agents, and thus pose similar environmental risks. Mot., Ex. "29" at 6:1-13. Therefore, plaintiffs argue, any methodology employed in the NBAF EIS for analyzing the environmental risk due to a potential terrorist attack should be found in the FREA. *Id.* at 6:14-7:2.

Defendants note the NBAF as proposed would consist of six buildings covering 500,000 to 520,000 square feet and require 30-acres of open land. Opp'n at 4:3-5. In contrast, LLNL's facility consists of one 1,500-square-foot building on a quarter acre. *Id.* at 4:5-6. The NBAF would employ 250-350 people, while LLNL's facility would employ 6 people. *Id.* at 4:6-8. The NBAF would house up to 200 to 300 large animals, such as cattle, swine, and sheep, while LLNL's facility would hold up to 100 small rodents. *Id.* at 4:8-10. The NBAF is predicted to generate 25 to 30 million gallons of wastewater annually, while LLNL's facility might generate 10,000 gallons. *Id.* at 4:12-14. Aesthetically, the NBAF would be similar in size to a 400-bed hospital or 1,600-student high school, while LLNL's facility sits on a former parking lot, and poses no visual issues relative to nearby

1  ///

2  structures.  *Id.* at 4:16-18.  Thus, these two facilities have radically different physical profiles and

3  expected environmental impacts.

4      Defendants also note these facilities differ drastically from an operational standpoint.

5  Approximately 11% or between 55,000 and 57,000 square feet of the NBAF will involve BSL-4

6  research, while the remainder will involve BSL-3 research.  *Id.* at 5:1-2.  BSL-4 research involves

7  pathogens for which no vaccine or curative therapy exists.  *Id.* at 5:3-7.  In contrast, BSL-3 research

8  involves pathogens for which medical treatment exists.  *Id.*  LLNL's facility will only involve BSL-

9  3 research.  Mot., Ex. "29" at 2:16.  In the United States, there are over 1,300 operational BSL-3

10  laboratories, but only 15 BSL-4 facilities in operation, planned, or under construction.  Opp'n

11  at 5:8-10.  Further, the NBAF is unique: It would be the only large animal or livestock BSL-4

12  facility in the United States.  *Id.* at 5:10-11.  Also, as expected given their respective sizes, the

13  NBAF is projected to hold approximately 10,000 liters or approximately 200 times the pathogenic

14  material which might be held at LLNL's facility.  *Id.* at 5:27-6:3.  Thus, the NBAF and LLNL's

15  facility have radically different operational profiles and expected environmental impacts.

16      In addition, defendants note the scope of work at both facilities is markedly different.  The

17  NBAF is proposed to enable basic and advanced research, diagnostic testing and validation,

18  countermeasure development (i.e. vaccines and antiviral therapies), and diagnostic training for

19  high-consequence livestock diseases with potentially devastating impacts to American agriculture

20  and public health.  *Id.* at 5:12-16.  In pursuit of this mission, the NBAF will focus on zoonotic

21  (capable of animal to human transmission) and foreign animal diseases, including African swine

22  fever, classical swine fever, foot and mouth disease ("FMD"), Japanese encephalitis, Rift Valley

23  fever, and the Hendra and Nipah viruses, none of which are expected to be cultured at the LLNL

24  BSL-3.  *Id.* at 5:16-20.  One of the NBAF's principal missions is developing a vaccine for FMD, one

25  of the most devastating viral animal diseases affecting cloven hoofed animals.  *Id.* at 5:20-22.  The

26  mission of the LLNL facility, in contrast, targets the reduction of the national threat from terrorism

27  ///

28  ///

1  ///

2  using biological weapons and enhancement of public health capabilities.[4]  *Id.* at 5:22-24.  Thus, the

3  NBAF and LLNL's facility have radically different missions and expected environmental impacts.

4      Based on the vast physical, operational, and natural differences between the NBAF and

5  LLNL's facility, the Court finds plaintiffs are incorrect in logically concluding that any

6  methodologies employed in the NBAF EIS must be reflected in the FREA.  Thus, these differences

7  do not show defendants failed to consider all reasonable alternatives in preparing the FREA.

8      **B.      The release scenarios merely differ in degree.**

9      The EIS for the NBAF models the release from an operational accident by analyzing the

10  release expected due to a small to medium size spill.  Mot., Ex. "29" at 8:7-10.  Plaintiffs allege this

11  model is similar to a scenario used in the FREA which considers the release which would occur due

12  to the accidentally improper use of a centrifuge.  *Id.* at 8:10-14.  To model the release due to an

13  unintentional or intentional "external event," the EIS considers an airplane crash followed by a fire.

14  *Id.* at 8:15-19.  The EIS also considers a crash without a fire, and indicates the release would be

15  similar to that expected for a large accidental spill.  *Id.* at 9:5-9.  In modeling these releases, the EIS

16  considers scenarios with and without mitigating factors.  *Id.* at 7:14-17.  In the latter scenarios,

17  structure and safety systems are assumed to fail.  *Id.* at 9:9-10.  Plaintiffs argue that because the

18  FREA contains no scenario involving an airplane crash without a fire, nor any unmitigated

19  scenarios, its terrorism analysis must be defective.  *Id.* at 9:11-10:2.

20      Defendants note in the initial environmental assessment ("EA") for LLNL's facility, they

21  concluded the forces generated by reasonably expected natural catastrophes such as earthquakes, or

22  accidents such as spills or plane crashes, would not generate a release greater than that expected

23  from the accidentally improper use of a centrifuge.  Opp'n at 8-10.  Defendants did not consider the

24

25  ─────────────

26  [4]    In a footnote, plaintiffs allege the smaller size of LLNL's facility, and its work with agents associated with "the bioweapons threat," in contrast to the NBAF's focus on "foreign animal diseases," makes the former a more attractive terrorist target.  Mot., Ex. "29" at 6 n.3.  Plaintiffs

27  provide no explanation for this bare conclusion, which is pure speculation, and thus the Court is unable to analyze to it.  In another footnote, plaintiffs note defendants prepared an EIS for a BSL-3

28  facility at the Los Alamos National Laboratory in New Mexico.  *Id.* at 7 n.4.  Plaintiffs, however, provide no explanation as to how this allegation relates to their Motion.

worst possible earthquakes or accidents in their model, because of their very low frequency of occurrence. *See id.* Both the Court and the Ninth Circuit approved defendants' reasoning based on the size, scope, and nature of LLNL's facility. *See id.* Defendants also note, in the EIS for the NBAF, the releases due to unintentional and intentional acts are modeled on small, medium, and large accidental spills. *See id.* In other words, the releases caused by the forces generated by unintentional and intentional acts are analyzed as similar to the releases caused by various sized accidental spills. *See id.* Defendants thus conclude that plaintiffs' argument is essentially that defendants should have considered a large accidental spill or release in the FREA, rather than a small to medium one. *See id.*

The Court agrees with defendants. That is, the Court finds the only basic methodological difference between the release scenarios in the EIS and the FREA is that the former consider releases from relatively small, medium, and large spills, while the latter only consider releases from relatively small or medium spills. *See* Mot., Ex. "29" at 8:7-14. The Court agrees that given the different size, scope, and nature of the two facilities, this size difference in release scenarios is expected. Further, the Court notes were it to adopt plaintiffs' conclusion that the EIS is the only proper standard for analyzing releases whether due to unintentional or intentional incidents, then it would have to find the Court and the Ninth Circuit erroneously found adequate defendants' analysis in the EA of releases due to natural or accidental events. The Court, however, is not so inclined. Thus, the Court finds the differences between the release scenarios in the EIS for the NBAF and the FREA do not suggest the latter must exactly mirror the former. Thus, these differences do not show defendants failed to consider all reasonable alternatives in preparing the FREA.

**C.    The 2006 publications are irrelevant for the FREA's terrorism analysis.**

Plaintiffs assert defendants should have used the following two DOE publications in preparing the FREA's analysis of the environmental impact of a potential terrorist attack: (1) *DOE Standard 3009-94, CN3, Preparation Guide for U.S. Department of Energy Nonreactor Nuclear Facility Documented Safety Analyses*, published in March 2006; and (2) *DOE Standard 3014-2006, Accident Analysis for Aircraft Crash into Hazardous Facilities*, published May 2006. *Id.* at 10:16-27. Plaintiffs claim it is "significant" the DHS used them in preparing the EIS for the

9

1    NBAF, but defendants did not use them to prepare the FREA. *Id.* at 10:25-27.

2    ///

3          Defendants note the first publication is for *nuclear* facilities, which LLNL's BSL-3 is not.

4    Opp'n at 11. And, they note the second publication is for *accidental* airplane crashes, which are not

5    at issue for an analysis of *intentional* acts. *See id.* Defendants note they could have consulted this

6    publication, but instead had DOE experts prepare an analysis using other publications discussing

7    how to model intentional acts. *See id.* Nonetheless, they indicate that given the proposed NBAF is

8    substantially larger, has a much greater volume of pathogens, and poses a greater environmental

9    impact than LLNL's facility, it is understandable the DHS might have prepared their external-events

10   analysis differently than defendants did. *See id.*

11         The Court agrees with defendants and finds their choice not to use these two publications in

12   preparing the FREA does not suggest they failed to consider all reasonable alternatives in preparing

13   it.

      **D.**    **Conclusion**

15         None of the reasons advance by plaintiffs suggest the documents related to the NBAF EIS

16   indicate defendants failed to consider in the FREA all relevant factors when preparing their analysis

17   of the environmental impact of a possible terrorist attack on LLNL's BSL-3 facility. Thus, this

18   extra-record evidence is inadmissible, and plaintiffs may not supplement their motion for a

19   preliminary injunction with it. The Court thus DENIES the Motion.

20   **III.**    **Plaintiffs failed to meet and confer with defendants prior to filing the Motion.**

21         As a separate and independent basis for denying the Motion, the Court holds plaintiffs failed

22   to meet and confer with defendants prior to filing the Motion. Paragraph 5 of the Court's Standing

23   Order for Civil Trials mandates all parties meet and confer before filing any motions. Here,

24   plaintiffs' counsel declares on July 10, 2008, he called defendants' counsel to ask if he would

25   oppose the Motion. Docket No. 47, Decl. of Counsel ¶ 2. Defendants' counsel asked for a copy of

26   the Motion, which plaintiffs' counsel then e-mailed to him. *Id.* The next day, defendants' counsel

27   sent plaintiffs' counsel an e-mail stating his clients would oppose the Motion. *Id.* ¶ 3. Plaintiffs'

28   counsel thus states, "As such, a stipulation could not be obtained." *Id.* Plaintiffs filed the Motion

1    that same day. *See* Docket No. 47.

2    ///

3          The Court notes the terms "meet and confer" mean a movant must make a good faith and

4    reasonable effort to actually engage in substantive discussions with all other parties before filing a

5    motion. This requirement is designed to save the parties time and money in adversarial proceedings,

6    and expedite the Court's docket, thus saving government resources. Here, plaintiffs made no

7    attempt to actually meet and confer with defendants. An exchange of e-mails does not constitute a

8    full, frank, and productive discussion on the merits of a proposed pleading or alternative courses of

9    action. As a result, the Court DENIES the Motion.

10                                    **CONCLUSION**

11         Accordingly, the Court DENIES Plaintiffs' Motion for Leave to File Supplemental Brief

12   [Docket No. 47].

13

14         IT IS SO ORDERED.

15
     September 5, 2008                        _____
16                                            Saundra Brown Armstrong
17                                            United States District Judge

18

19

20

21

22

23

24

25

26

27

28