1

2                     UNITED STATES DISTRICT COURT

3              FOR THE NORTHERN DISTRICT OF CALIFORNIA

4                            OAKLAND DIVISION

5

6   TRI-VALLEY CARES, et al.,              Case No:  C 08-1372 SBA

            Plaintiffs,                    **ORDER**
7
            vs.                            ECF Nos. 73, 77, 85
8
    UNITED STATES DEPARTMENT OF
9   ENERGY, NATIONAL NUCLEAR
    SECURITY ADMINISTRATION, and
10  LAWRENCE LIVERMORE NATIONAL
    LABORATORY,
11
            Defendants.
12

13          Plaintiffs Tri Valley Cares, Marylia Kelley and Janis Kate Turner (collectively

14  "Plaintiffs") bring the instant civil action under the National Environmental Policy Act of

15  1969 ("NEPA"), 42 U.S.C. § 4321 et seq., to challenge the decision by Defendant

16  Department of Energy ("DOE") to commence the operation of a Biosafety Level 3 ("BSL-

17  3") facility at Lawrence Livermore National Laboratory ("LLNL") in Livermore,

18  California.  In particular, Plaintiffs contend that the DOE relied on an inadequate Final

19  Revised Environmental Assessment ("FREA"). As Defendants, Plaintiffs have named the

20  DOE, the National Nuclear Security Administration ("NNSA") and LLNL.[1]

21          The parties are presently before the Court on Plaintiffs and Defendants' respective

22  motions for summary judgment.  ECF Nos. 73, 77.  Having read and considered the papers

23  filed in connection with this matter and being fully informed, the Court hereby GRANTS

24  Defendants' motion for summary judgment as to all Counts alleged in the Amended

25  Complaint, and DENIES Plaintiffs' motion for summary judgment.  The Court, in its

26

27

28          _____
            [1] The Court refers to the DOE and Defendants interchangeably.

discretion, finds this matter suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

**I.      BACKGROUND**

**A.      OVERVIEW**

The parties are familiar with the facts of this case, which are summarized herein as they are pertinent to the issues that remain before this Court.[2]  The LLNL is a DOE national scientific research laboratory operated by the University of California, located in Livermore, California.  AR 122 at 2, ECF No. 78, Ex. 1.  Defendant NNSA, an agency within the DOE, conducts work at LLNL aimed at enhancing national security by, inter alia, reducing threats from weapons of mass destruction.  Id. at 3.  Consistent with its mission, the NNSA has operated biological laboratories at the LLNL with Biosafety Level 1 (BSL-1) and Biosafety Level 1 (BSL-2) containment and protection.  Id. at 5.[3]

On December 16, 2002, the NNSA authorized construction of a BSL-3 facility laboratory at LLNL.  Id. at 4.  Previously, the LLNL conducted BSL-3 research at off-site private sector and university facilities.  Id. at 8.  However, continued off-site operations were deemed inadequate because security could not be guaranteed, samples were jeopardized by excessive handling and transportation, and external labs were frequently committed to other projects.  Id.  Thus, the DOE determined that, for security reasons, future bioscience work required construction of an on-site BSL-3 facility at LLNL. Id.

The DOE decided to assemble the BSL-3 lab as a prefabricated building next to the existing BSL-2 facility.  Id. at 9.  The 1,500 square-foot facility contains three BSL-3 lab rooms and is designed for occupancy of up to six workers.  Id.  The facility was designed in accordance guidelines for BSL-3 laboratories, and is equipped with an array of overlapping

---

[2] An extensive discussion of the background of this case is set forth in the Court's Order denying Plaintiffs' motion for preliminary injunction.  ECF No. 58 at 2-13.

[3] A biosafety level is the level of the biocontainment precautions required to isolate dangerous biological agents from infectious microorganisms and laboratory animals in an enclosed facility.  Id. at A-1.  There are four biosafety levels; the higher the level, the greater the degree of protection provided to personnel, the environment and the community. Id.

safety features.  Id. at 11.  Two High Efficiency Particulate Air-Purifying filtration banks

operate in series to filter air leaving the lab.  Id. at 16.  In the event of a power outage, a

backup generator enables workers to safely shut down the labs and zone-tight dampeners

close to prevent air flow within the facility.  Id.  Further, the laboratory operates at negative

air pressure, such that air would be drawn into the facility in the event a breach.  Id.;

Hofherr Decl. ¶ 6, ECF No. 12-8.

### B.    PRIOR LITIGATION INVOLVING THE ENVIRONMENTAL ASSESSMENT

In December 2002, the DOE issued its Environmental Assessment ("EA") and

Finding of No Significant Impact ("FONSI"), at which time construction on the proposed

BSL-3 facility commenced.  AR 122 at ii; AR 1.[4]  On August 26, 2003, Plaintiffs filed suit

in this Court under NEPA, challenging the EA on numerous grounds.  Tri-Valley Cares v.

U.S. Dept. of Energy, No. C 03-3926 SBA (N.D. Cal. filed Aug. 26, 2003).  The Court

granted Defendants' motion for summary judgment and denied Plaintiffs' cross-motion.

Id., 2004 WL 2043034 at *1 (N.D. Cal. filed Sept. 10, 2004).  In its order, the Court found

that the initial EA supported the issuance of a FONSI and did not require an EIS.  Id.  On

appeal, the Ninth Circuit affirmed, in part, and reversed, in part.  Id., 2006 WL 2971651

(9th Cir. filed Oct. 16, 2006).  Citing its then recent decision in San Luis Obispo Mothers

for Peace v. Nuclear Regulatory Comm'n, 449 F.3d 1016 (9th Cir. 2006), the court held

that the EA failed to consider the environmental impact of a terrorist attack.  Tri-Valley

Cares, 2004 WL 2043034 at *2.  The court remanded the action solely "for the DOE to

consider whether the threat of terrorist activity necessitates the preparation of an

---

[4] As will be discussed in more detail below, NEPA requires the preparation of an
environmental impact statement ("EIS") for "major Federal actions significantly affecting
the quality of the human environment." 42 U.S.C. § 4332(2)(C).  To decide whether an EIS
is required, the NEPA process begins with preparation of a brief EA. 40 C.F.R. § 1501.4.
On the basis of the EA, agencies decide whether a more detailed EIS is appropriate.  Id.  If
an agency decides that an EIS is not necessary, it issues a FONSI.  Id.  Otherwise, the
agency prepares an EIS.  Id.  In an EIS, an agency must study the environmental impacts of
its preferred action and various alternatives, including the possibility of taking no action at
all.  Id. § 1508.25(b).

Environmental Impact Statement." <u>Id.</u>  In so ruling, the court carefully noted that it was not prejudging the "wide variety of actions [the agency] may take on remand. . . ." <u>Id.</u>

### C.   POST-REMAND DEVELOPMENTS

In March 2007, the DOE released for public comment a Draft Revised EA ("DREA"), which specifically addressed the impacts potentially associated with terrorist attacks.  AR 122 at ii.  On January 25, 2008, the DOE released its FREA and a Revised FONSI, and operations at the BSL-3 facility commenced.  AR 122, 123; Gard Decl. ¶ 3, ECF No. 12-6.   The FREA contains an extensive analysis of threats posed by terrorist activity.  AR 122 at 56-64.

On March 10, 2008, Plaintiffs filed the instant action to challenge the adequacy of the FREA, and subsequently moved for a preliminary injunction to enjoin the operation of the BSL-3 facility.  On February 9, 2009, the Court denied the motion.   ECF No. 58.  Shortly thereafter, on March 20, 2009, Plaintiffs filed an Amended Complaint which alleges claims that Defendants:  (1) failed to prepare an adequate FREA and Revised FONSI; (2) failed to conduct an environmental analysis in good faith; (3) failed to prepare an EIS; (4) failed to supplement the FREA; and (5) failed to publicly circulate the FONSI.  Am. Compl. ¶¶ 84-98, ECF No. 61.

Plaintiffs have now filed a motion for summary judgment in which they seek judgment compelling Defendants to prepare an EIS, or alternatively, to prepare a revised EA and to reconsider whether an EIS is necessary. Pls.' Mot. at 20, ECF No. 73.  Plaintiffs also seek to enjoin Defendants from further operation of the BSL-3 facility "until such time as Defendants comply with NEPA." <u>Id.</u>  Defendants have filed a cross-motion for summary judgment as to all claims alleged in the pleadings.  ECF No. 77.  The matter has been fully briefed and is now ripe for determination.

## II.   <u>LEGAL STANDARD</u>

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48

(1986).  The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'" Ricci v. DeStefano, -- U.S. --, 129 S.Ct. 2658, 2677 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).  An issue of fact is "material" if, under the substantive law of the case, resolution of the factual dispute might affect the outcome of the claim.  See Anderson, 477 U.S. at 248.  Factual disputes are genuine if they "properly can be resolved in favor of either party."  Id. at 250. Accordingly, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  Id.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations omitted).  Only admissible evidence may be considered in ruling on a motion for motion for summary judgment.  Fed.R.Civ.P. 56(e); Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).

## III.   DISCUSSION

### A.   STANDARD OF REVIEW UNDER NEPA

NEPA requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  "The purpose of NEPA is twofold: 1) to ensure that the agency proposing major federal action will have available, and will carefully consider, detailed information concerning significant environmental impacts, . . . and 2) to guarantee that the relevant information will be made available to the larger public audience."  South Coast Air Quality Mgmt. Dist. v. F.E.R.C.,

-- F.3d --, 2010 WL 3504649, at *4 (9th Cir. Sept. 9, 2010).

"[I]f, as here, an agency's regulations do not categorically require the preparation of an EIS, then the agency must first prepare an EA to determine whether the action will have a significant effect on the environment."  Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir. 2000); 40 C.F.R. § 1501.4.  On the basis of the EA, the agency decides whether a more detailed EIS is appropriate.  Id.  If an agency decides that an EIS is unnecessary, it issues a FONSI (i.e., Finding of No Significant Impact).  Id.  Otherwise, the agency prepares an EIS.  Id.  In an EIS, an agency must study the environmental impacts of its preferred action and various alternatives, including the possibility of taking no action at all.  Id., § 1508.25(b).  "NEPA is a purely procedural statute, intended to protect the environment by fostering informed agency decision-making."  Hapner v. Tidwell, -- F.3d --, 2010 WL 3565255, at *3 (9th Cir. Sept. 15, 2010).  "NEPA's goal is satisfied once this information is properly disclosed; thus, NEPA exists to ensure a process, not to ensure any result."  Inland Empire Public Lands Council v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996).

Judicial review of administrative actions under NEPA is governed by the Administrative Procedure Act ("APA").  Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1194 (9th Cir. 2008).  Under the APA, the Court must determine whether the agency action was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  "The arbitrary and capricious standard requires [the Court] to ensure that an agency has taken the requisite hard look at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors."  Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Interior  608 F.3d 592, 599 (9th Cir. 2010) (internal quotation mark omitted).  "The standard is narrow and the reviewing court may not substitute its judgment for that of the agency."  Envtl. Def. Ctr. v. EPA, 344 F.3d 832, 858 n.36 (9th Cir. 2003).

**B.    COUNT 1:  FAILURE TO PREPARE AN ADEQUATE FREA/REVISED FONSI**

**1.    Breach of Containment**

Plaintiffs contend that the DOE failed to undertake the requisite "hard look" at the impacts that may result from terrorist activity at the LLNL BS-3 facility.  First, they assert that the DOE's containment analysis is inadequate.  Pls.' Mot. at 14-15.  In addressing the threat of terrorist attack, the DOE considered the impacts of a release caused by a catastrophic event where all of the containment systems at LLNL failed.  AR 122 at 57.  The DOE utilized a hypothetical Release Scenario in which pathogenic agents inadvertently are released into the lab due to the faulty operation of a centrifuge, which allows leakage of the agents from various centrifuge tubes.  AR 122 at 52.  Plaintiffs argue that the FREA is inadequate because the DOE relied on a Release Scenario based on an accidental release, and that other scenarios such as where the release is intentionally triggered by a suicidal plane crash or explosion should also have been considered.  Pls.' Mot. at 15-16.

In connection with Plaintiffs' motion for preliminary injunction, the Court previously considered the propriety of the DOE's containment analysis in this respect and concluded that it was "not arbitrary or capricious."  ECF No. 58 at 19.  As the Court explained previously, "the Release Scenario is not intended to mimic any specific type of terrorist attack.  Rather, it simply models the bounded conditions for a release due to *a loss of containment* attributable to an accident, a natural catastrophe, or a terrorist attack."  ECF Id. No. 58 at 21-22 (emphasis added).  In other words, the point of the analysis is the loss of containment, as opposed to the actual cause of the release.  Plaintiffs continue to ignore this analytical distinction, and thus, have not persuaded the Court to reconsider its earlier finding that that the DOE did not act arbitrarily or capriciously in defining the applicable Release Scenario.

Next, Plaintiffs assert that the DOE's analysis is flawed because it allegedly violated various provisions of its own guidelines, including the Guidelines Memo and the DOE Emergency Management Guide ("EM Guide").  Pls.' Mot. at 14-16.  As a threshold matter, internal agency guidance documents are not legally enforceable.  W. Radio Serv. v. Espy,

79 F.3d 896, 901-902 (9th Cir. 1996).  Thus, DOE's alleged failure follow the Guidelines Memo or EM Guide is insufficient to establish that the DOE acted arbitrarily or capriciously solely on that ground.  That aside, the record establishes that the DOE took the requisite "hard look" at the issue of whether and how to utilize bounding analyses, and whether and how to use the Release Scenario in analyzing the potential impact of a terrorist attack.  AR 122 at 58-59; see also ECF No. 58 at 19-20.

### 2.    Theft and Release of Pathogen by an Outsider

Plaintiffs allege that the analysis of a potential theft and subsequent release of pathogens by a terrorist from outside LLNL should have been restricted to the impacts of the BSL-3 facility in the context of the Livermore area.  Pls.' Mot. at 16.  This claim lacks merit.  While NEPA regulations provide that site-specific actions generally are evaluated in the context of the locale presented, see 40 C.F.R. § 1508.27(a), nothing in the regulations proscribe the DOE's discretion to apply a different scale of analysis, depending upon the circumstances presented, see WildWest Inst. v. Bull, 547 F.3d 1162, 1173 (9th Cir. 2008) ("Agencies have 'discretion to determine the physical scope used for measuring environmental impacts' so long as they do not act arbitrarily and their 'choice of analysis scale . . . represent[s] a reasoned decision.") (quoting in part Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002)).

Here, the FREA notes that the type of pathogenic organisms to be studied at BSL-3 are widely available from similar labs around the United States and are otherwise readily available to terrorists from a variety of sources.  AR 122 at 61.  In view of such availability, the DOE concluded that the proposed facility was not an "attractive target" or otherwise would have a significant impact on the status quo with respect to the availability of biological agents to would-be terrorists.  Id.  Despite Plaintiffs' suggestions to the contrary, the DOE's conclusion does not ignore the impact of a release in the Livermore locale, but

rather, simply considered the impact of the LLNL BSL-3 facility in relation to other potential sources for an attack.[5]

### 3.   Theft and Release by an LLNL Insider

Plaintiffs contend that the DOE failed to take a "hard look" at the impacts that may result from the threat of the theft and subsequent release of pathogen by an "insider" with access to the BSL-3 facility.  Pls.' Mot. at 17.  In fact, the FREA did consider such a possibility, but concluded that the risk of insider theft was marginal.  AR 122 at 63-64.  In particular, the DOE noted that individuals with access to select agents must pass through multiple screenings, including the Department of Justice Security Risk Assessment and obtain authorization by United States Department of Health and Human Services and register with the Center for Disease Control.  Id. at 63.  Moreover, LLNL maintains its own Select Agent Human Reliability Program in which it selects, trains and monitors all individuals whose work requires access to select agents.   Id.  The FREA also notes that the likelihood of insider theft is lessened by the relatively few individuals who have access to pathogens:  generally *less than ten individuals* have access to select agents in the BSL-3 lab.  Id.  Given the human reliability programs, security procedures, and management controls at the facility and the laboratory, it was reasonable for the DOE to conclude that the theft of pathogenic materials by an insider from LLNL "is not expected to occur."  Id. at 64.

The DOE's conclusion that the threat of insider theft does not require an EIS is further supported by DOE's evaluation of the most reasonably foreseeable theft scenario.  In particular, the DOE reasoned that the most reasonably foreseeable scenario involved an insider attempting to covertly remove a small sample of a pathogen that would require additional growth and preparation prior to dispersal.  Id. at C-24.  This assumption is based on the fact that direct removal of a large quantity of material would be quickly noticed, and

---

[5] To the extent that conflicting views exist about the appropriate scale of analysis, the DOE has discretion to rely on the reasonable opinions of its own qualified experts.  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989).

because the LLNL BSL-3 does not contain large amounts of "ready-to-use aerosolized pathogens," but instead stores material in frozen 2 mL vials.  Id.  Given these circumstances, the putative insider-thief would have to successfully culture, produce, store, transport and disperse a pathogen all while maintaining its virulence.  Id. at 61. The FREA notes that "[a]ccomplishing these requirements was difficult even for long-term and well-funded programs in the former Soviet Union and other state-run programs."  Id. at 62. Thus, a theft event would be highly unlikely to result in any significant environmental impact.  The Court finds nothing arbitrary or capricious with respect to the DOE's analysis of threats posed by an LLNL insider.

### 4.     Other Credible Terrorist Threats

Plaintiffs bring the entirely new claim that the FREA is deficient because it does not discuss a series of other possible sabotage actions, including "damage to the facility's containment suite autoclaves, deliberate release of an infected animal, and deliberate self-infection with the intent to spread the pathogenic material in the environment."  Pls.' Mot. at 18.  Having failed to raise these alleged concerns during the public comment process on the FREA, Plaintiffs have forfeited their right to pursue them in Court.  See Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764-65 (2004) ("Claims not properly raised before an agency are waived, unless the problems underlying the claim are 'obvious' or otherwise brought to the agency's attention."); North Idaho Comty. Action Network v. U.S. Dept. of Transp., 545 F.3d 1147, 1156 (9th Cir. 2008) ("because the tunnel alternative was not raised and identified until June 2006, well after the notice and comment periods for the 1999 EIS and the 2005 EA closed, any objection to the failure to consider that alternative has been waived").[6]

Even if the issue were properly before the Court, the record shows that the DOE did not err in omitting discussion of such scenarios from the FREA.  Undoubtedly, there are limitless terrorist attack scenarios that could be imagined.  But NEPA does not obligate an

---

[6] Plaintiffs claim that they did raise the issue during the public comment process, but record does not support their assertion.  See Pls.' Reply at 4 n.1.

agency to consider "every alternative device and thought conceivable by the mind of man." Vermont Yankee v. NRDC, 435 U.S. 519, 551 (1978); see also Citizens for a Better Henderson v. Hodel, 768 F.2d 1051, 1058 (9th Cir. 1985) (finding an agency need not discuss "remote and highly speculative consequences").  In the instant case, the DOE has proffered a reasoned analysis of terrorism that covers a reasonable range of threats.  The DOE's exclusion of autoclave damage, release of an infected animal and deliberate self-infection from the REA is supported by the Army's BDRP EIS, which does identify all three scenarios, but rejects the possibility that they pose any significant environmental risk. AR 27 at A9-51-A9-53.  This Court therefore rejects Plaintiffs' claim that the FREA is inadequate for failing to address other terrorist threats.

### C.   COUNT 2:  FAILURE TO CONDUCT ENVIRONMENTAL ANALYSES IN GOOD FAITH

In their second claim for relief, Plaintiffs allege that the DOE failed to prepare the FREA in "good faith" by failing to disclose information related to a 2005 anthrax shipping incident. Pls.' Mot. at 10-12; Am. Compl. ¶¶ 87-89.  In 2005, a former LLNL employee returned to the facility to package and ship anthrax vials to two offsite locations.  ECF No. 58 at 37.  Workers unpacking a shipment at one of the locations discovered that some of the vials had leaked into the inner packaging of a secondary container, though no material had leaked into the tertiary container.  Id.  The other recipient noted discrepancies between the shipping inventory and the samples in the container.  Id.  Plaintiffs complain that the DOE failed to disclose the anthrax shipping incident in the March 2007 DREA. Pls.' Mot. at 10-11.  Though acknowledging that the subsequent January 2008 FREA provided additional details concerning the incident, Plaintiffs argue that even then it failed to disclose numerous regulatory violations that arose out of the incident and were related to the lab's safety and security.  Id.  These material omissions allegedly frustrated the public's ability to comment on the DREA.  Id. at 11.

An EA should be a "concise public document" that serves to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental

1    impact statement of finding of no significant impact."  40 C.F.R. § 1508.9(a).  "NEPA

2    requires not that an agency engage in the most exhaustive environmental analysis

3    theoretically possible, but that it take a 'hard look' at relevant factors."  Northwest Envtl.

4    Advocates v. Nat'l Marine Fisheries Serv., 460 F.3d 1125, 1139 (9th Cir. 2006).  The "hard

5    look" required by NEPA "must be timely, and it must be taken objectively and in good

6    faith, not as an exercise in form over substance, and not as a subterfuge designed to

7    rationalize a decision already made."  Metcalf, 214 F.3d at 1142.  If an EA was not

8    conducted in good faith, its factual conclusions are deemed "arbitrary."  Surfrider Found. v.

9    Dalton, 989 F. Supp. 1309, 1320 (S.D. Cal. 1998).  Where information is "so incomplete or

10   misleading" as to corrupt the decision-making process, revision may be necessary to

11   "provide a reasonable, good faith, and objective presentation of the subjects required by

12   NEPA."  Animal Def. Council v. Hodel, 840 F.2d 1432, 1439 (9th Cir. 1988) (internal

13   citations omitted).  However, absent evidence to the contrary, it is presumed that

14   government agencies "act properly and according to law."  FCC v. Schreiber, 381 U.S. 279,

15   296 (1965).

16         In the instant case, the Court finds that Plaintiffs' claims of bad faith fail to

17   overcome the presumption that the DOE comported itself appropriately.  The mere fact the

18   DOE possessed certain information that was not included in an EA does not ipso facto

19   establish bad faith.  Rather, as explained in the declaration of Samuel D. Brinker, the DOE

20   staff member who supervised and coordinated the preparation of the Revised EAs, the DOE

21   determined that the inclusion of the additional information regarding the 2005 shipping

22   incident was unnecessary because "the circumstances leading up to it did not add

23   significant information regarding potential environmental impacts relating to transportation

24   activities associated with the operation of the BSL-3 Lab or challenge the conclusions of

25   the document regarding transportation activities."  Brinker Decl. ¶ 6, ECF No. 78-4.  In

26   reaching this conclusion, Mr. Brinker relied on data from the large number of research

27   facilities which generate and ship infectious materials showing that the risk to the public

28   was low, and that the consequences of such an accident would be minor.  Id. ¶ 7.  In

addition, he noted that the anthrax shipping incident did not involve a release of dangerous materials, and that the failure to disclose that anthrax was involved was due to DOE classification guidelines, as opposed to an intent to withhold information from the public. Id. ¶¶ 8-9.

Plaintiffs contend that judicial review is circumscribed by the administrative record, and therefore, the Court should disregard Mr. Brinker's declaration. Pls.' Opp'n at 16. As a general matter, Plaintiffs are correct that judicial review of final agency action is typically limited to "the administrative record in existence at the time of the decision." Southwest Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996). At the same time, such review may be expanded beyond the record "if necessary to explain agency decisions." Id. (internal citations omitted). Thus, "[e]xtra-record documents may also be admitted when plaintiffs make a showing of agency bad faith." Id. (internal quotations and citation omitted); Nat'l Audobon Soc. v. U.S. Forest Serv., 46 F.3d 1437, 1447 (9th Cir. 1993) (permitting extra-record documents in NEPA cases where the plaintiff alleges that an EA or EIS has "neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug"). In this case, where it is alleged that the DOE purposefully *excluded* the shipping incident from the EA, the Court must look beyond the record to determine whether the agency ignored relevant information. Without extra-record explanation, the DOE has no effective means of responding to this allegation, as an EA cannot reasonably be expected to expound on the reasons behind its omissions. Further, where Plaintiffs directly challenge the good faith of the decision-makers, the record should

be expanded to illuminate the decision-making process.  Based on the allegations made by Plaintiffs, the Court finds that consideration of Mr. Brinker's declaration is appropriate.[7]

Finally, the Court is unpersuaded by Plaintiffs' allegations that DOE's failure to disclose information regarding the "restricted experiments" that were conducted at LLNL in violation of certain regulations.  Pls.' Mot. at 11 (citing AR 125, 145).  In August 2005, Center for Disease Control ("CDC") inspectors discovered an unapproved experiment that produced an antibiotic resistant strain of *Yersinia pestis* (Plague) at the BSL-3 facility.  Id. The CDC demanded LLNL destroy the samples as a condition for retaining the lab's certificate of registration.  Id.  This claim is not alleged in the Amended Complaint, and therefore, is not properly before the Court.  See Pickern v. Pier 1 Imps. (U.S.), Inc., 457 F.3d 963, 968-69 (9th Cir. 2006) (refusing to allow the plaintiff to assert new specific factual allegations in support of a claim when they were "presented for the first time in [the plaintiff's] opposition to summary judgment"); Wasco Prods., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (internal quotation marks omitted).

Although Plaintiffs concede that "the complaint does not include facts concerning LLNL's restricted experiments," they assert that the Court may properly grant summary judgment in their favor on this unpled claim because the experiment is referenced in Counts 2 and 4. Pls.' Reply at 6. This contention is uncompelling.   As the Supreme Court has made clear, the pleadings must "give the defendant fair notice of what . . . the claim is and the grounds upon which it rests."  Erickson v. Pardus, 551 U.S. 89, 93 (2007) (internal

---

[7] Alternatively, Plaintiffs assert that Mr. Brinker's declaration lacks foundation and that he lacks competence to opine on the factual bases for the DOE's actions with respect to the DREA.  Pls.' Opp'n at 17-18.  However, Mr. Brinker states that he was responsible for determining the level of detail regarding the shipping incident that should be included in the DREA. Brinker Decl. ¶ 4.  Plaintiffs also seem to suggest that Mr. Brinker was unqualified to ascertain what information should or need not be included in the Draft EA.  Pls.' Opp'n at 17-18.  However, even if Mr. Brinker were unqualified (which Plaintiffs have not established), Plaintiffs fail to cite any authority to support the conclusion that such actions amount to "bad faith" in preparation of an EA.

quotation marks omitted).  Plaintiffs' reference to the restricted experiments in other parts

of the Amended Complaint does not afford the DOE fair notice that Plaintiff's "bad faith"

claim is predicated upon the non-disclosure of such information.  In sum, the Court finds

Plaintiffs have failed to raise a genuine issue as to any material fact and Defendants are

entitled to judgment as a matter of law.

### D.    COUNT 3:  FAILURE TO PREPARE AN EIS

Count 3 of Plaintiffs' Amended Complaint alleges that DOE violated NEPA by

failing to prepare a comprehensive EIS.  Am. Compl. ¶¶ 91, 92.  Under NEPA, an EIS need

not be prepared for every major federal action.  Ocean Advocates v. U.S. Army Corps of

Eng'rs, 402 F.3d 846, 864 (9th Cir. 2005).  Rather, an EIS is necessary only for such

actions "*significantly* affecting the quality of the human environment."  42 U.S.C.

§ 4332(2)(C) (emphasis added).  "Significantly" as used in §4332(2)(C), is defined by two

components:  context and intensity.  Ocean Advocates, 402 F.3d at 865 (citing 40 C.F.R. §

1508.27).  "Context" refers to the setting in which a proposed action will take place.  40

C.F.R. § 1508.27(a).  "Intensity" refers to the severity of the action's impact, and is

analyzed in connection with ten specified factors.  Id., § 1508.27(b).  To challenge an

agency's decision not to prepare an EIS, a plaintiff must raise substantial questions as to

whether a project may have significant effects.  Ocean Advocates, 402 F.3d at 865.

In their motion for summary judgment, Plaintiffs make a one-sentence long

argument that an EIS is required under 40 C.F.R. § 1508.27.  Pls.' Mot. at 19.[8]  Other than

citing the foregoing regulation, Plaintiffs fail to present any argument or decisional

authority to support their contention.  As such, Plaintiffs have waived their ability to seek

summary judgment or oppose Defendants' summary judgment motion as to Count 3.

---

[8] Likewise, in their opposition to Defendants' summary judgment motion Plaintiffs make no effort to respond to Defendants' arguments as to this claim.  See Defs.' Mot. at 15-17.  In their reply brief, Plaintiffs make a belated attempt to salvage their claim that Defendants should have prepared an EIR.  Pls.' Reply at 10.  However, a "district court need not consider arguments raised for the first time in a reply brief."  Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007); Dream Games of Ariz., Inc. v. PC Onsite, 561 F.3d 983, 995 (9th Cir. 2009) (Arguments that are "not specifically and distinctly argued in [the] opening brief" are waived) (internal quotation marks and citations omitted).

1   See FDIC v. Garner, 126 F.3d 1138, 1145 (9th Cir. 1997) (arguments are waived when no

2   case law or argument in support of the contention is presented).  Waiver notwithstanding,

3   the Court finds no substantive merit to Plaintiffs' claim.  The record confirms that the DOE

4   appropriately considered the potential effect of the BSL-3 facility on public health and

5   safety.  See AR 122 at 41-42.  Moreover, the Court extensively considered this claim in

6   connection with Plaintiffs' motion for preliminary injunction, and concluded that they had

7   little likelihood of success.  ECF No. 58 at 34.  Plaintiffs have offered no argument or

8   evidence to persuade the Court to the contrary.  Accordingly, summary judgment on Count

9   3 is granted in favor of Defendants.

10      **E.      COUNT 4:  FAILURE TO SUPPLEMENT THE FREA**

11      "[A] federal agency has a continuing duty to gather and evaluate new information

12   relevant to the environmental impact of its actions."  Warm Springs Dam Task Force v.

13   Gribble, 621 F.2d 1017, 1023 (9th Cir. 1980).  Supplementation is required if there are

14   "significant new circumstances or information relevant to environmental concerns and

15   bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  But,

16   supplementation is not required "every time new information comes to light after the EIS is

17   finalized."  Marsh, 490 U.S. at 373 (footnote omitted).  "[T]he decision whether to prepare

18   a supplemental EIS is similar to the decision whether to prepare an EIS in the first

19   instance."  Id. at 374.

20      Here, Plaintiffs briefly allege that the DOE should have supplemented the FREA

21   issued in January 2008 with "new information" regarding the 2005 anthrax shipping

22   incident.  Pls.' Mot. at 12-13; Am. Compl. ¶ 94.  With respect to the shipping incident, it

23   occurred almost three years *prior* to the issuance of the FREA. As such, it is questionable

24   whether the shipping incident constitutes *new* information.  In addition, as set forth above,

25   the DOE's decision regarding the handling of information regarding the shipping incident

26   was reasonable and justified.  Under the circumstances presented, the DOE's decision not

27   to supplement the FREA has not been shown by Plaintiffs to be a "clear error of judgment."

28   See Marsh, 490 U.S. at 378.

1   Plaintiffs also assert that the DOE violated NEPA by failing to prepare a supplement

2   to the FREA analyzing the results of the HSS inspections in March and April 2008.  Pls.'

3   Mot. at 13.  In those inspections, HHS evaluated LLNL in various protection-related areas,

4   such as personnel and physical security.  AR 154, 158.  HHS's Security Assessment

5   following those inspections gave LLNL the lowest rating of "Significant Weaknesses."  AR

6   154.  According to Plaintiffs, the deficiencies noted by the HHS in its report "bear upon the

7   environmental impacts that may result from the operation of the facility."  Pls.' Mot. at 13.

8   In advancing this argument, however, Plaintiffs overlook the fact that upon reviewing the

9   report, the DOE concluded that did it not constitute "new information or changed

10  circumstances such that a supplemental EA or an Environmental Impact Statement ('EIS')

11  should be prepared for the LLNL BSL-3 facility."  AR 154.

12  In reaching its decision not to supplement, Defendants explained that their analysis

13  in the FREA relied upon three possible scenarios for terrorist attack:  (1) an attack resulting

14  in facility damage and loss of containment; (2) a theft of pathogenic agent by a terrorist

15  from outside LLNL; and (3) a theft of pathogenic agent by a terrorist from inside LLNL.

16  Id. at 1-4.  Defendants reviewed the analysis underlying each scenario and determined none

17  were undermined by the findings of the HHS report, and that the report did not conclude

18  that LLNL was unable to provide the requisite security for a BSL-3 facility.  Id. at 3-4.

19  Notably, Plaintiffs do not contend that Defendants' review of the HHS Security Assessment

20  was in any way arbitrary or capricious.[9]

21  Even if Defendants had a legal obligation to supplement the FREA, the remedy

22  sought by Plaintiffs, i.e., halting operation of the BSL-3 facility pending Defendants'

23  compliance with NEPA, is inappropriate.  A plaintiff seeking a permanent injunction must

24  satisfy a four-factor test by demonstrating: (1) that it has suffered an irreparable injury;

25  (2) that remedies available at law, such as monetary damages, are inadequate to compensate

26

27  [9] Moreover, a more recent HHS report from April 2009 notes that LLNL has since
    implemented corrective actions and made "significant progress" with respect to the
28  deficiencies identified in the 2008 Security Assessment.  AR 163 at 2.

for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  eBay Inc. v. MercExch., L.L.C., 547 U.S. 388, 391 (2006); Am.-Arab Anti-Discrimination Comm. v. Reno, 70 F.3d 1045, 1066-67 (9th Cir. 1995) ("The requirements for the issuance of a permanent injunction are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law.").  In addition, in seeking prospective injunctive relief, plaintiff must allege facts that if proven would establish that he is likely to suffer future injury if defendant is not so enjoined.  See Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1042 (9th Cir. 1999).

Here, Plaintiffs have failed to make any showing of irreparable harm from the continued operation of the LLNL BSL-3 lab.  Moreover, Plaintiffs have cited no legal authority to establish that enjoining the operation of a federal activity authorized by an existing NEPA document is either necessary or authorized while the agency considers new information or is in the process of preparing supplemental documentation under NEPA. See ONRC Action v. Bureau of Land Mgmt., 150 F.3d 1132, 1140 (9th Cir. 1998) (holding that the Bureau of Land Management was not required to halt operations under existing NEPA and program plans pending preparation of new environmental analysis).  While there certainly may be situations where such relief may be warranted, Plaintiffs have made no showing that this is such a case.[10]

## F.   COUNT 5:  FAILURE TO COMPLY WITH APPLICABLE REGULATIONS

Finally, Plaintiffs allege that the DOE improperly failed to circulate the Revised FONSI for public comment.  Am. Compl. ¶ 97.  Under NEPA regulations, "DOE shall issue a proposed FONSI for public review and comment before making a final determination on the FONSI if required by 40 CFR 1501.4(e)(2) . . . ."  10 C.F.R. § 1021.322(d).  A FONSI must be circulated in two "limited circumstances"—namely where (1) "[t]he proposed action is, or is closely similar to, one which normally requires the

---

[10] The Court's conclusion with regard to Plaintiffs' request to enjoin operation of the BSL-3 facility applies equally to all of the claims alleged in the Amended Complaint.

preparation of an environmental impact statement" or (2) "[t]he nature of the proposed action is one without precedent."  40 C.F.R. § 1501.4(e)(2).  Plaintiffs rely on the latter circumstance.

Plaintiffs allege that the proposed action, the operation of a BSL-3 lab at LLNL, is "without precedent" because the DOE only previously operated laboratories at or below BSL-2.  Am. Compl. ¶ 80.  However, whether a proposed action is "without precedent" within the meaning of § 1501.4(e)(2)(ii) depends on the nature of the action's *environmental impact*, not the identity of the acting agency.  Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army, 398 F.3d 105, 115-116 (1st Cir. 2005).  Thus, the type of laboratories the DOE has operated is inapposite.  In addition, as Defendants point out, there are 1,350 BSL-3 laboratories operating in the United States, AR 122 at 59, and the environmental impacts of such facilities have been established.  Defs.' Mot. at 20.  There is no indication in the record that any meaningful difference between the environmental impacts attendant to LLNL's BSL-3 facility and other BSL-3 faciltiies.  E.g., Hofherr Decl. ¶ 9 (noting that select agents used at the LLNL BSL-3 facility are no different "in kind or concentration" than those used at other BSL-3 facilities located throughout the San Francisco Bay Area).

Citing Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026, 18036 (1981), Plaintiffs assert that a FONSI should be circulated when a proposed action is a "borderline" case for which a reasonable argument can be made for preparation of an EIS.  Pls.' Opp'n at 19 n.12.  In particular, Plaintiffs argue that the proposed action is a "borderline case" ostensibly because the Ninth Circuit "contemplated" the necessity of an EIS when it remanded the case for consideration of potential terrorist threats.  Pls.' Opp'n at 19.  Plaintiffs read too much into the appellate court's decision.  In its memorandum decision, the Ninth Circuit stated that:  "With the exception of the lack of analysis concerning the possibility of a terrorist attack, we hold that the DOE *did* take a 'hard look' at the identified environmental concerns and that the DOE's decision was 'fully informed and well-considered.'"  Tri-Valley Cares, 2006 WL 2971561,

1   at *1 (emphasis added) (citations omitted).  While the court of appeal required Defendants

2   to consider the threat of terrorist activity in a revised EA, it did not raise concerns about the

3   other conclusions reached by the DOE.

4         Plaintiffs also posit that this is "an unusual case" because the BSL-3 laboratory is

5   located inside the gates of a DOE nuclear weapons research laboratory, and is the first

6   BSL-3 facility "managed by the DOE." Pls.' Opp'n at 20.  This argument is little more than

7   a variation of its prior, uncompelling assertion that the proposed action is "without

8   precedent."  As noted, the identity of the operating agency has no bearing on the

9   *environmental impact* of the proposed action.  Likewise, the laboratory's location within a

10   larger research facility does not alter its *environmental impact*.  While there may be

11   environmental factors unique to a specific location that may have some bearing on a

12   proposed action's environmental impact, those salient factors were considered in the

13   FREA.  AR 122 at 28-36.  At bottom, Plaintiffs have failed to demonstrate that the LLNL

14   BSL-3 facility is "without precedent."  As such, this Court finds that the DOE did not act

15   arbitrarily or capriciously in issuing the FONSI without public comment.

16       **G.**   **PLAINTIFF'S MOTION FOR LEAVE TO FILE MOTION TO AUGMENT**

17                   **DEFENDANTS' ADMINISTRATIVE RECORD**

18         Well after the close of briefing on the parties' cross-motions for summary judgment,

19   Plaintiffs filed a Motion for Leave to File Motion to Augment Defendants' Administrative

20   Record.  ECF No. 85.  Plaintiffs seek to have a report from the National Academy of

21   Sciences ("NAS"), entitled Evaluation of the Health and Safety Risks of the New

22   USAMRIID High Containment Facilities at Fort Detrick, Maryland, ostensibly to show that

23   the DOE utilized an inadequate accident scenarios in the FREA.  ECF No. 85-2 at 2.

24   Plaintiffs' motion is procedurally and substantively inappropriate.

25         As an initial matter, Plaintiffs failed to comply with Civil Local Rule 7-11(a), which

26   requires that any motion for administrative relief include a stipulation or declaration

27   explaining why a stipulation could not be obtained.  Failure to comply with the Court's

28   local rules provides grounds for rejecting Plaintiffs' motion.  See Grove v. Wells Fargo Fin.

Cal., Inc., 606 F.3d 577, 582 (9th Cir. 2010) (upholding district court's denial of motion to tax costs which was not in compliance with the court's local rules); see also Civ. L.R. 1-4 (authorizing imposition of sanctions for failure to comply with local rules).

Even if Plaintiffs' motion were properly before the Court, Plaintiffs have failed to demonstrate that the proposed augmentation is warranted.  As discussed above, except in limited circumstances, the general rule is that a court's review of an agency's compliance with NEPA is limited to the administrative record.  See Friends of the Earth v. Hintz, 800 F.2d 822, 829 (9th Cir. 1986).  Here, Plaintiffs contend that augmentation should be permitted "in order to ascertain whether the agency considered all relevant factors or fully explicated its course of conduct or grounds for decision."  Pls.' Mot. to Augment at 3-4 (quoting Asarco v. EPA, 616 F.2d 1153, 1160 (9th Cir. 1980)), ECF No. 85-2.  However, this exception "only applies to information available at the time, not post-decisional information."  Rock Creek Alliance v. U.S. Fish & Wildlife Serv., 390 F. Supp.2d 993, 1002 (D. Mont. 2005).  Since the NAS report is post-decisional information, the exception upon which Plaintiffs rely is unavailable.  But even if it were, the new report would not alter the Court's analysis, since the information contained therein in insufficient to establish that the DOE violated NEPA.

## IV.   CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED THAT:

1.      Defendants' motion for summary judgment is GRANTED and Plaintiffs' motion for summary judgment is DENIED.

2.      Plaintiffs' Motion for Leave to File Motion to Augment Defendants' Administrative Record is DENIED.

3.      The Clerk shall close the file and terminate any pending docket matters.

IT IS SO ORDERED.

Dated:  September 30, 2010

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge